**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE:                                             Case No. 20-51066-MAR

HENRY FORD VILLAGE, INC.,                          Chapter 11

     Debtor.                                      Honorable Mark A. Randon

_____/

**DECLARATION OF CHIEF RESTRUCTURING OFFICER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION**
**AND FIRST DAY PLEADINGS**

I, Chad J. Shandler, as Chief Restructuring Officer of nonprofit Henry Ford Village, Inc., hereby declare under penalty of perjury:

1.  I am the Chief Restructuring Officer (the "CRO") of Henry Ford Village, Inc., a Michigan nonprofit corporation and the above-captioned debtor and debtor-in-possession ("HFV" or "Debtor"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2.  I am a Senior Managing Director, Corporate Finance & Restructuring at FTI Consulting with my practice focused on identifying restructuring alternatives, developing financial and operating plans and building consensus with stakeholders across a wide spectrum of healthcare assignments. My expertise includes serving as a Chief Restructuring Officer and advising stakeholders with an emphasis in

continuing care retirement communities, assisted living facilities, skilled nursing facilities, freestanding emergency rooms, physician practices, and hospitals. I am often asked to assess financial performance, compare operating results to industry norms, develop "bottoms-up" multi-year financial forecasts, prepare business valuations, support asset sales and due diligence processes, arrange financing and evaluate marketing plans, marketing efforts, and demographics of primary market areas and otherwise advise with respect to restructuring options.

3. A representative list of my previous clients includes Neighbors Health, Adeptus Health, Arlington of Naples, Hygea Holdings, Walker County Hospital District, Kingswood Retirement Community, Inverness Village, Dowling College, St. Francis Hospital and Health Centers, UGHS Senior Living, Erickson Retirement Communities and Tarragon Corporation. My FTI Consulting bio can be found at: https://www.fticonsulting.com/our-people/chad-shandler.

4. In August 2020, FTI was initially retained as a financial advisor to HFV's legal counsel after an extensive interview process of multiple financial advisory firms. On October 16, 2020, my role was changed to that of CRO leading financial oversight of HFV. I have become generally familiar with the Debtor's day-to-day operations and financial affairs, I have personal knowledge of, and am familiar with, the operations, books and records, and financial condition of the Debtor. Except as otherwise noted, I have personal knowledge of the matters set

forth herein or have gained knowledge of such matters from the Debtor's board of directors, employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

5.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "Chapter 11 Case") and in support of: (a) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") filed on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Court"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and pleadings (collectively, the "First Day Pleadings").

6.      The Debtor remains in possession of its assets and continues to operate its business as debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

7.      No trustee, examiner, or committee has been appointed in this Chapter 11 Case.

8.      To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into four sections. Section I provides an Introduction.  Section II provides an overview of the Debtor and its operations.  Section III provides an overview of the Debtor's secured

financing structure and entrance fee liability. Section IV describes the Debtor's circumstances leading to the commencement of the Chapter 11 Case and Debtor's anticipated course of action in the Chapter 11 Case. Section V sets forth the relevant facts in support of each of the pleadings this Declaration supports (the "First Day Pleadings")

9. The Debtor seeks the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Case on business operations and to maximize the value of its assets. I have reviewed the Debtor's petition and the First Day Pleadings, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

10. References to the Bankruptcy Code, the Chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my professional experience. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## I.  **Introduction:**

11. HFV is a nonprofit, nonstock corporation established to operate a senior continuing care retirement community (commonly referred to as a CCRC) with a beautiful campus located at 15101 Ford Road, Dearborn, Michigan 48126. Debtor

provides senior living services comprised of 853 independent living units, 96 assisted living units and 89 skilled nursing beds, of which 89 are certified for Medicare and 27 of which are dually certified for Medicare and Medicaid (the "Facility"). Hence, the Facility, the components of which are all physically connected, provides a place in which seniors can stay at the Facility and continue to have their needs met as they move through differing phases of life. HFV has an independent active volunteer board of directors, the vast majority of which are current residents and relatives of former residents.

12.     The biggest financial challenge for the Facility is due to the contingent unfunded entrance fee liabilities. Under the business model created by the original management company in 1998, entering independent living residents pay an entrance fee based on the type of unit, which has varied over the years since 1998 but that, as of January 1, 2020, range from $27,500 to $356,000. Payment of the entrance fee grants the resident right to occupy a unit and receive continuing care services, provided the resident also pays the applicable monthly service fees, subject to HFV's commitment under its charity care policy to provide care for residents who outlive their resources. Entrance fees generally have a refundable component (subject to certain conditions further described below), as well as a nonrefundable component that is either immediately nonrefundable or nonrefundable as it is "earned" by HFV on an amortized basis for each month of residency by the resident.

Entrance fees paid by new residents are used by HFV to pay entrance fee refunds to former residents. Hence, ongoing financial success is dependent on multiple factors that impact occupancy of HFV units, including the overall economy and the real estate market, given many residents use the equity from the sale of their home to pay their entrance fee to HFV. While HFV has struggled under the entrance fee business model and its debt load, HFV's financial situation became progressively worse through the years as the entrance fee liabilities to former residents continued to grow. In addition to a change in management companies and implementing expense reduction measures, HFV aggressively sought relief from its long-term debt obligations through a debt refinancing scheduled to close earlier in 2020, when the financial markets were more favorable. The 2020 refinancing – like so many other things – was upended by the COVID-19 pandemic and not completed. Hence, in addition to its endemic challenges, COVID-19 became an additional and significant contributing factor compromising HFV's financial viability.

13. To help offset the financial impact of the COVID-19 pandemic and provide additional liquidity to the Facility, on April 10,2020, HFV applied for funding pursuant to the Paycheck Protection Program ("PPP") through its bank, Comerica Bank. On April 20, 2020, HFV received a loan for approximately $2.7 million pursuant to the PPP. Additionally, on April 9, 2020, HFV received $840,650 pursuant to the Centers for Medicare & Medicaid Services ("CMS") Expanded

Accelerated and Advance Payments Program. CMS may attempt recoupment of these funds in April, 2021.

14.     The impact of the COVID-19 pandemic made an already difficult situation unsustainable, thereby resulting in this Chapter 11 case. The goal is to utilize the process under Chapter 11 of the Bankruptcy Code to appropriately address liabilities and provide HFV with the opportunity to achieve a more sustainable capital structure and build a strong financial foundation, while continuing to serve its residents with the highest quality of care and lifestyle.

## II.     <u>Overview of the Debtor's operations and management</u>

15.     Henry Ford Village, Inc. was incorporated in 1992 as a Michigan nonprofit charity corporation for the purpose of providing housing, healthcare and other related services to the elderly. As set forth in HFV's Articles of Incorporation, the stated mission of the organization is to "promote the health of the elderly through the ownership and or operation of one or more residential communities offering various levels of care services for elderly persons; carry on educational activities related to the promotion of health of the residential community; promote and carry on scientific research related to the promotion of health of the residential community; perform other activities permitted by nonprofit corporations under the laws of the State of Michigan."

16.     The Facility is located on the birth site of Henry Ford, on 35 acres of land and is known as "Henry Ford Village."  HFV offers residents of the Facility a continuum of care through three residential levels: Independent Living Units, Assisted Living Units and Skilled Nursing Community, allowing residents to age in place by providing them the increased levels of healthcare and other services that are needed as residents age or health otherwise changes (short of hospital care). Both the Independent Living and Assisted Living levels of care consist of 100% private pay.[1] There are several "service packages" available for assisted living at different fee levels, depending on the staff assistance needed by the resident. All buildings within the Facility are interconnected, allowing residents to walk from one neighborhood to another without regard to the weather. The Facility's amenities include two community buildings, dining rooms, a convenience store, bank, beauty salon/barbershops, game rooms, a music room, an aquatic center, classrooms, a library, a woodwork and hobby shop, a computer lab, an in-house cable television station, a non-denominational chapel, walking paths and a health club (collectively, the "Common Facilities"). The services provided within the Common Facilities include an on-site Medical Center (physician clinic) and services for resident organizations. As of October 22, 2020, the Debtor had the following occupancy

---

[1] Residents may have the benefit of long-term care insurance to offset the cost associated with their monthly service fees.

rates, which were significantly impacted by the ongoing COVID-19 pandemic, including restrictions under Executive Orders of the Governor of Michigan as to entry into residential care facilities and new admissions to skilled nursing facilities and homes for the aged:

|  | Census | Capacity | Percent Occupied |
|---|---|---|---|
| Independent Living Units | 587 | 841 | 68.8% |
| Assisted Living Units | 52 | 96 | 54.2% |
| Skilled Nursing Units | 38 | 89 | 42.7% |

17. While the Michigan Continuing Care Community Disclosure Act[2] requires the Board of Directors of HFV to have at least one resident representative and makes it optional for the resident representative to have voting rights, HFV has granted voting rights to its resident board members and HFV has an active volunteer Board of Directors all of which, except for two people, are either residents or the relatives of current or former residents of the independent living portion of the facility:

| Jesmore, Donald | Current Resident |
|---|---|
| Hiveley, Linda | Current Resident |
| Posa, Mary Lou | Relative of Current Resident |
| Talamonti, Dr. Walter | Relative of Current Resident |
| Falzon, Peter | Relative of Current Resident |

---

[2] See Continuing Care Community Disclosure Act §554.913.

| Byrne, John | Relative of Former Resident |
|---|---|
| Ross, Karen | None |
| Yun, Curt | None |

18.     In addition, the Board of Directors is advised by a Resident Council elected by the residents of Debtor.

19.     Erickson Retirement Communities ("Erickson"), was a developer and manager of communities for seniors and Erickson was responsible for all planning, design, initial marketing and construction of the Facility. Hence, the Facility is often referred to in the industry as an "Erickson Model" community. Unfortunately, although it is a beautiful large senior living complex, the manner in which it was built and certain other circumstances posed significant challenges from a financial perspective and despite the efforts of different management companies for the Facility, HFV has not been able to successfully reorient the campus offering to better meet challenges in its market area for entrance-fee based senior living options.

20.     On September 8, 1998, HFV purchased the Facility and the Facility Site and Erickson continued to operate and manage the Facility until 2009.

21.     Erickson itself filed bankruptcy in or about December 2009 and was acquired in its proceeding by Redwood Capital Investments LLC, which then took over management of the Facility. On November 30, 2010, HFV ended its relationship with Redwood and on December 1, 2010, Life Care Services LLC, d/b/a

Life Care Services, an Iowa limited liability company ("LCS") was engaged to operate the Facility and provide management services pursuant to the terms of a Management Agreement. Due to its financial difficulties, and pursuant to rights under the contract with LCS, HFV ceased paying management fees to LCS and currently owes LCS in excess of $2.5 million dollars in past due management fees. However, two of LCS employees are critical to the Facility's operations and per the terms of the LCS contract, HFV reimburses LCS the salaries of the two LCS employees.[3] The first of these LCS employees is Bruce Blalock who joined HFV in 2013 as the Executive Director and is responsible for daily operations. Mr. Blalock has decades of experience in operating senior living facilities and has worked to streamline and improve HFV operations throughout his tenure at HFV. Prior to my appointment as CRO, the CFO of HFV, Kushant Shah, was reporting to Mr. Blalock. However, since becoming CRO the CFO now reports to me, both Mr. Blalock and I work closely together, and each of us report directly to the Board of Directors.[4]

---

[3] HFV does not intend to pay any arrearages owed to LCS during the bankruptcy case but does intend to reimburse LCS the post-petition salaries of these two individuals in the ordinary course of business and as such the payments are accounted for in the cash collateral budget described below.

[4] Due to circumstances created by COVID-19 and the population of the Facility, noncritical visitation to the Facility remains limited. and I have not physically visited the Facility. As such, I have been working remotely with Mr. Blalock continuing to work on sight overseeing operations.

22.     The second LCS employee critical to HFV operations is Heather Scott, Assisted Living and Skilled Nursing Administrator.  Ms. Scott, is a licensed nursing home administrator and is responsible for the day to day operations of the skilled nursing and, assisted living portions of the community. She also oversees compliance with all state and federal regulations, the Elder Justice Act, and HIPAA.

23.     HFV currently operates the Facility with a staff of approximately 522 employees (206 fulltime and 316 part-time). HFV employees provide most resident services, perform building maintenance and grounds-keeping services and perform other miscellaneous services. HFV offers its employees a broad range of benefits, including a 403(b) or 401(k) retirement plan, life insurance coverage, dental coverage, vacations, an employee assistance program and a health care plan with managed care. HFV is an equal opportunity employer.

## III.   General Description of Secured Tax Exempt Bonds And Entrance Fee Structure[5]:

### A.   Secured Tax Exempt Revenue Bonds

24.     The Debtor's primary secured financing arose as a result of the issuance of two series of tax-exempt revenue bonds. The first bond financing was the Economic Development Corporation of the City of Dearborn (Michigan) Limited

---

[5] The discussion contained herein regarding the entrance fee contract structure is intended as a high-level general overview and is not intended to modify the entrance fee contracts.

Obligation Revenue and Refunding Revenue Bonds (Henry Ford Village, Inc. Project), Series 2008 bonds (the "Series 2008 Bonds") issued by the Economic Development Corporation of the City of Dearborn, Michigan (the "Authority") in the principal amount of $42,535,000.

25.    Debtor was further financed through the issuance of the Economic Development Corporation of the City of Dearborn Limited Obligation Revenue Bonds (Henry Ford Village, Inc. Project), Series 2017 bonds (the "Series 2017 Bonds") by the Authority in the principal amount of $14,185,000.

26.    In connection with the issuance of the Series 2008 Bonds and the Series 2017 Bonds and the loans to the Debtor related thereto, the bond and loan documents (all collectively the "Bond Documents") include the Trust Indenture, dated as of October 1, 2008 (the "Original Indenture") between the Economic Development Corporation of the City of Dearborn as the "Issuer" and UMB Bank, N.A, successor trustee to U.S. Bank, National Association, as "Bond Trustee." The Original Indenture granted the Bond Trustee a security interest in the Issuer's rights under the corresponding Loan Agreement (the "Original Loan Agreement") and the Mortgage and Security Agreement (the "2008 Mortgage") between Debtor and the Authority. The Original Loan Agreement governs the Issuer's loan to Debtor of the proceeds of the sale of the 2008 Series Bonds. The 2008 Mortgage was made by Debtor for the benefit of the Bond Trustee. For the 2017 Series Bonds, the Bond Documents

include the Original Indenture, the First Supplemental Trust Indenture between the Issuer and the Trustee, dated September 1, 2017 (the "Supplemental Indenture," and together with the Original Indenture, the "Indenture"), and the Original Loan Agreement, as amended by the First Amendment to Loan Agreement dated as of March 5, 2012 and the Second Amendment to Loan Agreement, dated as of September 1, 2017 and supplemented by the Supplement to Loan Agreement dated September 1, 2017 (collectively, the "Loan Agreement").

27.     Under the Bond Documents, the Bond Trustee was granted a first priority lien and security interest on substantially all of Debtor's assets including Receipts (collectively, the "Prepetition Collateral") with the exception of certain specific assets, including certain "restricted" funds held in certain accounts of Debtor (the "Restricted Funds").

28.     On October 2, 2020, HFV received a notice of default from the Bond Trustee.  On October 22, 2020, HFV received a notice of  acceleration of the Bond obligations and upon information and belief the Bond Trustee setoff various reserve accounts (the "Trustee Reserve Accounts") supporting the loans to Debtor arising out of the bond financing.

29.     As of the Petition Date, the total outstanding principal obligation owed by Debtor under the Loan Agreement and other Bond Documents is approximately $52,330,000 (the "Prepetition Obligations").

### B.     <u>Overview of Entrance Fee Obligations</u>

30.     The Residence and Care Agreement between HFV and each resident of the Facility governs the primary aspects of residency and care at the Facility, including provisions regarding transfers from Independent Living Units to Assisted Living Units or the Skilled Nursing Facility. With respect to Independent Living and Assisted Living Units, prospective residents pay a 10% deposit to reserve their specific independent living unit, the total amount of which will vary based on the entrance fee associated with the unit to be occupied. The initial 10% deposit is referred to as an "advance deposit" and is applied to the full entrance fee , which is paid upon execution of  a residence and care agreement or continuing care agreement ("<u>Residence and Care Agreement</u>"). The advance deposits, which are fully refundable with interest, are held in escrow until the resident executes their Residence and Care Agreement and takes occupancy of their applicable Independent Living Unit or Assisted Living Unit. On or before taking occupancy of an Independent Living Unit or Assisted Living Unit, the resident is required to pay the remainder of the entrance fee in full or sign a short-term promissory note.

31.     The entrance fee, or a portion thereof, is refundable to a resident upon the resident's termination of the Residence and Care Agreement and departure from the Facility or upon a resident's death, and is due no later than 30 days (under the current form of Residence and Care Agreement) after (i) the resident has vacated

and has removed all possessions from the living unit, (ii) the resident has signed a unit release for the living unit, (iii) all outstanding fees and charges (including health care obligations) are satisfied, and (iv) a qualified, new resident has signed a new Residence and Care Agreement for the living unit and has taken possession of the Independent Living or Assisted Living Unit. Hence, HFV may defer refunding the entrance fee when a resident departs the Facility and the Residence and Care Agreement is terminated until the vacated unit is occupied by a new resident. When a resident permanently transfers from an Independent Living Unit to a unit in Assisted Living or Skilled Nursing Facility, the resident does not pay a new entrance fee; rather the entrance fee paid by the resident for the Independent Living Unit follows the resident. Once the Independent Living Unit is permanently vacated, it can be occupied by a new resident who may pay an entrance fee for such unit. However, since the entrance fee paid by the prior resident is not refundable until after the prior resident terminates the Residence and Care Agreement and departs the Facility or passes away, there is usually an extended period of time before the refund is paid.

32.     In addition to entrance fees, residents pay a monthly fee which varies based on the type of unit, and with respect to assisted living, the level of services needed. The monthly rate for residents transferring from Independent Living Units to Assisted Living Units or Skilled Nursing Facility is the same rate charged to

residents who are admitted directly to these levels of care. Both the Independent Living and Assisted Living levels of care consist of 100% private pay.[6] There are several "service packages" available for assisted living at different fee levels, depending on the staff assistance needed by the resident.

33.     As of October 22, 2020, there were 60 Independent Living Units occupied by individuals on a landlord-tenant rental basis and who have not paid an Entrance Fee or entered into a Residence and Care Agreement. Rather, these individuals have entered into rental lease contracts, under which the individuals pay a monthly rent that ranges from $1,868 to $4,176 per month. Individuals occupying a unit at HFV under a rental contract do not receive continuing care or health care benefits. Rental lease contracts have an initial term of one year. Following the initial term, an individual may elect to rent the unit for successive one-month terms. When entrance fee Independent Living Units are occupied by rental lease contract residents, the entrance fee refund provision is triggered, resulting in an entrance fee refund payment, if any, being due to the prior resident of the unit.

## IV.    OVERVIEW OF CAUSES LEADING TO THE CHAPTER 11 FILING AND PATH FORWARD

### A.    Overview of Causes leading to this Bankruptcy Case.

---

[6] Residents may have the benefit of long-term care insurance to offset the cost associated with their monthly service fees.

34.     The principal financial problems HFV faces are associated with its large unfunded entrance fee refund liability which continues to grow. At the time HFV acquired the Facility, it also inherited significant entrance fee refund liability "overhead" and there were inadequate operating reserves set aside to cover entrance fee turnover and occupancy fluctuations as part of the ownership transfer. Over time, the large unfunded entrance fee refund liability depleted HFV's limited capitalization and negatively impacted HFV's flexibility to make entrance fee pricing adjustments, build liquidity reserves or make capital improvements. As of October 22, 2020, the current make up of entrance fee liability is, in approximate amounts, as follows: $7.0m of triggered entrance fee refunds due associated with 74 former residents, approximately $27.2m in untriggered liabilities (associated with units not re-occupied) with respect to 212 former residents and approximately $78.1m of untriggered refund liabilities for 557 current residents.

35.     Throughout its ownership, HFV has had to contend with significant increased competition in the extended care marketplace. It was also faced with such relatively recent events as the housing crisis, the Great Recession, and the bankruptcies of GM and Chrysler, all of which decreased the number of people who could sell their homes and move into facilities like the HFV Facility. HFV was working to dig itself out of the hole these events caused and then COVID-19 struck.

36. Now being hit with a pandemic, HFV, like all senior living facilities across the country and globe, was dramatically impacted. Challenges included unexpected increased operating expenses associated with combating the pandemic; the tragic death of residents (see the following link for a report on COVID-19 cases and deaths in Michigan senior living communities: https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173-526911-- ,00.html); and a significant decrease in the pool of potential residents. Other examples are:

- In the necessary interest of health and safety, HFV immediately closed everything from potential resident appointments to external visitors and dining/activity programs, a vital part of our day-to-day life.

- Hospitals substantially decreased, if not eliminated entirely, medical procedures that require rehab substantially reducing the skilled nursing center occupancy.

- Assisted living occupancy went down by nearly half due to normal attrition and COVID-19 impacts.

- The Facility continues to face increased operating expenses to combat the pandemic such as tests and testing equipment, increased cleaning, increased liability insurance premiums, personal protective equipment, and increased staffing costs.

- The pool of potential residents has significantly decreased due to the large number of seniors in Michigan that have passed away because of COVID-19.

37. With respect to this last factor, per the official state records, as of October 2, 2020, there were 5,155 deaths of Michigan residents ages 64 and up due

to COVID-19, and 2,429 deaths in that age group attributed to a combination of COVID-19 and pneumonia. (https://www.mdch.state.mi.us/pha/osr/Provisional/CvdTable2.asp.) Many seniors are generally staying at home and socially distancing and there remains a reluctance from certain of the applicable population to entertain moving from homes into this type of residential facility at this time.[7] In addition, some seniors who were in residential facilities left those facilities and moved in with family members.

38.     Even for those who are still considering a move to a residential facility during the pandemic, HFV has been subject to strict limitations on visitors which prevented HFV from showing vacant units to prospective residents and preventing tours of the facilities.

39.     Facing the above challenges, in May 2020 HFV did not make payment Bond-related payment obligations, although no default was declared at that time. On June 10, 2020, the State of Michigan Department of Licensing and Regulatory Affairs ("LARA") ordered (the "LARA Order") that all new entrance fee deposits must be placed in escrow. The LARA Order included a finding that:

> As of April 30, 2020, Respondent reported to the Department that it owes $5,030,785.63 in past-due entrance fee refunds, ranging in severity from thirty days or less past-due, to greater than 181 days past-due. Analysis by Department staff reveals that the balance of past-due

_____

[7] There does, however, also appear to be some turn in that conversely, as we enter into a second winter season in the pandemic, some seniors are actively seeking residency at HFV as opposed to a more isolated home alone environment.

entrance fee refunds has increased from month-to-month in twenty-five of the last twenty-six months, and that Respondent's financial condition has deteriorated.

The Department finds that Respondent is insolvent or in jeopardy of becoming insolvent, and that escrow of entrance fees is necessary and appropriate to protect prospective members.

40.     After working closely with LARA to develop an escrow agreement and process, an escrow account was established in which all entrance fees collected after entry of the LARA Order are being placed in escrow in the approved third-party escrow account.

41.     In addition to the above, in 2014 a class action lawsuit was filed in Wayne County Circuit Court against HFV, LCS, and one of HFV's former management companies captioned *David Plumley v. Erickson Retirement Communities et al*., Case No. 14-006796-CK (the "Plumley Lawsuit").[8] In the Plumley Lawsuit, the class plaintiffs asserted a variety of claims associated with alleged entrance fee liabilities. The "Settlement Class" was defined by the court as all persons, and the representatives of their estates, who entered into Residence and Care Agreements with Henry Ford Village prior to December 1, 2000 who have received less than a 100% percent full refund (adjusted for agreed upon outstanding charges) of their entrance deposit (subject to opt outs of the class). HFV disputed the

_____

[8] In addition, a number of additional independent lawsuits have been filed by entrance fee claimants

claims made. Mediation was held on August 8, 2019 at which time a settlement agreement was reached in principle. However, for a variety of reasons, including required periods for class members to be given notice of the settlement and the opportunity to opt-out, the settlement agreement was not fully and finally approved by court order until August 21, 2020. The settlement called for defendants to make payments into a settlement escrow. HFV was to pay $800,000 (the "<u>Settlement Payment</u>") on or before October 12, 2020. Defendant LCS and defendant Redwood-ERC Management, LLC paid $200,000 and $150,000, respectively by that date (the "<u>Settlement Funds</u>").[9] Out of the Settlement Payment $496,000 would be distributed to class counsel and the remainder was to be paid to "Group 1" of the class action plaintiffs who, in essence, were entrance fee claimants who had previously accepted less than their asserted claims. The settlement also called for HFV to, in the future, add interest to the refund amount due after a certain amount of time had passed without a refund being made. In light of HFV's recognition of its financial position and the Bond Trustee's opposition to the Settlement Payment,[10] HFV filed a motion

---

[9] Upon information and belief, the other two defendants did make their settlement payments into the settlement escrow.

[10] The Bond Trustee filed a motion to intervene in the Plumley Lawsuit and asserted that it had a first priority security interest in any funds that HFV would use to make the Settlement Payment and that the Settlement Payment would threaten HFV's ability to continue operating, and sought to prevent HFV from making the Settlement Payment.

seeking relief from having to make the Settlement Payment, which motion was heard on October 22, 2020. The court denied HFV's motion and ordered that HFV make the Settlement Payment within 7 days, resulting in the timing of this bankruptcy case.

42. In the end, for a business model dependent on new residents to fill vacancies, the increased vacancies and reduced opportunities to fill them, combined with a lack of ability to utilize new entrance fees which are being escrowed (and thus protected for new resident), a variety of lawsuits having been brought by entrance fee claimants (including the pending Plumley Settlement Payment), and the challenges associated with operating a Facility like this during a pandemic and the associated increased operational costs arising therefrom, the proverbial perfect storm had occurred giving rise to this filing as the best path towards restructuring for HFV.

**B. Debtor's Path Forward**

43. The Debtor will seek to run a marketing process while in Chapter 11 to find a strategic or financial acquirer or sponsor to put the Debtor on a solid financial footing to provide for the residents and patients that rely upon the Debtor now and into the future. The Debtor believes it has sufficient cash collateral to continue operations during a potential sale process over the next thirteen weeks, but will likely require additional liquidity to complete this case.

## V.   **FIRST DAY PLEADINGS**

44.    Contemporaneously with the filing of its chapter 11 petition, the Debtor has filed the First Day Pleadings.  The Debtor requests that each of the First Day Pleadings described below be granted, as they are vital to enabling the Debtor to maintain business operations with minimal disruption, protect its residents, and maximize the value of the Debtor's estate.

### A.    **Schedules/Statement of Financial Affairs Extension Motion**

45.    Pursuant to the *Motion Of Debtor For Entry Of An Order Extending The Deadline To File Schedules And Statement Of Financial Affairs,* the Debtor seeks entry of an order extending the deadline to file its: (a) schedules of assets and liabilities, (b) schedule of current income and expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statement of financial affairs (collectively, the "Schedules and Statements") by an additional nineteen (19) days, from the date such Schedules and Statements are otherwise required to be filed, to thirty-three days from the Petition Date, without prejudice to the Debtor's ability to request additional time to file the Schedules and Statements should it become necessary.

46.    I believe cause exists for the following reasons: (a) the size and complexity of the Debtor's business; (b) the number of creditors; (c) the number of interested parties; and (d) the burden that would be imposed on the Debtor to file

schedules and statements within the next fourteen (14) days. To completely and accurately file Schedules and Statements, the Debtor must collect, review, and analyze a substantial amount of information.

47.     Prior to the Petition Date, the Debtor, its advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. The Debtor is working expeditiously to prepare and file its Schedules and Statements, and I believe, given the size of the Debtor's business and the amount of information required to adequately prepare such Schedules and Statements, the Debtor respectfully requests an extension to November 30, 2020, without prejudice to the Debtor's right to request further extensions, for cause shown.

### B.     HIPAA/Resident Confidentiality Motion

48.     Pursuant to the *First Day Emergency Motion Of The Debtor For Entry Of An Order Authorizing The Implementation Of Procedures To Maintain And Protect Confidential Resident And Patient Information*, the Debtor respectfully requests entry of an order authorizing the disclosure of "protected health information" and the implementation of procedures to protect such information of the Debtor's Residents, as defined required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations.

49. The Debtor is in the business of operating an independent living, assisted living, memory care, and skilled nursing facility that provides, among other things, nursing and rehabilitation services to individuals. In the ordinary course of business, the Debtor has access to and receives "protected health information" and data relating to Residents, which the Debtor is required to confidentially maintain pursuant to HIPAA.

50. As further set forth in the HIPAA/Resident Confidentiality Motion, in an effort to comply with both federal statutes, the Debtor has proposed procedures to maintain confidentiality during the pendency of this Chapter 11 Case (the "Privacy Procedures").

51. The Debtor believes that the relief requested appropriately balances the need to maintain confidential information under HIPAA with the need for adequate disclosure under the Bankruptcy Code, and respectfully requests that the Court grant the relief requested therein.

### C. Cash Collateral Motion

52. Debtor has filed its *First Day Emergency Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion"). In the Cash Collateral Motion, Debtor seeks Court authority to use the cash collateral of

the Bond Trustee (and any other party that has an interest in Debtor's cash collateral) on an interim basis and a final basis.

53.    On an interim basis, Debtor seeks to immediately use cash collateral to pay essential and critically necessary expenses of the Debtor in conformity with the Interim Order, which is attached to the Cash Collateral Motion as Exhibit A, and the proposed Interim Budget, which is attached to the proposed Interim Order as Schedule A.

54.    The obligations to be paid consist of ordinary course expenses such as employee payroll and benefits, ongoing vendor and contract obligations necessary for Debtor to effectively operate the Facility, insurance, utilities, and other goods and services necessary for Debtor to meet its current and immediate obligations related to Debtor's Residents.

55.    The Debtor has determined that, absent the use of Cash Collateral on an interim basis as provided in the Cash Collateral Motion, Interim Order and Interim Budget, it will be unable to operate its business, immediately and irreparably harming the Debtor's operations, estate, creditors and Residents.

56.    Without the use of Cash Collateral on both an interim and final basis, the Debtor will be unable to continue normal operation of its business and the Facility during the Chapter 11 Case. The Debtor anticipates being able to subsist on

cash collateral on an interim and final basis while it addresses sale or reorganization options.

57.     If the Debtor is unable, on an ongoing and consistent basis, to maintain its business and demonstrate financial stability to existing and future creditors and Residents, the Debtor will lose existing Residents, key employees, and vendors, will be unable to attract new Residents and will likely be forced to cease operations. The devastating harm this will cause to the Residents and the creditors associated with Debtor's senior living Facility should be readily apparent. The Facility is the home for up to a thousand senior Residents which rely on the Facility for day to day living and, for many, medical support and services associated with same. The Debtor's immediate access to Cash Collateral is necessary to preserve and maximize value for the benefit of all parties in interest. Thus, the use of Cash Collateral is essential to Debtor's continued ability to operate, maintain the value of its assets and properly care for its Residents until a sale or consummation of a plan in the Chapter 11 Case.

58.     The Debtor reasonably believes that the Interim Budget will be adequate, considering all available assets, to pay necessary administrative expenses due or accruing during the period covered by the Interim Budget. Without approved use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and the entire bankruptcy proceeding will be jeopardized to the significant detriment of the Debtor's estate and its creditors.

20-51066-mar    Doc 21    Filed 10/28/20    Entered 10/28/20 21:12:03    Page 28 of 42

59. As noted in the Cash Collateral Motion, Debtor believes the Bond Trustee has a lien on all assets of the Debtor (except certain "Restricted Funds"). Thus, Debtor believes the Bond Trustee clearly has an interest in "Cash Collateral". Indeed, the Debtor believes that all or substantially all of its available cash constitutes assets in which the Bond Trustee has a security interest in and is therefore unable to continue its business operations without the ability to use such Cash Collateral. The Debtor's ability to fund its ongoing post-petition operations is vital to the preservation and maintenance of the value of the Debtor's assets. As a result, the proposed Interim Order provides the Bond Trustee with adequate protection in the form of replacement liens, a superpriority claim, stipulations as to its debt and liens, financial reporting and other protections which are, in my experience, customary in Interim Cash Collateral Orders in a case like the Debtor's Chapter 11 Case. I believe the adequate protection offered to the Bond Trustee in the Interim Order is sufficient and appropriate on an interim basis to support Debtor's use of cash collateral.

60. After considering its alternatives, the Debtor has concluded that the use of Cash Collateral pursuant to the terms of the proposed Interim Order for the interim period and thereafter on a final basis per a Final Order represents the best option available to interested parties, which funds will be used to maintain the Debtor's

assets, meet its administrative obligations, and maintain its high standards for the benefit of its Residents during the Chapter 11 Case.

61.     Based on my experience, the use of Cash Collateral and adequate protection proposed in the Interim Order and Interim Budget protects the Bond Trustee, or any other party with an interest in cash collateral, against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral and is fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by fair consideration.

62.     At this time, the Debtor is not contemplating the need for postpetition financing. Instead, the Debtor intends to operate its business solely on the use of the existing Cash Collateral. Access to Cash Collateral on an interim and, ultimately, final basis will provide the Debtor with the liquidity necessary to ensure that the Debtor has sufficient working capital and liquidity to operate its business, maintain its high standard of Resident care, and thus preserve and maintain the value of the Debtor's estate. Without access to such liquidity, the Debtor and its estate will face irreparable harm.

63.     Immediate use of Cash Collateral is necessary and will be used for funding business operations and allowing the Debtor to transition into the Chapter 11 Case. Immediate access to this liquidity will permit the Debtor to fund payroll,

pay vendors, provide Resident care, and otherwise continue business in the ordinary course.

**D.    Cash Management Motion**

64.    Pursuant to the Cash Management Motion, the Debtor seeks the entry of interim and final orders (i) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank accounts and business forms; (ii) granting the Debtor a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Eastern District of Michigan (the "U.S. Trustee") to the extent that such requirements are inconsistent with the Debtor's practices under the existing Cash Management System; and (iii) authorizing, but not directing, the Debtor to continue to maintain and use existing deposit practices.

65.    Before the Petition Date, the Debtor maintained a cash management system (the "Cash Management System"). As part of the Cash Management System, the Debtor maintained eight (8) bank accounts at Comerica Bank (the "Bank Accounts"), as more fully described below and on Exhibit A to the Cash Management Motion.

66.    Debtor's accounts at Comerica Bank are accounts used to facilitate normal operations, including its general operating account, its payroll account, a credit card collateral account supporting its procurement cards used by employees

to purchase necessary goods and services, and a lease security deposit account. These accounts are necessary for Debtor to efficiently and appropriately operate its Facility.

67. The Bank Accounts also include two accounts (the Residents Clubs Account and the Benevolent Care, Scholarship and Quality of Life Donations account) which Debtor maintains and operates for the benefit of its Residents. Funds in these two "restricted accounts" are funds of Debtor's Residents or donated funds to be used for benevolent purposes with respect to Debtor's Residents, and the facility the funds are used for the charitable and benevolent purposes for which the accounts were established as described in the Cash Management Motion.

68. Debtor also has two (2) other accounts at Comerica that were used to hold potential Residents deposits and Resident Entrance Fee funds but those accounts are no longer going to be used for that purpose as a result of the effectuation of the Escrow Agreement and Escrow Account with the Escrow Agent under the Entrance Fee Escrow Order procedures described in the Cash Management Motion. One of those accounts will continue to hold funds, however, as certain non-specifically identifiable deposits will remain in the Pre-Occupancy Deposit Account.

69. The Debtor also maintains four accounts at Merrill Lynch (the "ML Accounts") as part of its Cash Management System as follows:

(a)      Marketable Securities Account (Inactive) (Account #2175) - This account previously held marketable securities and other investments, but

Debtor determined it was best to convert these assets to cash and deposit the resulting funds into a money market account at Merrill Lynch. This was done and the account is inactive and Debtor expects to close it post-petition.

(b)     Marketable Securities Account (Acct. #2157) - This account holds the funds from Acct. #2175 arising from the liquidation of the investments described immediately above. The funds are held in an associated Bank of America money market account. The Debtor's Board established this account as an investment account for Debtor and it is maintained as such. The balance of the account is approximately $2.48 million.

(c)     Charitable Annuities Account (Acct. #2119) - This is a charitable gift annuity account holding annuities related to Debtor's Residents. The annuities are paid to the respective Resident and, upon that Resident's death, the remaining annuity funds go to the Debtor. These annuity funds are "Restricted Funds" not considered by Debtor to be Debtor funds included in the Estate are not cash collateral and are not useable by Debtor as general operating funds or cash. The Funds are currently and only usable for the Residents for whom the annuity was established. The balance in this account (reflecting Debtor's potentially payable current share from all of the annuity were the annuity payment to Debtor provisions triggered) is approximately $112,500.00. This marketable securities account holds funds in a money market account.

(d)     Endowed Scholarship Account (Acct. #2117) - The funds held in this account are funds donated to Debtor to endow scholarships. The funds are to be used to ultimately fund scholarships for Debtor's employees pursuing a college education for specific educational tracts although no specific scholarships have been established at this point. These funds are "Restricted Funds" not considered by Debtor to be Debtor funds included in the Estate and are not cash collateral and are not funds useable by Debtor as general operating funds or cash. The funds are only usable for the scholarship purposes for which they were donated. The balance in this account is approximately $429,320.00. This is a marketable securities account holding fixed income, equities and mutual fund investments as well as cash accounts. Debtor proposes that this account simply remain in place pending establishment of the intended scholarships.

70.     Debtor seeks to maintain the ML Accounts as described above and to use the funds in such accounts for the purposes for which such accounts were

established, consistent with the customary and ordinary practices existing pre-petition with respect to such accounts and the funds and other assets therein.

71.     There were four accounts held by the Bond Trustee, UMB Bank, N.A. (the "<u>Bond Trustee</u>"), under the bond financing transactions and related loan and other agreements entered into by the Debtor. All of these accounts were maintained by the Bond Trustee at UMB Bank, N.A. and are not affected by the relief sought in this Motion. Debtor has been advised by the Bond Trustee that the Bond Trustee has set-off all of the funds in these reserve accounts as a result of the acceleration of the bond debt so the balance in each is purportedly now zero.

72.     The Debtor's Cash Management System involves routine deposits into, withdrawals from, and transfers of funds between Bank Accounts by various means, including checks, wire transfers, and ACH transfers. On a daily basis, the Debtor processes large numbers of transactions through its Cash Management System.  At all times, the Debtor keeps current and accurate records of all transactions processed through its Cash Management System and of its Bank Accounts.

73.     The Debtor's Cash Management System is similar to those commonly employed  by enterprises of similar size and complexity. The Cash Management System permits the Debtor to accurately monitor cash availability at all times, track and manage the collection and transfer of funds from a central position, and thereby reduce administrative burdens and expenses while increasing interest income.

74.     One of the primary challenges to altering the Cash Management System currently maintained by the Debtor is the disruption of electronic deposits from Private Payors, Medicare and Medicaid that flow into the existing Bank Accounts. If Debtor is forced to close its pre-petition accounts and set up new post-petition accounts, Debtor's revenues and operations will be severely and immediately disrupted with dire consequences to Debtor and its Estate.

75.     Before the Petition Date, the Debtor also used in the ordinary course of its business numerous business forms, including checks, deposit slips, letterhead, contracts, purchase orders, and invoices. Because the Debtor has the ability to print checks on an as-needed basis, the Debtor will be able to utilize existing check stock and will include the language "Debtor-in-Possession" and Bankruptcy Case number on post-Petition checks. Debtor will need about fifteen (15) business days to implement printing of checks with the Debtor-In-Possession designation and the Debtor's case number.

76.     The Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtor's business operations during the Chapter 11 Case and the goal of maximizing value for the benefit of all parties in interest. To require the Debtor to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the

collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtor's ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtor to address cash management requirements and, to the best of the Debtor's knowledge, the Bank Accounts over which the Debtor has control are held at financially stable institutions approved by the U.S. Trustee (*i.e.*, Comerica Bank). For the aforementioned reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtor, the estate, and all interested parties. Accordingly, the Debtor requests that it be allowed to maintain and continue to use the Cash Management System, including maintenance of its existing Bank Accounts.

77. Accordingly, the Debtor respectfully requests authorization as described in the Cash Management Motion to continue utilizing its existing Cash Management System during the pendency of this Chapter 11 Case.

### E.  Wages Motion

78.  The Debtor has filed its *First Day Motion Of The Debtor For Interim And Final Orders (I) Authorizing (A) The Debtor To Pay Certain Prepetition Salaries, Wages, And Compensation And (B) The Continuation Of Employee Benefit Programs And (Ii) Directing Banks To Honor And Process Checks And Transfers Related To Such Employee Obligations* (the "Wages Motion").

79.     Through the Wages Motion, the Debtor is requesting entry of interim and final orders: (i) authorizing the Debtor to pay prepetition wages, salaries, and other compensation, taxes and withholdings, reimbursable employee expenses, and any payroll related fees to third parties; (ii) authorizing the Debtor to honor and continue benefit programs for employees; and (iii) authorizing and directing the applicable banks and financial institutions at which the Debtor maintains disbursement and other accounts to honor and process checks and transfers related to such obligations.

80.     The Debtor provides the following wages and benefits to its employees:

    a.     Wages, salaries, bonuses, and other compensation;

    b.     Employee benefits, including, but not limited to:

        i.     Medical, prescription, dental, and vision insurance;

        ii.     403(b) plan; and

        iii.     Life, accidental death and dismemberment, and long-term disability     insurance;

    c.     Paid vacation and sick time;

    d.     Miscellaneous employee-related obligations.

81.     The Debtor has approximately 387 employees in the aggregate: 126 employees are paid full-time hourly; 170 employees are paid part-time hourly; 68 are full-time salaried employees, and 23 are *pro re nata* (collectively, the "Employees"). The Debtor's approximate cost for wages, salaries, and benefits for each payroll date is $350,000.  The Debtor estimates that approximately $300,000

in unpaid salary, wages, and other compensation is due to its Employees as of the Petition Date.

82.     In addition to the Employees, the Debtor has other staff providing services to the Debtor as independent contractors, including but not limited to the medical director, the IT consultant, individuals providing services related to boilers and chillers at the Debtor's facilities, and individuals who provide activities for its residents (the "Independent Contractors"). The Debtor's aggregate monthly compensation to these Independent Contractors is less than $7,500.

83.     I believe that any delay in paying prepetition obligations to the Employees will adversely impact the Debtor's relationship with its Employees and will irreparably impair the Employees' morale, leading to unmanageable Employee turnover. At this early stage in the Chapter 11 Case, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' morale and cooperation attributable to the Debtor's failure to pay wages, salary, benefits, and other similar items.  The Debtor relies on the Employees to provide necessary services to its residents and patients and the loss of Employees would endanger their health, safety, and welfare. The same is true for the Independent Contractors and therefore the prepetition obligations to the Employees and the Independent Contractors should be honored.

84. In addition, I believe that all unpaid, prepetition compensation is entitled to priority treatment in accordance with Bankruptcy Code sections 507(a)(4) in light of the fact that none of the Debtor's employees will receive more than $13,650.00.

85. For these reasons, and for the reasons and legal arguments set forth in the Debtor's Wages Motion, I believe the relief requested in the Wages Motion should be approved.

### F. Utilities Motion

86. The Debtor has filed *First Day Motion Of The Debtor For Entry Of Interim And Final Orders (I) Prohibiting Utility Providers From Altering ,Refusing, Or Discontinuing Service, (II) Deeming The Utility Providers Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Requests For Additional Adequate Assurance* (the "Utilities Motion").

87. By the Utilities Motion, the Debtor seeks entry of interim and final orders: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of unpaid prepetition invoices; (b) determining that, pursuant to Bankruptcy Code section 366, adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers; and (c) approving the Procedures (as defined therein) as the method for resolving future requests by any Utility Provider for additional adequate assurance of payment.

88.     In connection with its day-to-day operations, the Debtor receives traditional utility services from nine utility providers (each a "Utility Provider" and collectively, the "Utility Providers"). The Utility Providers are identified on Exhibit C to the Utilities Motion (the "Utility Services List").

89.     As adequate assurance of payment for the Utility Providers, the Debtor proposes to, within twenty (20) days of the Petition Date, establish an account for the benefit of the Utility Providers ("Utility Deposit Account") and deposit an amount equal to two weeks of the average monthly cost for Utility Services (*i.e.,* $168,200.00). Thus, to maintain uninterrupted Utility Services, the Debtor proposes to deposit $85,000.00 (the "Deposit") into the Utility Deposit Account within 20 days of the Petition Date. Thereafter, the Debtor proposes to adjust the amount in the Utility Deposit Account to reflect several factors: (a) the termination of Utility Services by the Debtor regardless of any Additional Assurance Requests (as defined in the Utilities Motion), and (b) agreements reached with Utility Providers. These adjustments will permit the Debtor to maintain the Utility Deposit Account with an amount that consistently provides the Utility Providers with a half-month deposit on account of such services.

90.     The Debtor submits that the Deposit and maintenance of the Utility Deposit Account as described above, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business, constitutes sufficient

adequate assurance of future payment to the Utility Providers to satisfy the requirements of Bankruptcy Code. However, if any Utility Provider believes additional assurance is required, they may request such assurance pursuant to the procedures described in the Utilities Motion.

### G. Claims Agent Application

91.    Pursuant to the Claims Agent Application, the Debtor requests entry of an order (i) authorizing the retention and appointment of Kurtzman Carson Consultants, LLC ("KCC") as claims, balloting, and noticing agent (the "Claims Agent") for the Debtor as of the Petition Date (as defined therein).

92.    The Debtor's selection of KCC to act as Claims Agent is appropriate under the circumstances and in the best interests of the estate.

93.    In addition, the Claims Agent Application requests that the Court approve modified notice procedures to protect Resident confidentiality, pursuant to the HIPAA/Resident Confidentiality Motion.

94.    On behalf of the Debtor, I respectfully submit that the Claims Agent Application should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 28, 2020

_____
Chad J. Shandler