# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE:                          Case No. 20-51066-MAR

HENRY FORD VILLAGE, INC.,      Chapter 11

     Debtor.                   Honorable Mark A. Randon

_____/

## NOTICE OF FILING OF SUCCESSFUL BIDDER'S
## ASSET PURCHASE AGREEMENT

**PLEASE TAKE NOTICE OF THE FOLLOWING MATTER:**

Henry Ford Village, Inc. (the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case, hereby files this *Notice of Filing of Successful Bidder's Asset Purchase Agreement*.

The Court entered the *Order (A) Approving Bidding Procedures and Protections in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [ECF No. 179] on December 21, 2020. The Debtor files a copy of the Successful Bidder's Asset Purchase Agreement hereto as **Exhibit A**.

Dated: May 6, 2021

**DYKEMA GOSSETT PLLC**

By: */s/ Sheryl L. Toby*
Sheryl L. Toby (P39114)
39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304
(248) 203-0700 / Fax (248) 203-0763
SToby@dykema.com

and

Danielle N. Rushing
Texas Bar No. 24086961
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500 / Fax (210) 226-8395
DRushing@dykema.com

*COUNSEL FOR DEBTOR AND
DEBTOR-IN-POSSESSION*

# Exhibit A

# Asset Purchase Agreement

## By and Between

## HFV Opco, LLC

### and

## Henry Ford Village, Inc.

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of May 4, 2021 (the "**Execution Date**"), by and between **Henry Ford Village, Inc.**, a Michigan nonprofit corporation (the "**Seller**"), and **HFV Opco, LLC**, a Delaware limited liability company ("**Buyer**") The Seller and the Buyer are sometimes individually referred to as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, Seller has filed a voluntary petition for relief under the Bankruptcy Code as Case Number 20-51066-MAR (the "**Chapter 11 Case**") with the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "**Bankruptcy Court**");

WHEREAS, Seller is the owner and operator of a continuing care retirement community known as Henry Ford Village (the "**Facility**");

WHEREAS, Seller in its business judgment believes a sale of the Facility and related assets to be in the best interests of its bankruptcy estate and all its creditors and parties in interest, and Seller has obtained the approval of the Bankruptcy Court of a process for the proposed sale;

WHEREAS, Buyer desires to acquire the Facility and substantially all the assets owned by Seller and used in Seller's operation of the Facility (collectively, the "**Business**") on the terms and conditions contained in this Agreement, and desires to act as the stalking horse in the sale process, with this Agreement subject to higher and better bids, as well as Bankruptcy Court approval;

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used herein, the following terms have the meanings set forth below. Terms not otherwise defined in this Agreement have the meaning given to such terms in the Bid Procedures Order (as defined below).

(a) "**Accounts Receivable**" means uncollected accounts receivable for services and goods rendered by Seller to the Current Residents or Former Residents of the Facility, which term shall include, without limitation, out-of-pocket (self-pay) payments, commercial insurance payments, and the payments under (i) Title XVIII of the Social Security Act ("**Medicare**") and (ii) Title XIX of the Social Security Act ("**Medicaid**"), including (A) amounts due Seller on account of audits or appeals of audits, rate adjustments, reconciliations and other recoupments with any third party payor or Governmental Authority; (B) without limiting the foregoing, all claims, rights, interests and proceeds (whether received in cash, by credit to amounts otherwise due to a third party or any other proceeds) with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time; and (C) without limiting the foregoing, any receipts (x) relating to Seller's cost reports or rights to settlements and retroactive adjustments on the same

(whether resulting from an appeal by Seller or otherwise) with respect to time periods prior to the Effective Time, or (y) that result from Seller's pursuit of one or more appeals pertaining to a Governmental Authority reimbursement program.

(b)    "**Accrued PTO**" has the meaning set forth in <u>Section 5.7(c)</u>.

(c)    "**Action**" means any action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

(d)    "**Additional Financial Statements**" has the meaning set forth in <u>Section 5.11</u>.

(e)    "**Affiliate**" shall mean, as to the entity in question, any person or entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question.

(f)    "**Allocation Schedule**" has the meaning set forth in <u>Section 2.8</u>.

(g)    "**Alternative Transaction**" means if Seller selects a bid by someone other than Buyer as the "highest or best offer" in accordance with the Bid Procedures Order and said selection is not overruled by the Bankruptcy Court and the sale to such bidder closes.

(h)    "**Applicable Law**" means all applicable laws, statutes, regulations, rules, ordinances, codes, licenses, permits and orders, from time to time in existence, of all courts of competent jurisdiction and Governmental Authorities, and all applicable judicial and administrative and regulatory decrees, judgments and orders, including common law rulings and determinations of any kind, including without limitation, those relating to (i) damage to, or the protection of real or personal property, (ii) human health and safety (except those requirements which, by definition, are solely the responsibility of employers), (iii) Environmental Laws, (iv) accessibility for the disabled or handicapped, including, but not limited to, any applicable provisions of The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Fair Housing Act of 1988, The Americans With Disabilities Act, the accessibility code(s), if any, of the State in which the Facility is located, (v) any laws applicable to the Facility under any third party payor program contract, and all regulations and guidelines lawfully promulgated under any of the foregoing, as the same may be amended from time to time; and (vi) all Healthcare Regulatory Laws.

(a)    "**Approvals**" means all consents, approvals and licenses from any Governmental Authority, including without limitation any Governmental Authority with regulatory oversight of healthcare organizations, which are necessary for the transfer of the Purchased Assets or the operation of the Business, and includes all Regulatory Approvals.

(b)    "**Approvals Additional Purchase Price**" has the meaning set forth in <u>Section 2.7</u>.

(c)    "**Approvals Closing Date**" has the meaning set forth in <u>Section 2.7</u>.

(d)     "**Approvals Extension Deposit**" has the meaning set forth in <u>Section 2.7</u>.

(e)     "**Approvals Extension Deposit Credit**" has the meaning set forth in <u>Section 2.7</u>.

(f)     "**Assumed Contracts**" has the meaning set forth in <u>Section 5.9(b)</u>.

(g)     "**Assumed Liabilities**" has the meaning set forth in <u>Section 2.3</u>.

(h)     "**Auction**" shall have the meaning set forth in the Bid Procedures Order.

(i)     "**Audited Financial Information**" has the meaning set forth in <u>Section 3.17</u>.

(j)     "**Backup Bidder**" shall have the meaning set forth in the Bid Procedures Order.

(k)     "**Backup Notice**" has the meaning set forth in <u>Section 5.8(b)</u>.

(l)     "**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

(m)     "**Bankruptcy Court**" has the meaning set forth in the recitals.

(n)     "**Bid Procedures Order**" shall mean that certain order entered by the Bankruptcy Court on December 21, 2020, approving the bidding procedures in connection with the sale of substantially all the Seller's assets, approving the form and manner of notice thereof, scheduling an auction and a sale hearing, approving procedures for the assumption and assignment of contracts, and granting related relief.

(o)     "**Bond Trustee**" means UMB Bank, N.A, successor trustee to U.S. Bank, National Association.

(p)     "**Books and Records**" means the books and records of Seller relating to the Purchased Assets; provided, however, that "Books and Records" shall not include the originals of Seller's minute books, stock books and Tax returns.

(q)     "**Business**" has the meaning set forth in the recitals.

(r)     "**Business Day**" means any day other than any Saturday, Sunday or legal holiday in the State of Michigan.

(s)     "**Buyer's Regulatory Approvals**" has the meaning set forth in <u>Section 5.10.</u>

(t)     "**Casualty**" has the meaning set forth in <u>Section 2.9(b)</u>.

(u)     "**Chapter 11 Case**" has the meaning set forth in the recitals.

(v)    "**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

(w)    "**Closing**" has the meaning set forth in Section 2.7.

(x)    "**Closing Date**" has the meaning set forth in Section 2.7.

(y)    "**CMS**" has the meaning set forth in Section 2.5(a).

(z)    "**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

(aa)   "**Contract**" means agreements, contracts, commitments, personal property leases, real property leases, and other arrangements to which Seller is a party.

(bb)   "**Contract Party**" has the meaning set forth in Section 5.9(a).

(cc)   "**Control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise.

(dd)   "**Cure Amounts**" means the amount necessary pursuant to 11 U.S.C. Section 365 to cure defaults under Assumed Contracts.

(ee)   "**Current Entrance Fee Resident**" means any Current Resident who is subject to an Entrance Fee Residency Agreement, and includes Escrowed Residents.

(ff)   "**Current Rental Resident**" means any Current Resident who is subject to a Rental Residency Agreement.

(gg)   "**Current Resident**" means any individual who is a resident of the Facility as of the Closing Date.

(hh)   "**Current Resident Entrance Fee Refund Program**" means the program established under Section 5.14 of this Agreement pursuant to which Current Residents who enter into Modified Residency Agreements obtain partial refunds of fees paid by such residents in connection with moving into the Facility.

(ii)   "**Debtor**" shall have the meaning set forth in the Bid Procedures Order.

(jj)   "**Deposit**" has the meaning set forth in Section 2.62.6(b) and shall include any interest earned thereon.

(kk)   "**Effective Time**" has the meaning set forth in Section 2.7.

(ll)   "**Entrance Fee Refund Liability**" means the full or partial entrance fee refund liability owed under the Entrance Fee Residency Agreement to an Eligible Current Entrance Fee Resident, excluding Escrowed Residents.

(mm)  "**Entrance Fee Residency Agreement**" means each and every agreement between Seller and any current or former resident(s) of the Facility pursuant to which Seller currently owes or in the future may owe a full or partial refund of any fee paid by such resident in connection with such resident moving into the Facility.

(nn)  "**Environmental Defect**" means any condition of, in, on or under any of the Facility or Real Property that either (i) requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws or (ii) if known by a federal or state regulatory agency of competent jurisdiction, would reasonably be expected to cause such federal or state regulatory agency to assert that the Facility or Real Property require monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws.

(oo)  "**Environmental Laws**" means any federal, state, or local Applicable Law relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or releases of or exposure to Hazardous Materials or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the following federal statutes and the regulations promulgated thereunder: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Applicable Laws.

(pp)  "**Equipment**" means the equipment owned by Seller and used in the Business, including the equipment identified on Schedule 1(tt).

(qq)  "**Escrow Agent**" has the meaning set forth in Section 2.6(b).

(rr)  "**Escrow Agreement**" means the Escrow Agreement among the Title Company, Buyer and Seller in the form annexed as Exhibit A.

(ss)  "**Escrowed Residents**" means Current Entrance Fee Residents who signed Entrance Fee Residency Agreements after June 10, 2020 and whose entrance fees are in escrow pursuant to the LARA Escrow Agreement.

(tt)  "**Excess Facility Revenues**" means the net income from Buyer's operation of the Facility after adjusting for the exclusion of non-cash revenues and expenses and deducting capital expenditures and debt service payments.

(uu)  "**Excluded Assets**" has the meaning set forth in Section 2.2.

(vv)  "**Excluded Contract**" mean any contract of the Seller that is not an Assumed Contract.

(ww)  "**Facility**" has the meaning set forth in the recitals.

(xx)    "**Former Resident**" means any individual who (i) was a resident of the Facility prior to the Closing Date but is not a resident of the Facility as of the Closing Date, and (ii) has an outstanding Claim with respect to any Entrance Fee Residency Agreement.

(yy)    "**Foundation**" has the meaning set forth in <u>Section 5.15</u>.

(zz)    "**Governmental Authority**" means the Bankruptcy Court, any tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision.

(aaa)    "**Hazardous Material(s)**" means asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613), and any amendments thereto and regulations thereunder, (ii) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (iii) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), (iv) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), (v) the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), (vi) the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), (vii) the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), (viii) the Emergency Planning and Community Right to Know Act of 1986 (42 U.S.C. § 11001 et seq.), (ix) the Hazardous and Solid Waste Amendments of 1984 (Public Law 86-616 Nov. 9, 1984), (x) the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (xi) the Carpenter-Presley-Tanner Hazardous Substance Account Act (HLTH & S § 25300 et seq.), (xii) the Hazardous Waste Control Law (HLTH & S § 25100 et seq.), and (xiii) any federal, state or local law, statute, ordinance or regulation.

(bbb)    "**Healthcare Regulatory Laws**" means: (i) all state and federal healthcare fraud and abuse laws and regulations, including: (A) the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, 42 C.F.R. § 1001.952, (B) the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, (C) the federal physician self-referral prohibition, 42 U.S.C. § 1395nn, 42 C.F.R. § 411.351 et seq., (D) the False Claims Act, 31 U.S.C. § 3729 et seq.; (E) Truth in Negotiations (10 U.S.C. Section 2304 et seq.), (F) Health Care Fraud (18 U.S.C. 1347), (G) Wire Fraud (18 U.S.C. 1343), (H) Theft or Embezzlement (18 U.S.C. 669), (I) False Statements (18 U.S.C. 1001), and (J) Patient Inducement Statute and equivalent state statutes or any rule or regulation promulgated by a Governmental Authority with respect to any of the foregoing (ii) Department of Health and Human Services, Office of Inspector General Exclusion regulations at 42 C.F.R. part 1001; (iii) applicable state licensing regulations and rules including but not limited to those promulgated by LARA and MDHHS; (iv) federal or state laws related to billing or claims for reimbursement submitted to any third party payor; (v) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, the regulations promulgated pursuant thereto and comparable state privacy and security laws and regulations; and (vi) the regulations promulgated pursuant thereto and comparable state laws and regulations relating to any and all registration of practitioners to practice nursing and other related professional services.

(ccc)   "**Historical Financial Information**" has the meaning set forth in <u>Section 3.17</u>.

(ddd)   "**Inventory**" means all inventory of any kind or nature, whether or not prepaid, located at the Business.

(eee)   "**Knowledge of Seller**" or "**Knowledge**" shall mean the actual knowledge of Chad Shandler or Bruce Blalock after consultation with Heather Scott and Kushant Shah.

(fff)   "**LARA**" means the Michigan Department of Licensing and Regulatory Affairs.

(ggg)   "**LARA Escrow Agreement**" means that certain Continuing Care Community Disclosure Act Escrow Agreement dated as of September 23, 2020, by and between Seller and American Deposit Management, LLC, as required by an order of the Michigan Department of Licensing and Regulatory Affairs, dated June 10, 2020.

(hhh)   "**LARA Escrow Order**" means the Order Requiring Escrow of Funds, entered by LARA's Corporations, Securities & Commercial Licensing Bureau on June 10, 2020.

(iii)   "**Liabilities**" means any indebtedness, Claims, damages, lawsuits, liabilities, obligations, losses, fines or other penalties, royalties, proceedings, deficiencies, duties, obligations, contracts, agreements, debts, obligations, interests or other liabilities, whether statutory, regulatory or judicially created, including, without limitation, liabilities under the Provider Agreements and liabilities as a result of violations of Healthcare Regulatory Laws (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, or whether known or unknown, or whether due or to become due, and whether in Contract, tort, strict liability or otherwise, and whether or not resulting from third-party claims).

(jjj)   "**Lien**" means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or other similar right), defect of title, encroachments, or other encumbrance of any kind or character.

(kkk)   "**Material Adverse Effect**" means any circumstance, event, effect or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (i) the Business, or the results of operations, or condition (financial or otherwise) of the Facility, taken as a whole, (ii) the Purchased Assets; or (iii) the ability of Seller to perform its obligations under this Agreement or to consummate the transactions contemplated under this Agreement; provided, that no circumstance, event, effect or change arising out of any of the following shall be deemed, either alone or in combination, to constitute or contribute to a Material Adverse Effect: (A) any condition, change, effect, or circumstance generally affecting any of the industries or markets in which the Seller operates; (B) any change in any law or generally accepted accounting principles (or changes in interpretations of any law or generally accepted accounting principles); (C) general economic, regulatory, or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit, or securities markets; (D) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war, or any escalation or worsening of any of the foregoing; (E) the negotiation, execution, announcement, consummation, or existence of this Agreement or the transactions contemplated hereby (including the threatened or actual impact

on relationships of Seller with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (F) any action required or permitted to be taken pursuant to the terms of this Agreement or upon the mutual written consent of the Parties; (G) actions or effects caused by or under the responsibility of Buyer; (H) failure by Seller to meet any projections, forecasts, or other pro forma financial information; (I) the Chapter 11 Case; and (J) any litigation or claim threatened or initiated by creditors of Seller against Seller or any of its officers or directors, in each case, arising out of the execution of this Agreement or the transactions contemplated hereby; except in the circumstances contemplated by clauses (A), (B), and (D) above, to the extent any such condition, change, effect, or circumstance has a material and disproportionate adverse effect on Seller relative to other similarly situated participants in the industries and markets in which Seller operates.

(lll)   "**MDHHS**" means the Michigan Department of Health & Human Services.

(mmm) "**Medicare Advance Payments**" means unpaid or unreturned accelerated or advance Medicare payments received by the SNF under the Coronavirus Aid Relief, and Economic Security Act amending the Accelerated Payments program, and any other unpaid or unreturned advance payments or stimulus funds received by the SNF through any federal or state governmental agency providing reimbursement.

(nnn)   "**Modified Residency Agreement**" means the agreement described in Section 5.13 of this Agreement pursuant to which a Current Resident may modify their Entrance Fee Residency Agreement by electing to participate in the Current Resident Entrance Fee Refund Program in lieu of receiving any refunds contractually due under such resident's Entrance Fee Residency Agreement.

(ooo)   "**Modified Rental Agreement**" means the agreement described in Section 5.13 of this Agreement pursuant to which a Current Rental Resident may modify their Rental Residency Agreement.

(ppp)   "**Necessary Consent**" has the meaning set forth in Section 5.9(c).

(qqq)   "**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at the SNF at a "level G" or above that has not been corrected and cleared by the applicable Governmental Authority; (B) a denial of the SNF's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions at the SNF; (C) the SNF loses its operating license or any material Permit; (D) the SNF has any Provider Agreement revoked or terminated; and (E) the SNF has its number of beds reduced; provided that the SNF shall not be Out of Compliance if any of the conditions set forth in this definition exist at the SNF but are thereafter cured or rectified by the Seller within a reasonable period.

(rrr)   "**Payment Programs**" has the meaning set forth in Section 3.10.

(sss)   "**Permits**" means to the extent transferrable, all licenses, permits (including occupancy permits), certificates, registrations, approvals, franchises, consents and other

authorizations of Seller obtained from or filed with a Governmental Authority and used in connection with the Business, including Seller's Medicare and Medicaid Provider Agreements.

(ttt)    "**Permitted Liens**" means (i) statutory Liens for Taxes, assessments or other governmental charges not yet due and payable, (ii) workers', repairers', landlords' and similar Liens which arose or were incurred in the ordinary course of business and which secure obligations which are not yet due and payable and which do not exceed $10,000 in the aggregate, (iii) Liens which are expressly assumed or consented to by Buyer herein (including, without limitation, liens included in the Assumed Liabilities), (iv) Liens which are created by Buyer, (v) easements, restrictions and covenants of record and legal highways with respect to the Real Property or leased real property under an Assumed Contract, (vi) matters which would be shown on an accurate survey of the Real Property, the Facility, or any leased real property under an Assumed Contract, and (vii) those matters of record identified on Schedule B of the Pro Forma Title Policy.

(uuu)    "**Person**" means any natural person, corporation, limited liability company, general partnership, limited partnership, sole proprietorship, trust, union, association, Governmental Authority or other business organization.

(vvv)    "**Plan**" and "**Plans**" has the meaning set forth in Section 3.7.

(www)    "**Pro Forma Title Policy**" means the Pro Forma Policy of Title Insurance attached to this Agreement as Exhibit B.

(xxx)    "**Prorated Items**" has the meaning set forth in Section 2.6(f).

(yyy)    "**Provider Agreements**" has the meaning set forth in Section 2.5(a).

(zzz)    "**Purchase Price**" has the meaning set forth in Section 2.6(a).

(aaaa)    "**Purchased Assets**" has the meaning set forth in Section 2.1.

(bbbb)    "**Real Property**" means all of Seller's fee interest in all land, buildings, structures, improvements, fixtures or other interest in real property which is owned by the Seller and used in the Business more fully described on Schedule 3.19.

(cccc)    "**Refund Liability Escrow**" has the meaning set forth in Section 5.14.

(dddd)    "**Regulatory Approvals**" means an Approval from a Governmental Authority other than the Bankruptcy Court.

(eeee)    "**Rejected Contracts**" has the meaning set forth in Section 5.9(b).

(ffff)    "**Related Agreements**" means, collectively, (i) the Escrow Agreement, (ii) a Bill of Sale, (iii) an Assignment and Assumption Agreement, (iv) Buyer and Seller closing certificates, and (v) a Closing Statement, in the form provided by the Title Company and agreed upon by the Parties, (vi) a covenant deed for the Real Property, substantially in the form attached

as <u>Exhibit C</u>, and (vii) other agreements, documents, and instruments related to the transactions contemplated herein.

(gggg) "**Related Person**" means, with respect to a specific Person, any officer, director, member, manager, employee, agent, shareholder, representative, successor or assign of such Person.

(hhhh) "**Rental Residency Agreement**" means each and every agreement between Seller and any current resident(s) of the Facility pursuant to which the applicable resident is subject to a rental model.

(iiii) "**Resident Deposits**" has the meaning set forth in <u>Section 5.165.16(a)</u>.

(jjjj) "**Resident Trust Funds**" has the meaning set forth in <u>Section 5.165.16(a)</u>.

(kkkk) "**Retained Liabilities**" has the meaning set forth in <u>Section 2.4</u>.

(llll) "**Sale Order**" means the order, substantially in the form attached hereto as <u>Exhibit D,</u> which is to be entered by the Bankruptcy Court in the Chapter 11 Case approving the consummation of the transactions contemplated in this Agreement pursuant to Sections 363 and 365 of the Bankruptcy Code.

(mmmm) "**Sale Order Closing Date**" has the meaning set forth in <u>Section 2.7</u>.

(nnnn) "**Sale Order Extension Date**" has the meaning set forth in <u>Section 2.7</u>.

(oooo) "**Schedule of Employees**" has the meaning set forth in <u>Section 5.7(d)</u>.

(pppp) "**Seller Indemnitees**" has the meaning set forth in <u>Section 2.3</u>.

(qqqq) "**Seller's Regulatory Approvals**" has the meaning set forth in <u>Section 6.3(a)</u>.

(rrrr) "**SNF**" has the meaning set forth in <u>Section 3.9</u>.

(ssss) "**Successful Bid**" shall have the meaning set forth in the Bid Procedures Order.

(tttt) "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

(uuuu) "**Tax**" and "**Taxes**" means any and all taxes, fees, levies, duties, tariffs, import charges and other charges imposed by any taxing authority, together with any related interest, penalties or other additions thereto, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise,

severance, stamp, occupation, premium, property, windfall profit, environmental, custom, duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

(vvvv)  "**Termination Date**" has the meaning set forth in <u>Section 5.7(a)</u>.

(wwww)      "**Threshold**" has the meaning set forth in <u>Section 2.9(b)</u>.

(xxxx)  "**Title Company**" means Landmark Abstract Agency, LLC, 207 Rockaway Turnpike, Lawrence, NY 11559.

(yyyy)  "**Tradename License**" means the right and license to use the name "Henry Ford" in the Facility name "Henry Ford Village" and the Seller's legal name.

(zzzz)  "**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax).

(aaaaa)  "**Transferred Employees**" has the meaning set forth in <u>Section 5.7(e)</u>.

(bbbbb)"**Unaudited Financial Information**" has the meaning set forth in <u>Section 3.17</u>.

(ccccc)  "**Warranties**" has the meaning set forth in <u>Section 2.1(m)</u>.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

2.1     <u>Sale of Assets to Buyer</u>.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code, all of Seller's right, title and interest in and to all tangible and intangible assets, properties, furniture, fixtures, equipment, instruments, supplies, inventory, vehicles, artwork, leasehold improvements, phone systems, computer hardware, databases, machinery, tools (and related repair and maintenance records), rights, titles and interests of every kind and nature of Seller which are owned by the Seller and used in the Business, free and clear of all Liens, except Permitted Liens, including, without limitation (collectively, the "**Purchased Assets**"):

(a)     the Facility including the Real Property;

(b)     the improvements on the Facility;

(c)     the Accounts Receivable of the Business;

(d)     the Books and Records;

(e)     the Assumed Contracts;

(f)     the Equipment;

(g) the Inventory;

(h) to the extent transferable under Applicable Law, the Permits, including Seller's Provider Agreements;

(i) all intellectual property, including any trademarks, trade secrets, and the like, including but not limited to the Tradename License, if assignable under Applicable Law; and

(j) for each Transferred Employee, all employee employment applications, W-4's and I-9's;

(k) all assignable or transferable goodwill relating to or arising in connection with the ownership or operation of the Business and the Facility, including, without limitation, lists of residents and suppliers, correspondence, purchase orders, market surveys, and mailing lists;

(l) custody of all patient, resident and prospect lists (including, without limitation, all books, records and other materials, in hard copy and electronic format, that are in the possession of any Person that performs marketing services on behalf of Seller), marketing information, computer software and software licenses, telephone and fax numbers, telephone listings, email addresses and domain names used by the Facility;

(m) all transferable third-party warranties and claims for warranties relating to the Facility or the Purchased Assets, together with the obligations and Liabilities related thereto (collectively, the "**Warranties**");

(n) donor restricted assets, to the extent transferable under Applicable Law,

(o) all other assets of Seller relating to or used in connection with the Business or the Facility that are not Excluded Assets; and

(p) general intangibles, and community specific intellectual property, if assignable under Applicable Law.

2.2     Excluded Assets.  Notwithstanding Section 2.1, the Parties acknowledge that Seller shall not sell, assign, transfer or convey to Buyer, and Buyer shall not purchase, acquire or accept from Seller, the Excluded Assets (all such assets, the "**Excluded Assets**") consisting of the following:

(a) all cash and cash equivalents of the Business;

(b) all Claims and causes of action of Seller arising before the Effective Time;

(c) all set-off rights to claims filed or asserted in the Chapter 11 Case (except to the extent arising in connection with an Assumed Contract which is subject to cure);

(d) avoidance actions under Chapter 5 of the Bankruptcy Code;

(e)  hold-backs and escrows for any prorations or Taxes being paid by Seller in connection with the Closing or afterward;

(f)  all insurance policies of Seller, any prepaid insurance premiums and any rights or claims or proceeds arising from such policies;

(g)  all Tax refunds, rebates, bad debt, and overpayments which are related to Seller's operation of the Business prior to the Closing;

(h)  all (i) corporate seals, corporate organizational records, minute books, charter documents, record books, and stock transfer books pertaining to Seller, (ii) original Tax, accounting and financial records which pertain exclusively to the Excluded Assets, and (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence or capitalization of Seller or of any other Person;

(i)  all Inventory and assets of the Business disposed of or exhausted prior to Closing in the ordinary course of business;

(j)  any records which Seller is legally required to retain in its possession and any records related to Excluded Assets or Retained Liabilities (as hereinafter defined);

(k)  all equipment and tangible property located at the Business but not owned by Seller, and all other assets, properties and rights not related to or used in the Business, except for any equipment or personal property leased by Seller under any Assumed Contract;

(l)  personnel records for employees who are not Transferred Employees and, to the extent the transfer of such records (whether directly or by means of the sale of a Seller) to Buyer or its affiliates is prohibited by Applicable Law, for Transferred Employees, and all organizational documents and minute books of the Seller;

(m)  board designated, restricted and trustee-held or other escrowed funds (such as the debt service reserves, self-insurance trusts, workers compensation trusts, working capital trust assets, and assets and investments restricted as to use), beneficial interests in charitable trusts and accrued earnings on all the foregoing;

(n)  entrance fees held in escrow as of the Closing Date pursuant to the LARA Escrow Agreement;

(o)  the Purchase Price, and all of Seller's rights granted under this Agreement; and

(p)  Seller's attorney-client and work-product privileges.

**2.3**  <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Buyer shall assume or otherwise be responsible, which amounts shall be in addition to the Purchase Price, for (collectively, the "**Assumed Liabilities**"):

(a)     all Liabilities under the Purchased Assets accruing or arising after the Closing;

(b)     all Liabilities associated with the Assumed Contracts from and after Closing, including, without limitation, all Cure Amounts associated therewith (which Cure Amounts shall be a bar to any pre-existing liabilities);

(c)     Claims related to Provider Agreements or managed care plans as described in the Sale Order;

(d)     all Liabilities and obligations associated with Seller's Accrued PTO, including, without limitation, all pre-petition liabilities; and

(e)     all Liabilities required to be paid by Buyer pursuant to this Agreement (such as, without limitation, stamp and recording Taxes).

Seller shall have no liability for any such liabilities or obligations.  Buyer shall indemnify and defend each of Seller, its successors or assigns, its Affiliates, and Seller Related Persons (the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all actual losses, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind except for consequential, special or punitive damages, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of the Assumed Liabilities, or any breach by Buyer of representations, warranties, or covenants in this Agreement or the Related Agreements.  This provision shall survive termination of this Agreement.

**2.4**     Retained Liabilities.  Other than the Assumed Liabilities, Buyer shall not assume from Seller any Liabilities whatsoever (the "**Retained Liabilities**"), all of which shall be retained by the Seller including without limitation:

(a)     malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facility before the Effective Time;

(b)     any accounts payable, taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Effective Time;

(c)     any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d)     any administrative expense Claims accruing in the Chapter 11 Case;

(e)     Liabilities of Seller arising under or in connection with any Excluded Contract;

(f) Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(g) Liabilities or obligations in connection with any indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(h) other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims;

(i) any Liability arising out of, under or in connection with the Excluded Assets;

(j) all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by the Seller, including any amounts due to such Persons prior to Closing;

(k) any Liability that is not an Assumed Liability; and

(l) other than Cure Amounts related to the Assumed Contracts, any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time.

2.5     Provider Agreements; Interim Billing.

(a) As of the Closing Date and to the extent permitted by Applicable Law, Seller shall transfer and assign to Buyer all of Seller's rights and interests in and to Seller's Medicare provider numbers and Medicare provider reimbursement agreements. The Parties acknowledge and agree that Buyer is not expected to have received its "tie in" notice from Centers for Medicare and Medicare Services ("**CMS**") with respect to Seller's Medicare provider agreements or any new Medicare or Medicaid provider agreements (collectively, the "**Provider Agreements**") as of the Closing Date. Prior to Buyer's receipt of its tie in notice and Provider Agreements, so long as Buyer is accepting assignment of the Medicare Provider Agreement and is utilizing commercially reasonable efforts to become the certified Medicare and/or Medicaid provider, as applicable, at the Facility, Seller agrees that Buyer may bill for services performed following the Closing under Seller's Medicare and/or Medicaid provider number, as applicable, to the extent permitted by Applicable Law.

(b) The Parties acknowledge and agree that Seller's managed care provider plans and agreements with other third-party payors are not expected to have been updated with Buyer's provider information as of the Closing Date. From and after the Closing Date until such managed care provider plans and agreements with other third-party payors are updated with Buyer's provider information, Seller agrees that Buyer may bill for services provided following the Closing under Seller's managed care provider plans and agreements with other third-party

payors using Seller's provider information to the extent permitted by Applicable Law and the terms and conditions of the plans and agreements with the third party payors.

(c)     Any reimbursements from Medicare or Medicaid billed by Buyer for dates of service after the Closing Date which are paid into Seller's accounts shall be forwarded by Seller to Buyer.

2.6     Closing Proceedings.

(a)     The Purchase Price under this Agreement is Seventy-Six Million Three Hundred Fifty-Five Thousand Dollars ($76,355,000) ("**Purchase Price**") as adjusted in accordance with this Section 2.6.

(b)     Seven Million Six Hundred Thirty-Five Thousand Dollars ($7,635,500) of the Purchase Price shall be paid as an earnest money deposit (the "**Deposit**") to Title Company ("**Escrow Agent**") at the time of execution of this Agreement, which will be held in an interest-bearing account by Escrow Agent in accordance with the terms and conditions of this Agreement and the Escrow Agreement. The Deposit, and the Approvals Additional Purchase Price, if any, will be credited against the Purchase Price at Closing and will otherwise be disbursed as provided in this Agreement, the Escrow Agreement and the Sale Order. Any interest on the Deposit shall follow the Deposit. If Buyer is not selected as the Successful Bidder or Backup Bidder, then the Deposit shall be returned by the Escrow Agent to the Buyer no later than three (3) Business Days after the entry of the Sale Order.

(c)     At the Closing, in addition to such other actions as may be provided for herein, Buyer shall pay to the Seller, in cash, an amount equal to the Purchase Price (i) less the Deposit, (ii) less the amount of the Medicare Advance Payments, and (iii) less the Approval Extension Deposit Credit, if any, by wire transfer of immediately available funds, net of the cash portion of the Deposit transferred to Seller and credited thereto.

(d)     At the Closing, Buyer shall assume the Assumed Liabilities (which shall be in addition to, and not a credit against, the Purchase Price), and with regard to Assumed Contracts, shall pay to each Contract Party any Cure Amounts, in cash, by wire transfer of immediately available funds, necessary to acquire any Assumed Contract, at such time as may be designated by the Bankruptcy Court in the Sale Order.

(e)     At the Closing, Buyer shall pay all escrow fees, recording costs or fees, Transfer Taxes, and conveyance fees.

(f)     Except as otherwise set forth in this Agreement, all expenses arising from the conduct of the business of the Facility in the ordinary course, including, without limitation trade payables, telephone expenses and utility charges, real and personal property Taxes attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "**Prorated Item**s"), shall be apportioned between Seller and Buyer as of the Effective Time, it being the agreement of the Parties that Seller shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facility prior to the Effective Time and Buyer shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facility from and after the Effective Time, except, in

each case, as otherwise expressly set forth herein. All such prorations shall be made based on actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available to Seller. Utility charges which are not metered and read for the Closing shall be estimated based on prior charges. Based on reasonable estimates, the Parties shall make all prorations at the Closing, and all such prorations shall be effectuated through adjustment of the Purchase Price at Closing.

(g) At the Closing, the Parties will execute and deliver the Related Agreements.

**2.7** <u>Time and Place of Closing</u>. Subject to the terms of this Agreement, the closing of the transactions contemplated hereby (the "**Closing**") shall take place remotely via the exchange of documents and signatures, on or, at Buyer's option, prior to September 30, 2021 (the "**Closing Date**") (unless otherwise mutually agreed by the Parties) unless Buyer has not yet obtained Regulatory Approvals in which event Buyer may (i) send written notice to the Seller and make an additional deposit of five hundred thousand dollars ($500,000) with the Escrow Agent and the Closing Date ("**Approvals Extension Deposit**") shall be extended to November 1, 2021 ("**Approvals Closing Date**"), or (ii) Buyer may terminate this Agreement by sending written notice to the Seller and the Escrow Agent, and the Deposit shall be released by the Escrow Agent to the Buyer. If Buyer extends the Closing Date pursuant to this provision, and obtains Regulatory Approvals by the Approvals Closing Date and Closing occurs, then two hundred thousand dollars ($200,000) of the Approvals Extension Deposit shall be credited against the Purchase Price at Closing ("**Approvals Extension Deposit Credit**"), and three hundred thousand dollars ($300,000) shall be added to the Purchase Price ("**Approvals Additional Purchase Price**"). If Buyer extends the Closing Date pursuant to this provision and cannot obtain Regulatory Approvals by the Approvals Closing Date, then Seller may elect to terminate this Agreement and upon termination Buyer shall forfeit the Approvals Extension Deposit to the Seller and the Deposit shall be released by the Escrow Agent to the Buyer. However, in any event, if the proposed Closing Date, is prior to the date which is one hundred twenty (120) days following entry of the Sale Order approving a sale to Buyer which is not subject to a stay pending appeal ("**Sale Order Extension Date**"), even if Regulatory Approvals have been obtained by Buyer, then on written request from Buyer, Seller may extend the Closing Date to the Sale Order Extension Date, which extension shall be granted or denied by Seller in writing within three (3) Business Days. If Seller does not respond within three (3) Business Days or denies Buyer's request for a Closing Date extension to the Sale Order Extension Date, then Buyer may terminate this Agreement by sending written notice to the Seller and the Escrow Agent, and the Deposit shall be released by the Escrow Agent to the Buyer. The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof. The Closing shall be effective as of 11:59 p.m. on the Closing Date or such other date and time as the Parties may agree upon in writing (the "**Effective Time**").

**2.8** <u>Purchase Price Allocation</u>. Buyer and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in accordance with <u>Schedule 2.8</u> (the "**Allocation Schedule**"), which shall be prepared in a manner consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder, provided however that such allocation shall not be binding on any party for any purpose other than for Tax purposes. Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax returns in accordance with the Allocation Schedule.

**2.9**    <u>Risk of Loss</u>.

(a)    Risk of loss of the Facility with respect to a Casualty or condemnation as set forth in Section 2.10 below, shall remain with the Seller until the Closing or as provided herein. Seller shall promptly give Buyer written notice of any material damage to the Facility, describing such damage in reasonable detail and stating whether such damage and any loss of fees or rents is covered by insurance, the level of coverage and deductibles, and the estimated cost of repairing such damage.

(b)    In the event that all or any material part of the Purchased Assets are damaged or destroyed by fire, windstorm or any other casualty ("**Casualty**") on or prior to the Closing, Seller shall promptly notify Buyer in writing of such damage or destruction. In the event that such damage or destruction is in the aggregate more than Two Million Dollars ($2,000,000) ("**Threshold**"), Buyer shall have the option to: (i) terminate this Agreement by written notice delivered to Seller within ten (10) Business Days after Buyer's receipt of notice of such damage or destruction, in which case the Deposit shall be returned to Buyer and the Parties shall have no further obligations hereunder, or (ii) proceed with the transaction contemplated in this Agreement without abatement of the Purchase Price, in which case (A) all insurance proceeds relating to such damage or casualty shall be deemed to be absolutely and irrevocably assigned to and be payable directly to Buyer, except for those attributable to remedial actions taken by Seller with respect to such damage or casualty prior to the Effective Time, (B) after the Closing, Buyer shall have the right to conduct all settlement proceedings with respect to such insurance claims, and (C) Seller shall deliver to Buyer an unconditional assignment of all such insurance proceeds. If the Casualty does not meet the Threshold then the provisions of Section 2.9(b)(ii) shall apply. If Buyer proceeds with this Agreement after a Casualty, Seller shall provide Buyer with all necessary and reasonable access to the Facility in order to assess any damage or destruction.

**2.10**    <u>Condemnation.</u> In the event condemnation proceedings are commenced against all or a material part of the Real Property, Buyer may, at its option, by notice to Seller given within ten (10) Business Days after Seller provides written notice to Buyer of such condemnation proceedings together with all relevant information concerning such proceedings (and if necessary the Closing Date shall be extended to give Buyer the ten (10) Business Days to make such election): (a) terminate this Agreement and neither Party shall have any further obligations hereunder, except as expressly set forth herein, and upon election to terminate, the Deposit shall be returned to the Buyer, or (b) proceed under this Agreement, in which event the Seller shall, at the Closing, assign to Buyer its entire right, title and interest in and to any condemnation award, and Buyer and Seller shall jointly have the right during the pendency of this Agreement to negotiate and otherwise deal with the condemning authority in respect of such matter. If Buyer fails to make such election, Buyer shall be deemed to have elected to proceed under clause (b) above. A condemnation proceeding shall be "material" if, as a result thereof, either individually or in combination with other condemnation proceedings, there is a decrease in the value of any Real Property in excess of the Threshold. Buyer shall not have a right of termination hereunder if any taking is solely of subsurface rights or takings for utility easements or right of way easements, if the surface of the Real Property, after such taking, may be used in substantially the same manner as though such rights had not been taken and if the improvements on the Real Property, are not adversely affected.

# ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, Seller makes the representations and warranties set forth below which are true, correct and complete on the Execution Date and shall be true, correct and complete as of the Closing.

**3.1** <u>Organization</u>. Subject to entry of the Sale Order, Necessary Consents, and the Approvals, the Seller has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**3.2** <u>Execution and Delivery</u>. Subject to entry of the Sale Order, Necessary Consents, and the Approvals, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by the Seller of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

**3.3** <u>Permits</u>. The Facility is duly licensed in accordance with the Applicable Laws of the State of Michigan, MDHHS and LARA and all other ancillary departments or services located at or operated for the benefit of, the Facility that are required to be separately licensed are duly licensed by the appropriate Governmental Authority. To the Knowledge of Seller, Seller has all Permits which are needed or required by Applicable Law to operate its business related to or affecting the Facility or any ancillary services related thereto as currently conducted. <u>Schedule 3.3</u> is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facility or the Purchased Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facility as currently conducted and for the ownership of the Facility by Seller and operation and use of the Purchased Assets by Seller, all of which are in full force and effect.

**3.4** <u>Litigation Proceedings; Judgments</u>. In addition to the Chapter 11 Case, <u>Schedule 3.4</u> is an accurate list of all pending litigation or proceedings with respect to the Facility and the Purchased Assets of which Seller has Knowledge. To Seller's Knowledge, except for the Chapter 11 Case and as set forth on <u>Schedule 3.4</u> there are no claims, actions, suits, proceedings, or investigations, pending or threatened, against or related to Seller, the Facility or the Purchased Assets, at law or in equity. Except for the Chapter 11 Case and as set forth on <u>Schedule 3.4</u>, there are no judgments presently outstanding and unsatisfied against the Facility and Business, Seller or any of the Purchased Assets. Seller has not received any written notice or written claim for tort or violation of any applicable order, or an investigation thereof with respect to its ownership or operation of the Facility or the Business.

**3.5** <u>Employee Relations</u>. To the Knowledge of Seller, Seller is complying in all material respects with all Applicable Laws and contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours. To Seller's Knowledge there are no material actions, suits or legal, administrative, arbitration or other proceedings or governmental investigations pending or threatened against Seller in respect of, any unemployment or workers' compensation benefits or wrongful discharge, sexual harassment,

employment discrimination, unfair labor practices or other violation of any applicable federal, state or local employment law. Except as set forth on Schedule 3.5, Seller has no Knowledge of any complaints before or claims by a Governmental Authority regarding employment discrimination, unfair labor practices, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like. Seller is not a party to and is not otherwise bound by any labor agreement, collective bargaining agreement, or other similar contract.

 3.6 Multi-Employer Plans. Seller has not, nor is it required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended, with respect to any of the Facility employees.

 3.7 Employees; Employee Benefit Plans. Seller has provided Buyer a true, correct and complete list and copies of all material, written pension, profit sharing, retirement, deferred compensation, stock purchase, stock option, incentive, bonus, vacation, severance, disability, hospitalization, medical insurance, life insurance and other employee benefit plans, programs or arrangements, maintained by Seller (other than obligations to make current wage or salary payments) in respect of, or which otherwise cover, any of the Transferred Employees, or their beneficiaries (hereinafter individually referred to as a "**Plan**" and collectively referred to as the "**Plans**"). All such Plans have been maintained in material compliance with their terms and all Applicable Laws. None of the Transferred Employees are a party to any written employment agreement, consulting agreement, collective bargaining agreement, or similar contract, commitment or arrangement which, after the giving of notice, cannot be terminated at will by Seller.

 3.8 Compliance. Except as set forth on Schedule 3.8, or to the extent such failure would not constitute a Material Adverse Effect, to the Knowledge of Seller, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over the Seller, the operations of the Facility and the Purchased Assets.

 3.9 Regulatory and Legal Compliance. The Facility has a skilled nursing facility licensed in accordance with the rules and regulations of MDHHS and LARA ("**SNF**"), and to Seller's Knowledge, Seller is complying in all material respects with all Applicable Laws and the requirements of each Governmental Authority having jurisdiction over and applicable to the operation of the SNF. To Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any alleged violation or noncompliance that has not been cured or addressed by a plan of corrective action, or which, if adversely determined, would not reasonably be expected to have a Material Adverse Effect.

 3.10 Licensed Beds and Current Rate Schedule. Schedule 3.10 sets forth a true, correct and complete statement, as of three (3) Business Days prior to the Execution Date, of: (i) the number and type of licensed beds at the SNF, and (ii) the number of beds then occupied in, and the occupancy percentages at, the SNF.

**3.11** <u>Billing Practices</u>. (i) During the eighteen (18) month period prior to the Execution Date, to Seller's Knowledge, all billing practices of the Business with respect to all third party payors, including Medicare, Medicaid, and private insurance companies, have been in compliance in all material respects with all Applicable Laws, regulations, and policies of such third party payors (collectively, the "**Payment Programs**") or in the alternative, any such noncompliance has been cured within the time period allotted by applicable regulation or policy and, to Seller's Knowledge, Seller has not billed or received any payment or reimbursement in excess of amounts allowed by law or such policy which has not been refunded to the third party Payor or the resident; (ii) within the eighteen (18) month period prior to the Effective Time, to Seller's Knowledge, Seller has not received written notice that a Payment Program has requested or threatened any recoupment, refund or set-off from Seller or imposed any fine, penalty or other sanction on Seller; (iii) to Seller's Knowledge, Seller has not been excluded from participation in a Payment Program at any time; and (iv) there is currently no ongoing audit of the Seller under any of the Payment Programs, except in the ordinary course of business.

**3.12** <u>Prohibited Practices</u>. During the eighteen (18) month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses related to the delivery of health care services, nor, to Seller's Knowledge, have any of Seller's current officers or directors been excluded from participation in Medicare, Medicaid or any other state or federal government reimbursement program. To Seller's Knowledge, during the eighteen (18) month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

**3.13** <u>Government Investigations</u>. Other than for routine state and federal inspections or surveys performed by LARA, during the eighteen (18) month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under Healthcare Regulatory Laws.

**3.14** <u>Resident Roll</u>. The resident roll provided to Buyer in writing as of the Execution Date is, to Seller's Knowledge, a complete and accurate schedule of all the Facility residents as of the date of this Agreement, including the name of each resident and the payor source, if any, for such resident.

**3.15** <u>Cost Reports.</u> Seller has filed all cost reports required to be filed for the SNF as of the Closing Date under Applicable Law. Seller has furnished Buyer with copies of all cost reports filed by Seller with the appropriate State agency, the appropriate Medicare and Medicaid agencies and/or fiscal intermediaries in respect of the operation of the SNF for the years ended December 31, 2020 and 2019, and to Seller's Knowledge, such cost reports did not contain any material disallowable costs or expenses or any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading, and, to Seller's Knowledge, such cost reports have been prepared in all material respects in accordance and compliance with all applicable government rules and regulations.

**3.16** <u>Broker</u>. Except for the engagement of RBC Capital Markets, LLC, whose fee shall be paid by Seller from the proceeds of the sale and, if required, upon entry of applicable Approvals by the Bankruptcy Court, neither Seller nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Buyer.

**3.17** <u>Environmental Matters</u>. Except as set forth on <u>Schedule 3.17</u>: (a) there are no material environmental liabilities on or affecting any of the Facility, (b) to the Knowledge of Seller, Seller has at all times operated the Facility and conducted the Business and, during the period that Seller owned the Facility and any third party operated any such Business, such third party operated the Business, in each case, in compliance with all applicable Environmental Laws and all Permits required thereunder or issued pursuant thereto; (c) there are no Actions pending or to Seller's Knowledge threatened before any Governmental Authority with respect to Seller's ownership or operation of the Real Property alleging violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and Seller has not received any written notice of any alleged or actual violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Real Property or the ownership or operation thereof; and (d) Seller has provided Buyer access to accurate and complete copies of all final written environmental reports, studies and notices in Seller's possession prepared by any third party on behalf of, or delivered by a Governmental Authority to, Seller with respect to the Real Property, that identify or allege any Environmental Defect on or affecting the Real Property.

**3.18** <u>Financial Information</u>.

(a)     <u>Schedule 3.18</u> hereto contains the following financial statements and financial information (collectively, the "**Historical Financial Information**"):

(i)     audited financial statements consisting of the balance sheet of the Business as of December 31 in each of the years 2017 and 2018 and the related statements of income and net surplus/deficit, and cash flow for the years then ended (the "**Audited Financial Information**"); and

(ii)     unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2019 and December 31, 2020, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2019 and December 31, 2020 (the "**Unaudited Financial Information**").

(b)     The Audited Financial Information included in the Historical Financial Information is true, correct and complete in all material respects and has been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated. The Unaudited Financial Information included in the Historical Financial Information has been prepared consistent with past practice and may not include required footnote disclosures or reflect normal year-end adjustments. Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented in the Historical Financial Information. Except as set

forth on Schedule 3.18, the financial statements contained in the Historical Financial Information present fairly, in all material respects, the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

**3.19**    Real Property.

(a)    Schedule 3.19 contains an accurate and complete legal description, street address and tax parcel identification number for the Real Property. Seller holds good and indefeasible fee simple title to all the Real Property and shall convey the Real Property in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens). Seller is not a lessee of any portion of the Real Property. Seller agrees that title to the Real Property shall not be altered between the Execution Date and Closing. Except as set forth on Schedule 3.19, other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Real Property or any portion thereof or interest therein.

(b)    Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation proceedings affecting the Real Property, or any part thereof; (ii) any written notice asserting or alleging any material violations or potential violations of any Applicable Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Real Property, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Real Property, relating to the ownership, lease, use or occupancy of such Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of the Real Property or the ownership or operation of the Real Property. Seller has not received any written notice of any pending zoning or other land use change affecting the real property.

(c)    Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Real Property in any material respect.

(d)    To Seller's Knowledge, except as set forth on Schedule 3.19, the Real Property is zoned for its current use and there are no waivers or variances granted by any Governmental Authority which, as a result of the transactions contemplated in this Agreement, will be withdrawn or abrogated, including but not limited to life safety code waivers.

**3.20**    Insurance. Schedule 3.20 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller or its representatives or agents with respect to the Facility and Seller as of the Execution Date covering the ownership and operation of the Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).

**3.21**    Intellectual Property. Except with respect to the Tradename License and all rights related thereto, Seller owns or has the right to use all intellectual property used in connection with the ownership or operation of the Facility. Schedule 3.21 lists all the registered intellectual property owned by Seller. Except as set forth on Schedule 3.21, the conduct of the Business does

not infringe or otherwise violate any intellectual property or other proprietary rights of any other Person, and there is no action pending or, to the Knowledge of Seller, threatened, alleging any such infringement or violation or challenging Seller's rights in or to any of its intellectual property.

**3.22**   Tax Matters.  Except as set forth on Schedule 3.22:

(a)   All Taxes due and owing by Seller (whether or not shown on any tax return) have been paid when due (taking into account any applicable extensions), including all Taxes with respect to the Facility.

(b)   There are no liens relating to Taxes on any of the Purchased Assets other than liens for Taxes not yet due and payable.

(c)   To Seller's Knowledge, proper and accurate amounts have been withheld by Seller in compliance with the payroll tax and other withholding provisions of all Applicable Laws, and all such amounts have been remitted to the proper taxing authority.

(d)   Seller has filed all tax returns required to be filed by it, including all tax returns relating to the Purchased Assets (all of which are true, complete and correct in all material respects).  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a tax assessment or deficiency, which currently remains in effect.

(e)   To Seller's Knowledge, no deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any liability or which may attach to the Purchased Assets.  There are no pending or, to Seller's Knowledge, threatened proceedings for or relating to any liability in respect of Taxes for which Seller may have any liability or which may attach to the Purchased Assets.  There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which Seller may have any liability or which may attach to the Purchased Assets.  No Governmental Authority has notified Seller that it has conducted an audit of any Taxes that may be due and owing by Seller or as the result of the Business audited by Seller, which currently remains outstanding or unresolved.

**3.23**   No Other Representation and/or Warranty.  Except for the representations and warranties contained in this Article 3 (including the related portions of the Schedules), Seller has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of or with respect to Seller, the Purchased Assets, the Facility or the Business, including any representation or warranty arising from statute or otherwise in law.

ARTICLE 4
**REPRESENTATIONS AND WARRANTIES OF BUYER**

In order to induce Seller to enter into this Agreement, Buyer makes the representations and warranties set forth below which are true, correct and complete on the Execution Date and shall be true, correct and complete as of the Closing.

**4.1**     Organization.  Buyer has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**4.2**     Execution and Delivery.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes and, upon the execution and delivery by Buyer of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

**4.3**     Governmental Approvals and Filings.  Except for the Buyer's Regulatory Approvals and the Sale Order, no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

**4.4**     Brokers.  Neither Buyer nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Seller.

**4.5**     Adequate Funds.  At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder.  As of the Execution Date, Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein.

**4.6**     Fitness for Obtaining Permits and Approvals.  Buyer has no knowledge of any material fact or other information related to Buyer or any of its Affiliates which could be reasonably expected to have an adverse impact on Buyer's ability to obtain the Permits or Approvals.  To Buyer's Knowledge, it has been in material compliance with Healthcare Regulatory Laws and has not received any communication from a Governmental Authority or third-party payors that would prohibit or delay the Buyer from consummating the transaction contemplated herein or obtaining the Buyer's Regulatory Approvals.

**4.7**     Condition of Assets.

(a)     Buyer acknowledges that it has fully inspected or waived the right to inspect the Purchased Assets prior to the execution of this Agreement and does hereby assume all the risks, including, but not limited to, latent defects in the Facility.  Seller shall not be obligated to do any work or alter, restore, repair or develop the Facility.  Any work (including demolition) which may be necessary to adapt the Facility for Buyer's occupancy or for the operation of Buyer's business shall be the sole responsibility of Buyer and shall be performed by Buyer at its sole cost and expense.

(b)     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES

WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE FACILITY (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE FACILITY; THE PHYSICAL CONDITION OF THE FACILITY; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE FACILITY OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE FACILITY; THE ZONING OF THE FACILITY; THE POSSIBILITY OF DEVELOPING OR USING THE FACILITY IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE FACILITY; THE FITNESS OF THE FACILITY, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYER WITH RESPECT TO THE FACILITY (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE FACILITY). BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLER. BUYER ALSO ACKNOWLEDGES THAT BUYER HAS CONDUCTED OR WAIVED THE RIGHT TO CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE FACILITY AND ALL SUCH OTHER MATTERS RELATED TO OR AFFECTING THE FACILITY, AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IS ACQUIRING THE FACILITY, BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS OR BUYER'S INDEPENDENT JUDGMENT, AND BUYER IS NOT RELYING UPON ANY REPRESENTATIONS OF SELLER OR SELLER'S AGENTS. ACCORDINGLY, BUYER HEREBY ACCEPTS THE FACILITY IN ITS "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS.

(c)     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PURCHASED ASSETS. BUYER HEREBY ACCEPTS THE PURCHASED ASSETS IN THEIR "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS. BUYER UNDERSTANDS AND AGREES THAT BUYER'S SOLE RECOURSE FOR ANY BREACH OF A REPRESENTATION AND WARRANTY MADE BY SELLER UNDER THIS AGREEMENT PRIOR TO CLOSING IS TO TERMINATE THE AGREEMENT IN ACCORDANCE WITH ARTICLE 7 AND THAT ALL OF SELLER'S REPRESENTATIONS AND WARRANTIES SHALL EXPIRE UPON THE OCCURRENCE OF, AND SHALL NOT SURVIVE, THE CLOSING AND THAT BUYER SHALL HAVE NO RECOURSE TO SELLER OR ANY AFFILIATE OF SELLER FOR ANY BREACH OF THE SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREIN EITHER PRIOR TO OR FOLLOWING THE CLOSING. NOTWITHSTANDING ANYTHING TO THE CONTRARY

CONTAINED ABOVE, SELLER SHALL BE LIABLE TO COMPLY WITH ANY AND ALL POST-CLOSING COVENANTS CONTAINED IN THIS AGREEMENT.

(d)     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS (a) THROUGH (c), BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER, WHETHER KNOWN OR UNKNOWN, ACTUAL OR CONTINGENT, FORESEEN OR UNFORESEEN, RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PURCHASED ASSETS AND THE FACILITY, EITHER PATENT OR LATENT, (ii) POST-CLOSING POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE FACILITY, OR (iii) REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE FACILITY.

(e)     Except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any of the Seller Indemnitees as to the condition or repair of the Facility or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Facility or the condition, repair, value, expense of operation or income potential of the Facility or any portion thereof.  The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Agreement and Related Agreements, which alone fully and completely express their Agreement, and that this Agreement has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Agreement or the Related Agreements.  Buyer acknowledges that Seller has requested that Buyer inspect the Facility fully and carefully and investigate all matters relevant thereto and that Buyer rely solely upon the results of Buyer's own inspections or other information obtained or otherwise available to Buyer, rather than any information that may have been provided by Seller to Buyer.

(f)     The provisions of this Section 4.7 will survive the Closing.

ARTICLE 5
**COVENANTS**

**5.1**     Access to Books and Records.  From and after the Closing, the Buyer shall afford, for a period ending on the later of (i) three (3) years from the Closing Date and (ii) the date of the entry of a final decree or an order converting or dismissing the Chapter 11 Case, the Seller and its representatives reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Governmental Authority, (d) in connection with any threatened or actual legal proceeding, (e) in connection with any audit of the Business for any pre-Closing period, or (f) in connection with administering the Chapter 11 Case, or any subsequent Chapter 7 case.  During such period neither Party shall dispose of or destroy

any books, records or other data relating to the operation of the Business prior to the Closing unless such Party gives the other Party thirty (30) days' prior written notice thereof and the option to retain such books, records or other data.

**5.2** <u>Cooperation; Approvals</u>. Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement.

**5.3** <u>Further Assurances</u>. Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Buyer's reasonable request, the Seller will execute and deliver to Buyer such other instruments of sale, transfer, conveyance and assignment, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Purchased Assets.

**5.4** <u>Buyer's Closing Deliveries</u>. At the Closing, Buyer shall deliver the following to Seller:

(a) the Purchase Price, net of the cash portion of the Deposit to be applied thereto;

(b) the Related Agreements to which Buyer is a party, duly executed by Buyer;

(c) a certificate executed as of the Closing Date by a duly authorized representative of the Buyer, certifying that the conditions set forth in this Agreement have been satisfied;

(d) a certificate of a duly authorized representative of Buyer (i) certifying that attached to such certificate are true and complete copies of (A) Buyer's organizational documents, each as amended through and in effect on the Closing Date and (B) resolutions of the authorized representative of Buyer, authorizing the execution, delivery and performance of this Agreement and the Related Agreements to which Buyer is a party and the consummation of the transactions contemplated by this Agreement and the Related Agreements, and (ii) certifying as to the incumbency of the officer of Buyer executing this Agreement and the Related Agreements to which Buyer is a party;

(e) a certificate of good standing (or the equivalent) for Buyer from the Delaware Secretary of State;

(f) all Buyer's Regulatory Approvals except those not required by Applicable Law to be issued at or prior to Closing and that the Parties have agreed will be obtained post-Closing pursuant to <u>Section 5.10</u>;

(g) all instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing an/or recording, and other documents as are reasonably necessary to effectuate the sale of the Purchased Assets, including customary documents required in order for title policies to be issued by the Title Company to Buyer at Closing; and

(h)     all other documents and instruments contemplated to be delivered by Buyer pursuant to this Agreement.

**5.5**     Seller's Closing Deliveries.  At the Closing, Seller shall deliver the following to Buyer:

(a)     the Related Agreements to which the Seller is a party, duly executed by the Seller;

(b)     an Owner's Affidavit executed by Seller in the form provided by the Title Company;

(c)     a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller;

(d)     Michigan Form UIA 1027 in connection with Seller's unemployment tax account; and

(e)     all other documents and instruments contemplated to be delivered by Seller pursuant to this Agreement.

**5.6**     Deposit.  Except as set forth in Section 7.2, the Deposit is non-refundable to the Buyer.

**5.7**     Employees.

(a)     Immediately prior to the Effective Time (the "**Termination Date**"), Seller shall terminate all of its employees, and, as of the Effective Time, Buyer shall offer employment to such persons (except for those employees listed on Schedule 5.7) on an at-will basis and subject to Buyer's pre-employment screenings and employment practices, policies and procedures.  Seller agrees to use its commercially reasonable efforts to make employment records and other related information reasonably requested by Buyer available to Buyer, subject to Applicable Law.

(b)     Following the Effective Time, Buyer shall provide benefits and other terms and conditions of employment to the Transferred Employees (as defined below) at substantially the same levels as those offered by Seller immediately prior to the Closing.

(c)     Seller shall provide Buyer, at least twenty (20) days prior to the Closing Date, a schedule setting forth, for each employee, the amount of accrued but unused paid time off (including any accrued sick time) for each employee as of the Closing Date (collectively, "**Accrued PTO**") and the aggregate value of the Accrued PTO.  Seller shall provide Buyer on the Closing Date with an updated version of such schedule reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date.  On the Closing Date, Buyer shall assume the Accrued PTO balances with respect to the Transferred Employees and Buyer will, thereafter, be responsible for paying the Accrued PTO to the Transferred Employees in accordance with the Seller's applicable policies and procedures in effect at the Closing.

(d)     Not more than fifteen (15) days after the Execution Date, Seller shall provide Buyer with a list (the "**Schedule of Employees**") of all employees of Seller working at the Facility, including, for each listed employee, his or her name, date of hire, job title, full-time/part-time status, exempt/non-exempt status, bonus eligibility, commission eligibility, severance entitlement, current compensation paid or payable, including annual PTO (both allotted annually and accrued but unused as of the date of the Schedule of Employees) and status (e.g., leave of absence, disability, layoff, active, temporary).

(e)     Buyer shall offer immediate employment (so that no period of unemployment shall occur between employment with Seller and employment with Buyer) to a sufficient number of Seller's employees to ensure that there will be no violation of the WARN Act or any comparable state or local laws with such employment to commence at 12:01 a.m. on the Closing Date (such employees who accept such offer from Buyer, the "**Transferred Employees**"). If Buyer fails to offer immediate employment to a sufficient number of employees, Buyer agrees that it shall be responsible for any associated liabilities arising under the WARN Act or any comparable state or local laws.  Buyer shall (i) prior to the Closing Date, identify to Seller all of Seller's employees to which Buyer will not offer employment, and (ii) ten (10) days prior to the Closing Date, identify to Seller all of Seller's employees to whom offers will be made by Buyer. In furtherance and not in limitation of the foregoing, Buyer shall treat prior service with Seller reflected in the information provided above as service with Buyer for purposes of determining eligibility to participate and vesting in all benefits programs maintained by Buyer.  Seller shall cooperate with Buyer in providing information reasonably requested by Buyer to facilitate hiring and establishing benefits for Transferred Employees who accept employment with Buyer.  This Agreement shall not be deemed to create or grant to any Transferred Employee any third-party beneficiary rights or claims or any cause of action of any kind or nature.  Buyer agrees that it will continue to employ all Transferred Employees that provide direct care to the residents for a period of not less than twelve (12) months from the Closing Date, subject to such employee's compliance with law and policies and procedures.

(f)     At Buyer's sole cost and expense (other than for employee cost-sharing), Buyer shall make available to the Transferred Employees and M&A qualified beneficiaries group health plan coverage on and after the Closing Date sufficient to extinguish any rights a Transferred Employee and M&A qualified beneficiaries may have to continuation of coverage under any of Seller's group health plans including, but not limited to, COBRA insurance coverage, if a Transferred Employee or M&A qualified beneficiary so elects such coverage in accordance with Applicable Law.

**5.8**     Bankruptcy Matters.  If Buyer is not selected as the Successful Bidder or Backup Bidder at the Auction, the Deposit shall be refunded to Buyer within three (3) Business Days following entry of the Sale Order.  If Buyer is selected as the Backup Bidder at the Auction, Buyer understands and acknowledges that it will remain obligated hereunder as the Backup Bidder and will not have its Deposit refunded except in accordance with Section 7.2(c).  In the event Buyer is the Backup Bidder, then the Closing Date shall be set by the Parties no sooner than one hundred twenty (120) days from the date that Buyer receives formal notice that the Seller will proceed with the Backup Bidder transaction ("**Backup Notice**").  If Backup Notice has not been sent to Buyer by December 31, 2021, then Buyer may terminate this Agreement on written notice to Seller, the Deposit and all accrued interest shall be immediately released to the Buyer by the Escrow Agent, Buyer shall no longer have the status of Backup Bidder and this Agreement shall otherwise be or no further force and effect.

**5.9**     <u>Assumed and Assigned Contracts</u>.

(a)     <u>Cure Process</u>.  Buyer shall assume all obligations from and after the Closing Date under Assumed Contracts, and at such time as is required by the Bankruptcy Court in the Sale Order, shall pay cash or other acceptable consideration to the third party (or parties) to the applicable Assumed Contract (each, a "**Contract Party**") in order to cure the monetary defaults and satisfy any pecuniary obligations of Seller (or obtain waivers with respect thereto) with respect to the Business, and to provide adequate assurance of future performance under the Assumed Contracts.

(b)     <u>Identification of Assumed Contracts</u>.  Within ten (10) days after the Execution Date, Buyer shall provide a <u>Schedule 5.9(b)</u>, which schedule can be modified by the Buyer up to five (5) Business Days before the Closing Date, identifying (i) all Contracts Buyer wishes to be assumed by Seller and assigned by the Seller to Buyer at Closing (the "**Assumed Contracts**"); and (ii) all Contracts that Buyer will not be seeking to be assigned by the Seller (the "**Rejected Contracts**").  Seller shall move to assume and assign to Buyer, effective as of the Closing Date, any Assumed Contract that is designated on or before the 10th day after the Execution Date by Buyer to Seller.  Notwithstanding anything to the contrary set forth herein, Buyer shall be permitted to remove any Contract from the Assumed Contracts list and place it on the Rejected Contracts list until five (5) Business Days before the Closing Date. After the Closing Date, the Seller shall be released from any further liability under such Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

(c)     <u>Non-Assignment of Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (i) notwithstanding section 365 of the Bankruptcy Code, an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or (ii) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract for any reason (each such action in (i) and (ii), a "**Necessary Consent**").  In such event, Seller and Buyer shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price.  Nothing in this <u>Section 5.9</u> shall in any way diminish or enlarge (x) Buyer's obligations hereunder to obtain the applicable Approvals, or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

**5.10**     <u>Buyer's Regulatory Approvals</u>. Buyer shall use commercially reasonable efforts to obtain as expeditiously as possible, and in any event prior to the Closing Date, all Regulatory Approvals necessary to permit Buyer's consummation of the transactions contemplated by this Agreement, all as set forth on <u>Schedule 5.10</u> (collectively, "**Buyer's Regulatory Approvals**"). Commercially reasonable efforts shall include, but not be limited to, requiring Buyer to apply for all such Buyer's Regulatory Approvals no later than three (3) Business Days after entry of the Sale Order.  Seller shall cooperate in all reasonable respects with Buyer in its efforts to obtain such consents, approvals and licenses.  Seller and Buyer shall provide the other party and the Bond Trustee with all correspondence concerning the Buyer's Regulatory Approvals within one (1) Business Day of receipt of such correspondence.

**5.11**    Additional Financial Information.    Seller has delivered to Buyer copies of the unaudited balance sheets, statements of operations, statements of changes in net assets, and statements of cash flows (including the accompanying consolidating schedules of balance sheet information and statement of operation information) of Seller for the month of December, 2020, and within forty-five (45) days following the end of each calendar month prior to the Closing Date, Seller will deliver to Buyer copies of the unaudited balance sheets and statements of operations of Seller for each month then ended (all such financial statements are referred to herein as the "**Additional Financial Statements**").    The Additional Financial Statements shall be prepared from and in accordance with Seller's books and records, shall fairly present the financial position and results of operations of Seller relating to the Facility of the date and for the period indicated, and shall be prepared in accordance with GAAP, consistently applied, except that such Additional Financial Statements need not include required footnote disclosures, nor reflect normal year-end adjustments or adjustments that may be required as a result of the transactions contemplated by this Agreement.

**5.12**    Seller-Specific Covenants.    From the Execution Date until the earlier of termination of this Agreement or the Closing, Seller shall use commercially reasonable efforts to (except as otherwise consented to or approved by Buyer in writing, which consent or approval shall not be unreasonably withheld, conditioned or delayed):

(a)    operate the Business in the ordinary course consistent with Seller's past practices, as operated during the Seller's bankruptcy;

(b)    preserve and keep all its books and records related to or prepared in connection with the Purchased Assets, subject to Seller's normal document retention protocol;

(c)    obtain, on or prior to the Closing, any consents required to be obtained by Seller necessary for Seller to fulfill its obligations to consummate the transactions contemplated hereby;

(d)    comply in all material respects with all Applicable Laws, in conjunction with the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(e)    timely file federal, state, and local tax returns, and pay all amounts then due (other than those amounts being disputed in good faith and with appropriate proceedings), with respect to all periods through and including the Closing Date;

(f)    not sell, lease or otherwise dispose of all or any part of any Facility or the Purchased Assets other than in the ordinary course of business;

(g)    not enter into any agreement for the performance of material capital expenditures at the Real Property (or any portion thereof) which will not be paid for by Seller prior to the Closing or enter into any capital or equipment leases;

(h)    promptly notify Buyer of any litigation, arbitration or administrative proceeding pending or, to Seller's Knowledge, threatened against Seller which challenges the transactions contemplated herein;

(i)     provide Buyer with all material information regarding SNF census, residents at the Facility and payroll;

(j)     reasonably cooperate with Buyer with respect to all transitional matters;

(k)     not increase in any manner the rate or terms of compensation or benefits of any Facility employees, except as may be required under existing employment agreements or benefit plans or in the ordinary course of business consistent with past practices, or as provided for pursuant to the Chapter 11 Case;

(l)     not hire any new employees other than in the ordinary course of business; provided that Seller shall consult with Buyer prior to hiring any management-level employee;

(m)     not terminate the employment of any employees (other than in the ordinary course of business); provided that Seller shall consult with Buyer prior to terminating any management-level employee;

(n)     after consultation with Buyer and after entry of the Sale Order, permit Buyer and/or its representatives to have a reasonable presence at the Facility including the SNF and to interact with Facility staff, subject to Section 5.18 and all Applicable Laws;

(o)     after consultation with Buyer, permit Buyer and/or its representatives to hold group meetings with Transferred Employees for purposes of addressing employment and transitional matters;

(p)     permit Buyer and/or its representatives to tour the Facility for purposes of determining capital expenditure and financing needs; and

(q)     afford Buyer and Buyer's employees, auditors, legal counsel, lenders, or other authorized representatives all reasonable opportunity and access during normal business hours upon reasonable prior notice to Seller.

**5.13**   Residents.

(a)     Buyer intends to operate the Facility as a rental facility consistent with the standards and levels of care provided by Seller prior to the Closing Date. From and after the Closing Date, Buyer will not accept refundable entrance fees from residents upon move in.  Except as modified pursuant to Section 5.13(b)(iii) below, Buyer shall assume all Rental Residency Agreements.

(b)     Upon the Closing Date, all Current Entrance Fee Residents shall have the opportunity to enter into a Modified Residency Agreement.  Buyer shall provide a form of Modified Residency Agreement consistent with the terms of this Agreement to Seller for review within fourteen (14) days of the Execution Date

(i)     **Current Entrance Fee Residents that are Escrowed Residents**: Escrowed Residents shall be entitled to return of their unearned escrowed funds in accordance with the provisions of the LARA Escrow Agreement and LARA Escrow Order.  Escrowed Residents

will not be able to participate in the Current Resident Entrance Fee Refund Program and will not have a claim against the Debtor estate. Escrowed Residents shall be entitled to execute a Modified Residency Agreement. Upon execution of a Modified Residency Agreement by an Escrowed resident, the Entrance Fee Residency Agreement shall be assumed by Buyer as modified by the Modified Residency Agreement. The Modified Residency Agreement shall provide, among other things, that: (A) an Escrowed Resident shall be entitled to receive free or reduced charge care if such resident is receiving such care as of the Closing Date or the right to receive such care is included in the resident's Entrance Fee Residency Agreement in effect as of the Closing Date; and (B) such resident's rental rate shall be consistent with the rates pursuant to their Entrance Fee Residency Agreement in effect as of the Closing Date, and for a period of three (3) years from the Closing Date, shall not increase except for a standard annual cost of living adjustment, consistent with the consumer price index for urban wage earners and clerical workers ("**CPI-W**"). Any Escrowed Resident that does not execute a Modified Residency Agreement or a new rental agreement (which shall be at market rate established for all new incoming residents that are not Current Residents), shall have their Entrance Fee Residency Agreement rejected. In such event, such resident may be treated as a holdover tenant subject to legal process by Buyer.

(ii) **Current Entrance Fee Residents that are not Escrowed Residents**: Current Entrance Fee Residents shall be entitled to execute a Modified Residency Agreement. Upon execution of a Modified Residency Agreement by a Current Entrance Fee Resident, the Entrance Fee Residency Agreement shall be assumed by Buyer as modified by the Modified Residency Agreement. The Modified Residency Agreement shall provide, among other things, that: (A) such resident shall be entitled to participate in the Current Resident Entrance Fee Refund Program (and for clarity, any such resident that executes a Modified Residency Agreement will only be entitled to refunds provided by the Current Resident Entrance Fee Refund Program and will not have any other claim, against the Debtor estate or Buyer, with respect to such Current Resident's Entrance Fee Residency Agreement); (B) such resident shall be entitled to receive free or reduced charge care if such resident is receiving such care as of the Closing Date or the right to receive such care is included in the resident's Entrance Fee Residency Agreement in effect as of the Closing Date; and (C) such resident's rental rate shall be consistent with the rates pursuant to their Entrance Fee Residency Agreement in effect as of the Closing Date, and for a period of three (3) years from the Closing Date, shall not increase except for a standard annual cost of living adjustment, consistent with the CPI-W. Any Current Entrance Fee Resident that does not execute a Modified Residency Agreement or a new rental agreement (which shall be at market rate established for all new incoming residents that are not Current Residents), shall have their Entrance Fee Residency Agreement rejected. In such event, such resident may be treated as a holdover tenant subject to legal process by Buyer.

(iii) **Current Residents with Rental Residency Agreement**: Current Residents shall be entitled to have their current Rental Residency Agreements assumed and modified on terms and conditions satisfactory to Buyer, provided that any such new rental residency agreements shall reflect such resident's rental rate consistent with the rates pursuant to their Rental Residency Agreement in effect as of the Closing Date, and for a period of three (3) years from the Closing Date, shall not increase except for a standard annual cost of living adjustment, consistent with the CPI-W. Buyer shall provide a form of Modified Rental Agreement consistent with the terms of this Agreement to Seller for review on or before April 30, 2021. Current Rental Residents that decline to enter into Modified Rental Agreements or a new rental

agreement (which shall be at market rate established for all new incoming residents that are not Current Residents), shall be subject to having their Rental Residency Agreements rejected and may, at Buyer's option, be treated as a holdover tenant subject to legal process by Buyer. From and after the Execution Date, Seller shall not enter into any Rental Residency Agreements at a discounted rental rate. Buyer shall have the right to reject any Rental Residency Agreement executed from and after the Execution Date which has a discounted rental rate.

(iv) Buyer shall have no obligations or liabilities with respect to Entrance Fee Residency Agreement of all Former Residents.

(c) Without limiting the foregoing, the terms of all residency agreements following the Closing shall be consistent with the terms of the matrix contained in the Stalking Horse Notice filed with the Bankruptcy Court simultaneously with the filing of this Agreement.

### 5.14 Current Resident Entrance Fee Refund Program.

(a) All Current Entrance Fee Residents who are not Escrowed Residents, who are parties to Entrance Fee Residency Agreements, and who enter into a Modified Residency Agreement shall be entitled to participate in the Current Resident Entrance Fee Refund Program (the "**Eligible Current Entrance Fee Residents**"). Buyer shall devote a portion of the future revenues of the Facility to payment of Entrance Fee Refund Liability to Eligible Current Entrance Fee Residents. Buyer shall create an escrow account (the "**Refund Liability Escrow**") into which Buyer shall deposit 50% of the Excess Facility Revenues until such time as Buyer receives a written opinion from a third-party accounting or actuarial professional that the Refund Liability Escrow has been sufficiently funded to ensure the following recoveries to participants in the Current Resident Entrance Fee Refund Program with respect to the payment of Entrance Fee Refund Liabilities:

| Length of Stay after Closing Date | Percentage of Entrance Fee Refund Liability Paid to Resident Upon Move-Out |
|---|---|
| 1 Year | 8% |
| 3 Years | 12% |
| 5 Years | 22% |
| 7 Years | 30% |
| 9 Years | 38% |
| 11 Years | 46% |
| 13 Years | 54% |
| 15 Years | 60% |

Buyer will prepay 5% of the Entrance Fee Refund Liability to the Eligible Current Entrance Fee Residents within 120 days of the Closing Date, which amount will be decreased from the total amount owed to such Eligible Current Entrance Fee Resident upon move-out.

(b) The recovery reflected in the table above with respect to Year 1 shall be the base recovery available to all applicable Current Residents who do not leave the facility of their own volition and shall be paid to the estate of any Current Resident who is no longer a resident of

the Facility during the first year due to the death of such resident, within ninety (90) days from the date the Buyer receives notice of the death of such resident.

(c) Notwithstanding the foregoing, if the aggregate Refund Liability Escrow deposits are insufficient to fully fund the Current Resident Entrance Fee Refund Program, then the Buyer shall be obligated to fund any deficit regardless of the extent of Excess Facility Revenues. All refunds under the Current Resident Entrance Fee Refund Program shall be paid within ninety (90) days from the date the resident entitled to a refund vacates and delivers possession to the Buyer of the occupied unit.

(d) All Escrowed Residents shall receive the unearned portion of their escrowed funds, when the LARA Escrow Agreement is terminated, with LARA's Approval, which will occur on or prior to the Closing Date.

**5.15** <u>Commitment to Benevolence Care</u>. From and after the Closing Date, Buyer shall (a) continue to honor all arrangements put in place by Seller with respect to any Current Residents of the Facility receiving free or reduced charge care as of the Closing Date and the Modified Residency Agreement shall provide for the same benevolence care benefits provided for under the Entrance Fee Residency Agreement under standards and criteria established by Seller prior to the execution of this Agreement, including as described in <u>Section 5.13(b)(i)</u>, and (b) without limiting subsection (a), continue to offer care to residents for free or at reduced charges provided such residents meet Buyer's benevolence care guidelines. Buyer shall establish an independent, charitable, tax-exempt foundation under Section 501(c)(3) of the Internal Revenue Code (the "**Foundation**") to raise funds with which to continue the charitable mission of Seller by providing free or reduced charge care to Residents in need who meet Buyer's benevolence care guidelines. Buyer, while it remains the licensed operator, shall commit to contribute not less than $100,000 annually to the Foundation. Buyer shall hire or cause the Foundation to hire a fundraising director help the foundation raise funds for this purpose. Buyer shall offer at least two (2) seats on the Board of Directors of the Foundation to officers or directors of Seller. Notwithstanding the foregoing, Buyer shall continue to fund all applicable free and reduced charge care obligations set forth in this <u>Section 5.15</u>, regardless of the extent of funds raised by the Foundation. Buyer agrees to give preferential placement to all current residents of the independent living facility into the assisted living and/or skilled nursing facilities.

**5.16** <u>Transfer of Resident Trust Funds and Deposits</u>.

(a) At the Closing, Seller shall deliver to Buyer a true, correct and complete schedule of all trust funds held by Seller as of the most recent date available prior to the Effective Time for any current resident of the SNF (collectively, the "**Resident Trust Funds**") and deposits or prepayments paid by or for any resident of the Facility (collectively, the "**Resident Deposits**").

(b) At the Closing, Seller shall transfer the Resident Trust Funds and Resident Deposits to Buyer, and Buyer shall accept, the Resident Trust Funds and Resident Deposits in trust for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Seller and Buyer shall prepare a final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Seller to Buyer.

### 5.17 Accounts Receivable.

(a)     With respect to the post-Closing billing practice to be applied with respect to Accounts Receivable due to Seller from private pay, managed care and long-term care insurance patients after the Effective Time, Seller shall prepare and send to the appropriate responsible parties for such patients bills for all periods up to and including the Effective Time.  All such Accounts Receivable as and when paid and received shall be the property of the Buyer and to the extent Seller controls any accounts into which Accounts Receivable is paid, Seller shall hold such funds in trust for the Buyer and shall remit all such funds to the Buyer within ten (10) Business Days of receipt.  Seller shall provide Buyer with access to all accounts into which Accounts Receivable are paid.  The Parties acknowledge that after the issuance to Buyer of the "tie-in notices" from CMS, Buyer may contact its Medicaid intermediary, Medicare intermediary, the applicable State agency or any other third-party payor to remit payment directly to Buyer for services rendered after the Effective Time; provided, however, that the Parties shall coordinate and cooperate with each other regarding such notification to avoid any conflicting or confusing payment instructions.

(b)     During the period prior to all "tie-in-notices" being received by Buyer, Seller shall promptly forward to Buyer all remittance advices, explanations of benefits, denial of payment notices, and other related correspondence received by Seller with respect to the Accounts Receivable for services provided after the Effective Time.

### 5.18 Buyer Entry on Premises.

(a)     To the extent and on each occasion when Buyer and Seller agree for Buyer and/or its representatives (collectively "**Buyer Personnel**") to enter the Facility or Real Property in accordance with Section 5.12(n), Buyer Personnel shall at all times use commercially reasonable efforts to minimize any disruption to Seller's business and operations.

(b)     BUYER SHALL DEFEND, INDEMNIFY AND HOLD SELLER HARMLESS FROM, ANY LOSS, COST, DAMAGE, INJURY OR EXPENSE OF ANY KIND OR NATURE (INCLUDING REASONABLE ATTORNEYS' FEES INCURRED IN CONNECTION THEREWITH) ARISING FROM OR IN ANY WAY CONNECTED WITH BUYER PERSONNEL'S ENTRY ONTO THE REAL PROPERTY, INCLUDING ANY OBLIGATIONS ARISING WITH RESPECT TO BUYER'S OBLIGATIONS TO ITS PERSONNEL. SELLER SHALL PROMPTLY NOTIFY BUYER OF THE EXISTENCE OF THE CLAIM, DEMAND, ACTIONS AND RIGHT OF ACTION COVERED BY THE FOREGOING INDEMNITY AND SHALL BE GIVEN REASONABLE OPPORTUNITY TO PARTICIPATE IN THE DEFENSE THEREOF.

(c)     Buyer shall maintain a policy of commercial general liability insurance relating to the Buyer Personnel, with minimum limits of liability as may be agreed upon by the Parties. This policy of insurance shall name Seller as an additional insured and shall be non-cancellable with respect to Seller without thirty (30) days' written notice to Seller.

### 5.19 Disclosure Schedules.  The Parties agree to the Disclosure Schedules attached to this Agreement.

**5.20** <u>Capital Improvements</u>.  Buyer commits to invest not less than Four Million Dollars ($4,000,000) to capital improvements at the Facility within two years of the Closing Date.

ARTICLE 6
**CONDITIONS TO CLOSING**

**6.1** <u>Conditions to Obligations of Seller to Close</u>.  The obligation of the Seller to effect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions, any of which may, in sole discretion of the Seller, be waived in whole or in part:

(a) <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall have entered the Sale Order on terms reasonably satisfactory to the Parties approving a sale to Buyer and it shall not be subject to a stay pending appeal.

(b) <u>Observance and Performance</u>.  Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Buyer shall remain true and correct as of Closing.

(c) <u>Buyer Transaction Documents</u>.  Buyer shall have delivered to Seller all the documents, instruments and agreements set forth in <u>Section 5.4</u>.

(d) <u>No Legal Actions</u>.  No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

(e) <u>Approvals</u>.  Buyer shall have obtained the Buyer's Regulatory Approvals.

**6.2** <u>Conditions to Obligation of Buyer to Close</u>.  The obligation of Buyer to affect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions, any of which may, in Buyer's sole discretion, be waived in whole or in part:

(a) <u>Compliance by Seller with Covenants and Representations Correct</u>.  All the covenants and obligations of this Agreement to be complied with and performed by Seller at or before the Closing Date shall have been complied with and performed in all material respects.  The representations and warranties made by Seller in this Agreement that are not qualified as to "materiality" shall be true and correct in all material respects as of the date hereof, and all representations and warranties that are qualified as to "materiality" or "material adverse effect" shall be true, correct and complete in all respects, as of the date hereof.  The representations and warranties made by Seller in this Agreement (other than those that speak as of a specified date or time) shall be true and correct in all respects, as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent such failure to be true and correct has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)　　Seller Transaction Documents.  Seller shall have delivered to Buyer all the documents, instruments and agreements set forth in Section 5.5.

(c)　　No Legal Action.  No action, suit, investigation, other proceeding or Claim shall have been instituted before any court or before or by any government or governmental agency or instrumentality seeking to prevent or enjoin the consummation of the transactions contemplated by this Agreement.

(d)　　Bankruptcy Matters.  The Bankruptcy Court shall have entered the Sale Order and it shall not be subject to a stay pending appeal.

(e)　　Sale Order.  The Sale Order shall be entered by the Bankruptcy Court and shall not be subject to any stay pending appeal.

(f)　　Compliance.  The Facility shall not be Out of Compliance.

(g)　　Material Adverse Effect.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect.

(h)　　Title.  The Title Company is prepared to issue, as of the Closing Date, an Owner's Policy of Title Insurance in substantially the same form and substance as the Pro Forma Title Policy, insuring Buyer's fee interest in the Facility subject only to the Permitted Liens upon payment by Buyer of the premium for such policy (it being acknowledged and agreed said premium shall be at Buyer's sole cost and expense).

**6.3**　　Approvals.

(a)　　Seller shall have obtained all Regulatory Approvals necessary for Seller's consummation of the transaction contemplated herein and the continued operation of the Business as set forth on Schedule 6.3 (collectively, the "**Seller's Regulatory Approvals**").

(b)　　Buyer shall coordinate and cooperate with Seller to obtain the Seller's Regulatory Approvals.

ARTICLE 7
**TERMINATION**

**7.1**　　Termination.  This Agreement may be terminated at any time before the Closing:

(a)　　by mutual written agreement of Buyer and Seller;

(b)　　by either Buyer or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, or has made a representation or warranty that is not true and correct in all material respects, which breach or inaccuracy is not cured within ten (10) Business Days after written notice thereof is received, provided, however, that the terminating party is not in material breach or default of this Agreement;

(c)     by either Buyer or Seller if the sale is disapproved by the Bankruptcy Court, or an Alternative Transaction has been consummated;

(d)     by either Buyer or Seller if the Closing has not occurred for any reason including the failure to satisfy a condition to Closing under Article 6 by the Closing Date by no fault of the Party terminating; provided that if Seller is Out of Compliance on the Closing Date, but all conditions to Closing other than Section 6.2(f) have been met, then Buyer may not terminate the Agreement pursuant to this Section 7.1(d) so long as Seller is diligently pursuing resolution of such Out of Compliance status, and the period to cure an Out of Compliance status does not extend beyond sixty (60) days after the Closing Date;

(e)     by Seller, if Buyer is not diligently pursuing the Closing, including all Buyer's Regulatory Approvals, or if Buyer has received notice that it is not reasonably likely to receive all Buyer's Regulatory Approvals, such that the Closing can occur on or prior to the Closing Date;

(f)     by either Buyer or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided by an order of a court of competent jurisdiction;

(g)     by Buyer, if, prior to the Closing Date, Seller files a motion in the Chapter 11 Case (i) seeking to dismiss the Chapter 11 Case or convert the Chapter 11 Case to a chapter 7 case; or (ii) to take any other action or actions adverse to Buyer or its rights and remedies hereunder or under this Agreement in any material respect;

(h)     by Buyer, in the event an appeal of the Sale Order is filed (and a stay pending appeal is granted), and not resolved by the Closing Date;

(i)     by Buyer pursuant to Section 5.8(b); and

(j)     by Buyer pursuant to Section 2.7.

**7.2**     Remedies.

(a)     Termination, plus any rights the parties shall have under this Section regarding the Deposit, shall be the sole remedy of the Parties for a breach of this Agreement. If the Closing does not occur in accordance with this Agreement and Buyer has defaulted under or breached this Agreement, then Buyer will be deemed to have forfeit its Deposit as liquidated damages. If the Closing does not occur in accordance with this Agreement and Buyer has not defaulted or breached this Agreement, the Deposit and all accrued interest will be returned to Buyer.

(b)     The Parties intend that the Deposit constitute compensation, and not a penalty. The Parties acknowledge and agree that the either Party's harm caused by the other Party's default or breach of this Agreement would be impossible or very difficult to accurately estimate as of the Execution Date, and that Deposit (or return of the Deposit, as the case may be) is a reasonable estimate of the anticipated or actual harm that might arise from such a default or breach. The transfer and/or return of the Deposit is each Party's sole liability and entire obligation

and the exclusive remedy for the other Party's default or breach of this Agreement. If the Closing does not occur on or before the Closing Date, the Deposit shall be disbursed in accordance with this Agreement.

(c)      Immediately upon the occurrence of any termination of this Agreement pursuant to Section 7.1(a), Section 7.1(b) where Buyer is the terminating Party, Section 7.1(c), Section 7.1(d) where Buyer is the terminating Party, Section 7.1(e) (so long as the termination is not due to Buyer's failure to diligently pursue Closing), Section 7.1(f), and Section 7.1(g), Section 7.1(h), Section 7.1(i), or Section 7.1(j), the Escrow Agent shall refund the Deposit and all accrued interest to Buyer. If the termination is pursuant to Section 7.1(c) as the result of an Alternative Transaction, then subject to and in accordance with the terms of the Bid Procedures Order and provided Buyer has not breached this Agreement, (i) upon the entry of the Sale Order, if Buyer is neither the Successful Bidder, nor the Backup Bidder, then Escrow Agent shall refund the Deposit to Buyer within three (3) Business Days.

(d)      In all other circumstances, the Deposit shall be forfeited to the Seller and the Seller shall be released from all obligations to Buyer hereunder.

# ARTICLE 8
## MISCELLANEOUS

**8.1**    <u>Expenses</u>. Except as specifically set forth in this Agreement or any Related Agreement, the Parties shall bear their own expenses, including, without limitation, fees, disbursements and other costs of any attorneys, accountants and other advisors, in connection with this Agreement, the Related Agreements, and the transactions contemplated hereby and thereby. This section shall not apply, if the Closing does not occur, to any existing or future litigation, if a right to attorneys' fees and expenses otherwise exists.

**8.2**    <u>Notices</u>. All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a)(i) sent by nationally recognized overnight courier for next Business Day delivery, or (ii) personally delivered by hand, *and* (b) sent by email, addressed as follows:

| | |
|---|---|
| Seller: | Chad J. Shandler<br>Senior Managing Director, Corporate Finance &<br>  Restructuring<br>FTI Consulting<br>3 Times Square<br>New York, NY 10036<br>Email: chad.shandler@fticonsulting.com |
| With a simultaneous copy to: | Dykema Gossett PLLC<br>39577 Woodward Avenue, Suite 300<br>Bloomfield Hills, Michigan 48304<br>Attn: Sheryl L. Toby |

Email: SToby@dykema.com

Buyer:                           HFV Opco, LLC
395 Pearsall Avenue, Suite K
Cedarhurst, NY 11516
Attention:  Sam Tennenbaum
Email:  sam@sagehcp.com

With a simultaneous copy to:     Gutnicki LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
Attn.:  Stacy J. Flanigan, Esq.
         Mimi Stein, Esq.
Email: sflanigan@gutnicki.com
       mstein@gutnicki.com

or, in each case, such other address as may be specified in writing to the other Party.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (x) if by hand delivery, on the day after such delivery, (y) if by electronic means and the transmitting Party receives a transmission receipt dated the day of transmission, on the same day as the transmission, and (z) if by nationally recognized overnight courier, on the next Business Day after deposit with such courier.

    **8.3**    _Confidentiality._ Each Party hereto agrees that all non-public information received from the other Party or otherwise relating to such other Party or (prior to Closing) the Facility, shall be confidential, and shall not be disclosed or otherwise released to any other Person (other than such first Party's Affiliates or another party hereto), without the written consent of the other Party. The obligations of the Parties hereunder shall not apply to: (a) the extent that the disclosure of information otherwise determined to be confidential is anticipated hereunder or required by Applicable Law, including bankruptcy law or filings in the Bankruptcy Court; (b) the disclosure of confidential information to any financial advisors, legal advisors, other professional advisors, shareholders, investors and lenders (both actual and potential) of a Party who agree to hold confidential such information substantially in accordance with this Section or who are otherwise bound by a duty of confidentiality to such Party; and (c) such disclosures as may be contained in any transaction-specific press release approved by both Buyer and Seller, each Party agreeing not to unreasonably withhold, condition or delay its approval.

    **8.4**    _Amendment; Waivers, Etc._ No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

**8.5**     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**8.6**     Assignment.  Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by either Party without the prior written consent of the other Party, although no permitted assignment of this Agreement by a Party will relieve the Party of any of its obligations under this Agreement.

**8.7**     Parties in Interest; No Third-Party Beneficiaries.  This Agreement and the Related Agreements shall be binding upon and inure solely to the benefit of the Parties and their successors and permitted assigns, and nothing in this Agreement or any Related Agreement, expressed or implied, is intended to confer upon any other Person (including, but not limited to, any current, prospective, or former residents of the Facility) any rights or remedies of any nature under or by reason of this Agreement or any Related Agreement.  Without limiting the foregoing, nothing in this Agreement or the Related Agreements is intended to confer upon any past, present or future employee of Seller or its Affiliates or his or her legal representatives or heirs any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement or by the Related Agreements, including, without limitation, any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

**8.8**     Counterparts; Facsimile Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties.  Any Party may execute this Agreement by facsimile (or .pdf copy) signature and the other Parties will be entitled to rely upon such facsimile (or .pdf copy) signature as conclusive evidence that this Agreement has been duly executed by such Party.

**8.9**     Governing Law.  Except to the extent inconsistent with the Bankruptcy Code, this Agreement and the Related Agreements shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, without regard to its conflicts of law rules.

**8.10**    Jurisdiction.  Each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.  Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Related Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Related Agreement.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL

CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

**8.11** **WAIVER OF JURY TRIAL**. EACH PARTY TO THIS AGREEMENT HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED TRANSACTIONS.

**8.12** Severability. If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever, so long as this Agreement, taken as a whole, still expresses the material intent of the Parties. The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

**8.13** Entire Agreement. This Agreement and the Related Agreements constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof. There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

**8.14** Bulk Sales or Transfer Laws. Buyer hereby waives compliance by Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

**8.15** No Inferences. Inasmuch as this Agreement is the result of negotiations between sophisticated Parties of equal bargaining power represented by counsel, no inference in favor of, or against, either Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**8.16** Enforcement Expenses. In the event any Party elects to incur legal expenses to enforce, defend or interpret any provision of this Agreement, as between it and any other Party, the prevailing Party shall be entitled to recover from the other party such legal expenses, including reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such Party may be entitled.

**8.17** Interpretation. In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the Schedules and Exhibits hereto; (b) references to Articles and Sections are references to articles and sections of this Agreement; (c) references to any party to this Agreement shall include references to its respective successors, its designees, and permitted assigns; (d) references to a judgment shall include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (e) the terms "hereof," "herein," "hereby," and any derivative or similar words will refer to this

entire Agreement; (f) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereof from time to time; (g) references to any law are references to that law as of the Closing Date, unless the context requires otherwise, and shall also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise; (h) the word "including" shall mean including without limitation; (i) references to time are references to Eastern Standard or Daylight time (as in effect on the applicable day) unless otherwise specified herein; and (j) use of the singular in defined terms shall include the plural and vice versa.

**8.18** <u>Survival of Representations and Warranties</u>.  None of the representations or warranties of Seller set forth in this Agreement, any Related Agreement, or in any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of Seller shall expire upon Closing.

**8.19** <u>Time of the Essence</u>.  Time is of the essence for purposes of this Agreement and the rights and obligations of the Parties hereunder.

[Signatures Follow on Next Page]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the date first above written.

**HENRY FORD VILLAGE, INC.**

By: _____

Name:    Chad J. Shandler

Its:        Chief Restructuring Officer

**HFV OPCO, LLC**

By: _____

Name:   Sam Tennenbaum

Its:   Authorized Signatory

20-51066-mar    Doc 396    Filed 05/06/21    Entered 05/06/21 14:49:40    Page 50 of 137

# Exhibit A

<u>Exhibit A</u>

Escrow Agreement

See attached.

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made this 4th day of May, 2020, by and among Henry Ford Village, Inc., a Michigan nonprofit corporation ("Seller") and HFV Opco, LLC, a Delaware limited liability company (the "Buyer"), and Landmark Abstract Agency, LLC ("Escrow Agent").

## Preliminary Statement

In connection with the execution and delivery by Seller and Buyer of that certain Asset Purchase Agreement of even date herewith entered into between the Seller and Buyer (the "APA"), Buyer has agreed to deliver to Escrow Agent a deposit of Seven Million Six Hundred Thirty Five Thousand Five Hundred and 00/100 Dollars ($7,635,500) (the "Deposit") in good funds by federal wire transfer, pursuant to the APA. Escrow Agent shall hold the Deposit pursuant to the terms hereof.

The Buyer, Seller, and Escrow Agent further agree that any additional deposits due under and in connection with the APA will be governed pursuant to the terms hereof.

Escrow Agent agrees to act as such upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1.      Escrow Agent. Seller and Buyer hereby engage Escrow Agent to serve as escrow agent under the terms hereof, and upon execution thereof, pursuant to the terms of the APA. Escrow Agent hereby accepts such engagement and agrees to hold and release the Deposit in accordance with the terms hereof. The Deposit shall be deposited with Escrow Agent by wire transfer. All interest, investment income or other proceeds will accrue to and be reported to applicable taxing authorities, including the Internal Revenue Service, for the account of Buyer.

2.      Deposit. The parties hereto agree that the Escrow Agent shall invest the Deposit in a non-interest bearing account, subject to immediate withdrawal, at a federally insured bank designated by Escrow Agent; provided, however, that nothing herein shall diminish Escrow Agent's obligation to apply the full amount of the deposits in accordance with the terms of these escrow trust instructions.

3.      Release of Deposit.

(a)      In no case shall the above-mentioned Deposit be surrendered except in accordance with written instructions signed by Buyer and Seller. Upon receipt by Escrow Agent of joint written instructions of Seller and Buyer, as applicable, directing Escrow Agent to release the Deposit, Escrow Agent shall deliver the Deposit, to Buyer or Seller, as and to the extent indicated in said written instructions, within three (3) Business Days after receiving such instructions, by wire transfer of immediately available funds. In the event Escrow Agent does

1

not receive such written instructions, the Deposit shall be held and released pursuant to the remainder of this Section 3.

(b)    If there is a dispute with respect to the distribution of the Deposit, Buyer and Seller shall use their reasonable best efforts to resolve such dispute, and the Deposit shall continue to be held by Escrow Agent until either joint written instructions of Buyer and Seller are delivered to Escrow Agent or there is a final, non-appealable order of a court directing the distribution of the Deposit..

4.    Notices.  All notices, requests, demands, waivers and communications required or permitted to be given under this Agreement shall be in writing signed by or on behalf of the party making such notice, request, demand, waiver or communication and shall be deemed to be given (i) on the day delivered (or if that day is not a Business Day, or if delivered after the close of business on a Business Day, on the next day that is a Business Day) when delivered by personal delivery or overnight courier, (ii) on the third (3rd) Business Day after mailed by registered or certified mail, postage prepaid, return receipt requested, or (iii) upon transmission when sent by facsimile transmission or email transmission (provided that such facsimile or email is followed by an original of such notice by mail or personal delivery as provided herein).  Mailed notices shall be addressed as set forth below, but any party may change the address set forth below by written notice to other parties in accordance with this paragraph.

To Seller:

Chad J. Shandler
Senior Managing Director, Corporate
Finance & Restructuring
FTI Consulting
3 Times Square
New York, NY 10036
Email:chad.shandler@fticonsulting.com


With a copy to:

Dykema Gossett PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan  48304
Attn: Sheryl L. Toby
Email: SToby@dykema.com


To Buyer:

HFV Opco, LLC
395 Pearsall Avenue, Suite K
Cedarhurst, NY 11516
Attention:  Sam Tennenbaum
Email:  sam@sagehcp.com

<table>
<tr><td>With a copy to:</td><td>Gutnicki LLP<br>4711 Golf Road, Suite 200<br>Skokie, IL 60091<br>Email: sflanigan@gutnicki.com<br>Attn: Stacy J. Flanigan</td></tr>
<tr><td>To Escrow Agent:</td><td>Landmark Abstract Agency, LLC<br>207 Rockaway Turnpike<br>Lawrence, NY 11559<br>Email: jrekant@laatitle.com<br>Attention: Jacob Rekant</td></tr>
</table>

5.    <u>Liability and Duties of Escrow Agent</u>.  Acceptance by Escrow Agent of its duties under this Agreement is subject to the following terms and conditions:

(a)    The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties, and that Escrow Agent shall not be liable to either of the parties for any act or omission on its part taken or made in good faith, and not in disregard of this Agreement and/or, upon execution thereof, the APA, but shall be liable for its negligent acts and willful misconduct;

(b)    Seller and Buyer shall jointly and severally indemnify Escrow Agent for, and hold it harmless against all costs, claims and expenses, including but not limited to reasonable attorneys' fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by Escrow Agent in bad faith, in disregard of this Agreement or involving negligence or willful misconduct on the part of Escrow Agent;

(c)    Escrow Agent shall be fully protected in acting on and relying upon any written notice, instruction, direction or other document which Escrow Agent in good faith believes to be genuine and to have been signed or presented by the proper party or parties;

(d)    Escrow Agent may seek the advice of legal counsel in the event of any dispute or question as to the construction of any of the provisions of this Agreement or its duties hereunder, and it shall incur no liability and shall be fully protected in respect of any action taken or suffered by it in good faith in accordance with the opinion of such counsel; and

(e)    Escrow Agent may resign and be discharged from its duties hereunder at any time by giving written notice of such resignation to each of Seller and Buyer specifying a date, not less than thirty (30) days after the date of such notice, when such resignation will take effect.  Upon the effective date of such resignation, Escrow Agent shall deliver the funds held in escrow to such person or persons as Seller and Buyer shall in writing jointly direct, and upon such delivery Escrow Agent shall be relieved of all duties and liabilities thereafter accruing under this Agreement.  Seller and Buyer shall have the right at any time upon joint action to substitute a new Escrow Agent by giving notice thereof to Escrow Agent then acting.  If, however, Seller and Buyer shall fail to name such a successor escrow agent within twenty (20)

days after the notice of resignation from Escrow Agent, Escrow Agent may apply to a court of competent jurisdiction for appointment of a successor escrow agent.

6. _Governing Law_. This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7. _Waiver of Jury Trial_. EACH OF SELLER, BUYER AND ESCROW AGENT HEREBY WAIVE A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN ESCROW AGENT, SELLER AND BUYER OR THEIR RESPECTIVE SUCCESSORS OR ASSIGNS, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF ITS PROVISIONS OR ANY NEGOTIATIONS IN CONNECTION HEREWITH.

8. _Counterparts_. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and it will not be necessary in making proof of this Agreement or the terms of this Agreement to produce or account for more than one of such counterparts. All counterparts shall constitute one and the same instrument. Each party may execute this Agreement via a facsimile (or transmission of a .pdf file) of this Agreement. In addition, facsimile or .pdf signatures of authorized signatories of the parties shall be valid and binding and delivery of a facsimile or .pdf signature by any party shall constitute due execution and delivery of this Agreement.

9. _Entirety; Modifications_. This Agreement and, upon execution thereof, the APA together embody the entire agreement between the parties with respect to the Deposit and supersedes all prior agreements and understandings related to the Deposit. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

11. _Binding Effect; Successors_. This Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors and assigns. If Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another entity authorized to exercise fiduciary powers, the successor entity without any further act shall be the successor Escrow Agent.

12. _Termination of Escrow_. This Agreement shall terminate upon the release by Escrow Agent of the Deposit in accordance with this Agreement.

13. _Definitions_. The following terms shall have the following meanings in this Agreement:

"Business Day" means any day except Saturday, Sunday and any legal holiday or a day on which banking institutions in New York, New York, generally are authorized or required by Law or other governmental actions to close.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the day and year first above written.

**BUYER:**

**HFV OPCO, LLC**

By: _____
Name: Sam Tennenbaum
Its: Authorized Signatory

**SELLER:**

**HENRY FORD VILLAGE, INC.**

By: _____
Name:   Chad J. Shandler
Its:      Chief Restructuring Officer

*[Signatures continue on the next page]*

**ESCROW AGENT:**

**LANDMARK ABSTRACT AGENCY, LLC**

By: _____
Name:    JACOB REKANT
Title:     PRES

*[End of Signatures]*

# Exhibit B

<u>Exhibit B</u>

Pro Forma Title Policy

See attached.

PRO FORMA               PRO FORMA



# Owner's Policy

### Owner's Policy of Title Insurance

ISSUED BY

### First American Title Insurance Company

POLICY NUMBER

### 5011426-905739

---

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the address shown in Section 18 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, **FIRST AMERICAN TITLE INSURANCE COMPANY**, a Nebraska corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.

**(Covered Risks Continued on Page 2)**

---

In Witness Whereof, First American Title Insurance Company has caused its corporate name to be hereunto affixed by its authorized officers as of Date of Policy shown in Schedule A.

*First American Title Insurance Company*

Dennis J. Gilmore, President

Greg L. Smith, Secretary

(This Policy is valid only when Schedules A and B are attached)      **This Jacket was created electronically and constitutes an original document**

**Copyright 2006-2009 American Land Title Association. All rights reserved.** The use of this form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association

## COVERED RISKS (Continued)

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i) the occupancy, use, or enjoyment of the Land;
      (ii) the character, dimensions, or location of any improvement erected on the Land;
      (iii) the subdivision of land; or
      (iv) environmental protection;
      or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

**CONDITIONS**

**1. DEFINITION OF TERMS**

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d) "Insured": The Insured named in Schedule A.

    (i) The term "Insured" also includes

        (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;

        (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

        (C) successors to an Insured by its conversion to another kind of Entity;

        (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

            (1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

            (2) if the grantee wholly owns the named Insured,

            (3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or

            (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

    (ii) With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

(e) "Insured Claimant": An Insured claiming loss or damage.

(f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(j) "Title": The estate or interest described in Schedule A.

(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4. PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5. DEFENSE AND PROSECUTION OF ACTIONS**

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

### 6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

### 7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

### 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of

(i) the Amount of Insurance; or

(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9. **LIMITATION OF LIABILITY**

   (a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

   (b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

   (c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10. **REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

   All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

11. **LIABILITY NONCUMULATIVE**

   The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

12. **PAYMENT OF LOSS**

   When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

13. **RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

   (a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

   If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

   (b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

14. **ARBITRATION**

   Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

15. **LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

   (a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

   (b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

   (c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

   (d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

16. **SEVERABILITY**

   In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

17. **CHOICE OF LAW; FORUM**

   (a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

   Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

   (b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

18. **NOTICES, WHERE SENT**

   Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at **First American Title Insurance Company, Attn: Claims National Intake Center, 1 First American Way; Santa Ana, CA 92707. Phone: 888-632-1642.**

20-51066-mar    Doc 396    Filed 05/06/21    Entered 05/06/21 14:49:40    Page 66 of 137

PRO FORMA                                                                                      PRO FORMA

 **First American**

**Owner's Policy of Title Insurance**

ISSUED BY

**First American Title Insurance Company**

POLICY NUMBER

**5011426-905739**

## Schedule A

This is a pro-forma policy furnished to and at the request of _____. It is understood and agreed that the pro-forma policy does not reflect the current status of title and is not a commitment to insure. Any endorsements attached to the pro-forma policy indicates the form of the policy and the exceptions and endorsements First American Title Insurance Company would expect to issue when all necessary documentation has been furnished and all acts performed, all to the satisfaction of First American Title Insurance Company in order that such policy may be issued.

Name and Address of Title Insurance Company:

**First American Title Insurance Company First American Title Insurance Company, Bloomfield Hills, Michigan 48304
Phone: (248)540-4102, Fax: (866)550-1079**

File No.: 905739

Amount of Insurance: $To Be Determined

Date of Policy: date of recording of vesting deed

1. Name of Insured:

   a natural person or legal entity to be determined

2. The estate or interest in the Land that is insured by this policy is:

   Fee Simple

3. Title is vested in:

   a natural person or legal entity to be determined

4. The Land referred to in this Policy is described as: situated in the County of Wayne, City of Dearborn, State of Michigan

   See Schedule "C" attached hereto and made a part hereof.

By:
    Authorized Countersignature
    (This Schedule A valid only when Schedule B is attached.)

PRO FORMA

PRO FORMA                    PRO FORMA

20-51066-mar    Doc 396    Filed 05/06/21    Entered 05/06/21 14:49:40    Page 68 of 137 Michigan

PRO FORMA                    PRO FORMA



| First American | Owner's Policy of Title Insurance |
|---|---|
| **Schedule B** | ISSUED BY<br>**First American Title Insurance Company**<br><br>PO ICY NUMBER<br>**5011426-905739** |

## <u>EXCEPTIONS FROM COVERAGE</u>

File No.: 905739

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

1.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or by making inquiry of persons in possession of the Land.

2.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

3.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title including discrepancies, conflicts in boundary lines, shortage in area, or any other facts that would be disclosed by an accurate and complete land survey of the Land, and not shown by the Public Records.

4.  Any lien or right to lien for services, labor or material imposed by law and not shown in the Public Records.

    **NOTE: General exception(s) 1, 2, 3 and 4 is/are hereby deleted in its/their entirety.**

5.  Taxes and Assessments not due and payable at Policy Date.

6.  Easement in favor of the City of Dearborn and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 15216, page 66, Register No. E830823.

7.  Underground Easement (Right of Way) in favor of The Detroit Edison Company and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 26089, page 7.

8.  Underground Distribution Easement (Right of Way) in favor of The Detroit Edison Company and Cablevision Industries, L.P. and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 26426, page 851, together with violation of restriction prohibiting buildings or permanent structures within the Easement (Right of Way) Area.

9.  Terms and Conditions contained in Resolution as disclosed by instrument recorded in Liber 27691, page 949.

10. Terms and Conditions contained in Resolution as disclosed by instrument recorded in Liber 27946, page 120.

11. Highway Easement in favor of the Michigan Department of Transportation and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 45083, page 724.

PRO FORMA
PRO FORMA

12.  Any rights, title interest or claim thereof to that portion of the land taken, used or granted for Ford Road and Greenfield Road.

13.  Any claim that the Title is subject to a trust or lien created under The Perishable Agricultural Commodities Act (7 U.S.C. 499a, et seq.) or the Poultry and Stockyards Act (7 U.S.C. 181, et seq.) or under similar state laws.

14.  Interest, if any, of the United States, State of Michigan, or any political subdivision thereof, in the oil, gas and minerals in and under and that may be produced from the captioned land.

15.  Rights of tenants, if any, under any unrecorded leases.

16.  Bankruptcy filed in Case No. 20-51066, by Henry Ford Village Inc. on 10-28-2020.  PENDING.

17.  Survey by Giffels Webster, dated December 17, 2020, last revised March 24, 2021, Job No. 19944.00, discloses the following:
a. Electric overhead and gas lines crossing property and property lines without the benefit of a recorded easement.
b. Sanitary sewer, storm sewer, electric, telephone, cable, light poles, utility poles, guy wires, hydrants and traffic pole on property without the benefit of a recorded easement.
c. Fence inside Northerly, Easterly, Southerly and Westerly property lines.
d. Concrete walks crossing Northerly and Westerly property lines.
e. Concrete walk encroaches from the North and Northwest.
f. Historic sign outside historic monument easement recorded in Liber 15216, page 66, Register No. E830823, Wayne County Records.
g. Carports encroach onto easement recorded in Liber 26426, page 851, Wayne County Records.

PRO FORMA                                        PRO FORMA


 First American

ISSUED BY
**First American Title Insurance Company**
POLICY NUMBER
**5011426-905739**

# Schedule C

File No.: 905739

## LEGAL DESCRIPTION

The land referred to in this policy, situated in the County of Wayne, City of Dearborn, State of Michigan, is described as follows:

Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant South 89 degrees 53 minutes 57 seconds East (recorded as South 89 degrees 54 minutes 20 seconds East) 33.01 feet along the Northerly line of said Section 18 and South 01 degree 13 minutes 50 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 87 degrees 04 minutes 00 seconds East 567.79 feet; thence North 72 degrees 26 minutes 40 seconds East 230.81 feet; thence North 82 degrees 58 minutes 10 seconds East 166.62 feet; thence South 89 degrees 45 minutes 50 seconds East (recorded as South 89 degrees 05 minutes 34 seconds East) 320.14 feet (recorded as 320.65 feet) to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION AND JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 01 degree 33 minutes 58 seconds East (recorded as South 00 degrees 47 minutes 00 seconds East) 1253.93 feet (recorded as 1253.21 feet) to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY MANOR SUBDIVISION, South 89 degrees 22 minutes 20 seconds West (recorded as South 88 degrees 39 minutes 10 seconds West) 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 01 degree 13 minutes 50 seconds West (recorded as North 01 degree 57 minutes 00 seconds West) 1150.03 feet (recorded as 1150.96 feet) to the Point of Beginning.

ALSO DESCRIBED BY SURVEY AS FOLLOWS:

Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant North 88 degrees 40 minutes 28 seconds East, 33.01 feet along the Northerly line of said Section 18 and South 02 degrees 39 minutes 42 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 85 degrees 38 minutes 25 seconds East 567.79 feet; thence North 71 degrees 01 minutes 05 seconds East 230.81 feet; thence North 81 degrees 32 minutes 35 seconds East 166.62 feet; thence North 88 degrees 48 minutes 35 seconds East 320.14 feet to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION and JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 02 degrees 59 minutes 33 seconds East, 1253.93 feet to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY MANOR SUBDIVISION, South 87 degrees 56 minutes 45 seconds West, 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 02 degree 39 minutes 42 seconds West, 1150.03 feet to the Point of Beginning.

PRO FORMA                                        PRO FORMA

PRO FORMA            PRO FORMA



## COMMERCIAL ENVIRONMENTAL
## PROTECTION LIEN ENDORSEMENT

### Issued by

## *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

*First American Title Insurance Company*

Dennis J. Gilmore, President          Greg L. Smith, Secretary

By:
        Authorized Countersignature

| Form 50-10021 (7-1-14) | Page 11 of 23 | ALTA 8.2-06 Commercial Environmental Protection Lien (10-16-08) |

PRO FORMA PRO FORMA

 *First American*

**COVENANTS, CONDITIONS AND RESTRICTIONS -
IMPROVED LAND - OWNER'S POLICY ENDORSEMENT**

**Issued by**

**First American Title Insurance Company**

Attached to Policy No.: 5011426-905739

File No.: 905739

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For the purposes of this endorsement only:

    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
    b.  "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
    b.  Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
    c.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  any Covenant contained in an instrument creating a lease;
    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
    c.  except as provided in Section 3.c., any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

PRO FORMA PRO FORMA

PRO FORMA

PRO FORMA

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

| Form 50-10801 (7-1-14) | Page 13 of 23 | ALTA 9.2-06 Covenants, Conditions and Restrictions Improved Land - Owner's Policy (Rev. 4-2-12) |
|---|---|---|

PRO FORMA                    PRO FORMA



**DELETION OF ARBITRATION CONDITION -
OWNER'S POLICY ENDORSEMENT**

**Issued by**

### *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739                              File No.: 905739

The Policy is hereby amended by deleting Paragraph 14 from the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

**First American Title Insurance Company**

Dennis J. Gilmore, President                    Greg L. Smith, Secretary

By:
      Authorized Countersignature

| Form 50-11000 (7-1-14) | Page 14 of 23 | Deletion of Arbitration Condition - Owner's Policy<br>For use with ALTA 2006 Owner's Policy |
|---|---|---|

PRO FORMA     PRO FORMA



**ACCESS AND ENTRY
ENDORSEMENT**

**Issued by**

### *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from Greenfield Road and Ford Road M-153 (the "Streets"), (ii) the Streets are not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Streets abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

By:

Authorized Countersignature

| Form 50-10045 (7-1-14) | Page 15 of 23 | | ALTA 17-06 Access and Entry (6-17-06) |
|---|---|---|---|

PRO FORMA                    PRO FORMA



**UTILITY ACCESS ENDORSEMENT**

**Issued by**

### First American Title Insurance Company

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services: **[CHECK ALL THAT APPLY]**

☒ Water service                ☒ Natural gas service            ☒ Telephone service

☒ Electrical power service     ☒ Sanitary sewer                 ☒ Storm water drainage

☐                              ☐                                ☐

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

(1)  a gap or gore between the boundaries of the Land and the rights-of-way or easements;

(2)  a gap between the boundaries of the rights-of-way or easements; or

(3)  termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

**First American Title Insurance Company**

Dennis J. Gilmore, President            Greg L. Smith, Secretary

By:

           Authorized Countersignature

| Form 50-10047 (7-1-14) | Page 16 of 23 | | ALTA 17.2-06 Utility Access (10-16-08) |
| --- | --- | --- | --- |

PRO FORMA PRO FORMA



**SINGLE TAX PARCEL
ENDORSEMENT**

**Issued by**

### *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

**First American Title Insurance Company**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

By:

Authorized Countersignature

| Form 50-10048 (7-1-14) | Page 17 of 23 | ALTA 18-06 Single Tax Parcel (6-17-06) |
| --- | --- | --- |

PRO FORMA PRO FORMA

PRO FORMA                    PRO FORMA



## LOCATION ENDORSEMENT

### Issued by

### *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured by reason of the failure of

2 existing buildings, 1 one-story brick building, 2 one-story brick and block buildings, 1 three-story brick and block building, 3 four-story brick and block buildings, and 4 six-story brick and block buildings

known as 15101 Ford Road, Dearborn, MI 48126,

to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

*First American Title Insurance Company*

Dennis J. Gilmore, President          Greg L. Smith, Secretary

By:
      Authorized Countersignature

| Form 50-10054 (7-1-14) | Page 18 of 23 | | ALTA 22-06 Location (6-17-06) |
|---|---|---|---|

PRO FORMA　　PRO FORMA

 First American

**SAME AS SURVEY ENDORSEMENT**

**Issued by**

**_First American Title Insurance Company_**

Attached to Policy No.: 5011426-905739

File No.: 905739

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by Giffels Webster dated December 17, 2020, last revised March 24, 2021, and designated Job No. 19944.00.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

**_First American Title Insurance Company_**

Dennis J. Gilmore, President

Greg L. Smith, Secretary

By:

Authorized Countersignature

| Form 50-10059 (7-1-14) | Page 19 of 23 | ALTA 25-06 Same as Survey (10-16-08) |
| | | CLTA 116.1-06 (10-16-08) |

PRO FORMA                                                                    PRO FORMA



## MINERALS AND OTHER SUBSURFACE
## SUBSTANCES - BUILDINGS ENDORSEMENT

### Issued by

### First American Title Insurance Company

Attached to Policy No.: 5011426-905739                    File No.: 905739

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence; or

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substance.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**First American Title Insurance Company**

Dennis J. Gilmore, President                    Greg L. Smith, Secretary

By:

Authorized Countersignature

| Form 50-10837 (9-2-16) | Page 20 of 23 | ALTA 35-06 Minerals and Other Subsurface Substances - Buildings (4-2-12) Technical Corrections 8-1-16 |
|---|---|---|

PRO FORMA    PRO FORMA



**POLICY AUTHENTICATION ENDORSEMENT**

**Issued by**

### *First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

***IN WITNESS WHEREOF,*** the Company has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.

Date:

*First American Title Insurance Company*

Dennis J. Gilmore, President        Greg L. Smith, Secretary

By:

Authorized Countersignature

| Form 50-10899 (7-1-14) | Page 21 of 23 | ALTA 39-06 Policy Authentication (4-2-13) CLTA 142-06 |
|---|---|---|

PRO FORMA　　　　　　　　　　　　　　　　　　PRO FORMA



**IDENTIFIED RISK COVERAGE
ENDORSEMENT**

**Issued by**

*First American Title Insurance Company*

Attached to Policy No.: 5011426-905739

File No.: 905739

1.  As used in this endorsement "Identified Risk" means: Enforced removal of existing carports as a result of the encroachment described in Exception 17.g. of Schedule B in the event that the owners of the easement shall, for the purpose of exercising the right to use or maintain the easement, compel removal.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A final order or decree enforcing the Identified Risk in favor of an adverse party; or

    b.  The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

        i.   there is a contractual condition requiring the delivery of marketable title, and

        ii.  neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3.  The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4.  This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

*First American Title Insurance Company*

Dennis J. Gilmore, President

Greg L. Smith, Secretary

PRO FORMA                                    PRO FORMA

By:

Authorized Countersignature

| Form 50-10794 (7-1-14) | Page 23 of 23 | | ALTA 34-06 Identified Risk Coverage (8-1-11) |

# Exhibit C

Exhibit C

Deed

## COVENANT DEED

KNOW ALL MEN BY THESE PRESENTS: that **HENRY FORD VILLAGE, INC**., a Michigan nonprofit corporation ("Grantor"), whose address is 15101 Ford Road, Dearborn, Michigan 48126, hereby conveys, sets over and transfers to _____, a _____ ("Grantee"), whose address is _____, that certain premises commonly known as 15101 Ford Road, Dearborn, Michigan, and as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference for the full consideration set forth on the Real Estate Transfer Valuation Affidavit, the receipt and sufficiency of which is hereby acknowledged, subject to those matters set forth in **Exhibit B** attached hereto (the "Permitted Encumbrances").

TO HAVE AND TO HOLD the same in fee simple forever, unto the said Grantee, its legal representatives, successors and assigns, and Grantor does hereby covenant Grantor has not done, committed or willingly suffered to be done anything whereby title in the above described property, rights and interests are encumbered except for the Permitted Encumbrances, and binds itself and its legal representatives, successors and assigns to covenant and forever defend all and singular the above described property and interests unto the said Grantee, its successors, legal representatives and assigns, against the claims of all persons claiming by, through or under Grantor but not otherwise, subject, however, to the Permitted Encumbrances.

*[Signatures on following page]*

Dated this _____ of _____ , 2021.

**HENRY FORD VILLAGE, INC.**, a Michigan nonprofit corporation

By:_____
Name:_____
Title:_____

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing Covenant Deed was acknowledged before me this _____ day of _____, 2021, by _ _____, the _____ of HENRY FORD VILLAGE, INC., a Michigan nonprofit corporation, on behalf of said corporation.

_____
_____, Notary Public
State of _____, County of _____
My Commission Expires:_____
Acting in the County of _____

DRAFTED BY:

_____
_____
_____

AFTER RECORDING RETURN TO

Grantee at the address set forth above

# EXHIBIT A

# LEGAL DESCRIPTION

Land situated in the City of Dearborn, County of Wayne, State of Michigan, more particularly described as follows:

Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant South 89 degrees 53 minutes 57 seconds East (recorded as South 89 degrees 54 minutes 20 seconds East) 33.01 feet along the Northerly line of said Section 18 and South 01 degree 13 minutes 50 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 87 degrees 04 minutes 00 seconds East 567.79 feet; thence North 72 degrees 26 minutes 40 seconds East 230.81 feet; thence North 82 degrees 58 minutes 10 seconds East 166.62 feet; thence South 89 degrees 45 minutes 50 seconds East (recorded as South 89 degrees 05 minutes 34 seconds East) 320.14 feet (recorded as 320.65 feet) to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION AND JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 01 degree 33 minutes 58 seconds East (recorded as South 00 degrees 47 minutes 00 seconds East) 1253.93 feet (recorded as 1253.21 feet) to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY MANOR SUBDIVISION, South 89 degrees 22 minutes 20 seconds West (recorded as South 88 degrees 39 minutes 10 seconds West) 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 01 degree 13 minutes 50 seconds West (recorded as North 01 degree 57 minutes 00 seconds West) 1150.03 feet (recorded as 1150.96 feet) to the Point of Beginning.

ALSO DESCRIBED BY SURVEY AS FOLLOWS:
Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant North 88 degrees 40 minutes 28 seconds East, 33.01 feet along the Northerly line of said Section 18 and South 02 degrees 39 minutes 42 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 85 degrees 38 minutes 25 seconds East 567.79 feet; thence North 71 degrees 01 minutes 05 seconds East 230.81 feet; thence North 81 degrees 32 minutes 35 seconds East 166.62 feet; thence North 88 degrees 48 minutes 35 seconds East 320.14 feet to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION and JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 02 degrees 59 minutes 33 seconds East, 1253.93 feet to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY MANOR SUBDIVISION, South 87 degrees 56 minutes 45 seconds West, 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 02 degree 39 minutes 42 seconds West, 1150.03 feet to the Point of Beginning.

Commonly known as:  Henry Ford Village, 15101 Ford Road, Dearborn, Michigan

Tax Parcel No. 82-10-181-01-001

**EXHIBIT B**

**PERMITTED ENCUMBRANCES**

1. Taxes and assessments for the year 2021 and subsequent years not yet due and payable.

2. Easement in favor of the City of Dearborn and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 15216, page 66, Register No. E830823.

3. Underground Easement (Right of Way) in favor of The Detroit Edison Company and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 26089, page 7.

4. Underground Distribution Easement (Right of Way) in favor of The Detroit Edison Company and Cablevision Industries, L.P. and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 26426, page 851, together with violation of restriction prohibiting buildings or permanent structures within the Easement (Right of Way) Area.

5. Terms and Conditions contained in Resolution as disclosed by instrument recorded in Liber 27691, page 949.

6. Terms and Conditions contained in Resolution as disclosed by instrument recorded in Liber 27946, page 120.

7. Highway Easement in favor of the Michigan Department of Transportation and the Covenants, Conditions and Restrictions contained in instrument recorded in Liber 45083, page 724.

8. Any rights, title interest or claim thereof to that portion of the land taken, used or granted

9. Interest, if any, of the United States, State of Michigan, or any political subdivision thereof, in the gas and minerals in and under and that may be produced from the captioned land.

10. Rights of tenants, if any, under any unrecorded leases.

11. Bankruptcy filed in Case No. 20-51066, by Henry Ford Village Inc. on 10-28-2020. PENDING.

12. Survey by Giffels Webster, dated December 17, 2020, last revised March 24, 2021, Job No. 19944.00, discloses the following:

   a. Electric overhead and gas lines crossing property and property lines without the benefit of a recorded easement.
   b. Sanitary sewer, storm sewer, electric, telephone, cable, light poles, utility poles, guy wires, hydrants and traffic pole on property without the benefit of a recorded easement.
   c. Fence inside Northerly, Easterly, Southerly and Westerly property lines.
   d. Concrete walks crossing Northerly and Westerly property lines.
   e. Concrete walk encroaches from the North and Northwest.
   f. Historic sign outside historic monument easement recorded in Liber 15216, page 66, Register No. E830823, Wayne County Records.
   g. Carports encroach onto easement recorded in Liber 26426, page 851, Wayne County Records.

# Exhibit D

## Exhibit D

Sale Order

See attached.

120951.000002 4826-1052-6175.15

IN RE:                                          Case No. 20-51066-MAR

HENRY FORD VILLAGE, INC.,                        Chapter 11

    Debtor.                    Honorable Mark A. Randon

_____/

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND HFV OPCO, LLC; (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, EXCEPT FOR CERTAIN ASSUMED LIABILITIES; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF

This matter having come before the Court upon Debtor's [Docket No. 110] (the "Motion") of the above-captioned debtor and debtor-in-possession (the "Debtor"), pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"), for entry of an order (i) authorizing and approving, among other things, the sale of substantially all of the Debtor's assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Claims and Encumbrances"), other than those liabilities expressly assumed under the APA (as defined below); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief; and the Court having entered the *Order (A) Approving Bid Procedures and Protections*

*in Connection with the Sale of Substantially all of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof; (C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [Docket No. 179] (the "<u>Bid Procedures Order</u>"); and the Debtor having conducted a marketing process in compliance with the Bid Procedures Order and, subject to court approval, entering into that certain Asset Purchase Agreement (the "<u>APA</u>")[1] with HFV OPCO, LLC (the "<u>Successful Bidder</u>"), pursuant to which the Successful Bidder has agreed to, among other things, purchase substantially all of the Debtor's assets (the "<u>CCRC Assets</u>") for a purchase price of $76,355,000.00 and other consideration as set forth in the APA; and the Debtor having determined that the Successful Bidder has submitted the highest and best bid for the CCRC Assets; and the Court having conducted a hearing to approve the sale to the Successful Bidder upon the terms and conditions set forth in the APA on May 24, 2021 (the "<u>Sale Hearing</u>") at which time all interested parties were offered an opportunity to be heard; and all parties in interest having been heard, or having had the opportunity to be heard, regarding entry of this Order and approval of the Sale and APA; and it appearing that due and appropriate notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the results of the Auction and the Assignment Procedures having been given; and it appearing that no other notice of the relief granted by this Order need be given; and this Court being fully advised in the premises; this Court, based upon the arguments, testimony and evidence presented to it, hereby makes the following findings of fact and conclusions of law:[2]

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the APA or the Motion.

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* FED. R. BANKR. P. 7052.

A.     This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this Chapter 11 Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.     This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.     The statutory predicates for the Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007, and Local Rule 6004-1.

E.     As evidenced by the affidavits of service filed with the Court, and based upon the representations of counsel at the Sale Hearing: (i) proper, timely and adequate notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, the Auction, the Bid Deadline, the results of the Auction and the Assignment Procedures has been provided in accordance with Bankruptcy Rules 2002, 6004, and 9007 and Local Rule 6004-1; (ii) such notice was good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, the Auction, the Bid Deadline, the results of the Auction or the Assignment Procedures is necessary or shall be required.

F.     A reasonable opportunity to object or be heard with respect to the Motion and the Sale has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee; (ii) counsel

3

for the Committee; (iii) counsel for the Bond Trustee; (iv) all entities known by the Debtor to have expressed an interest in acquiring the CCRC Assets since the Petition Date; (vi) Centers for Medicare and Medicaid Services, Legal Department; (vii) all parties that have requested notice or which are on the Special Service List in this Chapter 11 Case as of the date of the filing of the Motion; (viii) all creditors of the Debtor; (ix) all residents of the Debtor as of or after the Petition Date; (x) each other governmental agency that is an interested party with respect to the Sale; (xi) Michigan Department of Health and Human Services; (xii) Michigan Department of Licensing and Regulatory Affairs; and (xiii) (all other parties who filed requests for notice under Bankruptcy Rule 2002. The Debtor also gave due and proper notice of the Sale and assumption and potential assignment of each of the executory contracts (the "Initial Contracts") listed in any of the *Notice to Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases Regarding Cure Amounts and Possible Assignment to Successful Bidder at Auction* [Docket No. 265], the *Amended Notice to Counterparties Establishing Cure Amounts for Executory Contracts* [Docket No. 268] or [Assumption Notice] (together, the "Assumption and Assignment Notice") to each non-Debtor party to such Initial Contracts. The Debtor also gave due and proper notice of the Sale and offer of assumption and assignment of each of the modified Residency and Care Agreements (the "Assigned Modified Resident Agreements") listed in the Notice provided to Residents [Notice to Residents] (the "Resident Assumption and Assignment Notice") to each resident to such Assigned Modified Resident Agreement.

G.    Notice, as specified in the preceding paragraphs and as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Motion and required by the Bid Procedures Order, and the Court finds that the notice is adequate and sufficient in all respects to bind all creditors and parties in interest in this Chapter 11 Case.

4

H.    The process for the sale of the CCRC Assets was conducted in accordance with the Bid Procedures Order and in a non-collusive, fair and good faith manner.

I.    A reasonable opportunity has been given to any interested party to make a higher or better offer for the CCRC Assets.

J.    The Successful Bidder is purchasing the CCRC Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.

K.    The APA attached hereto as **Exhibit 1** was negotiated, proposed and entered into by the Debtor and the Successful Bidder without collusion, in good faith and from arms-length bargaining positions.  Neither the Debtor nor the Successful Bidder has engaged in any conduct that would cause or permit the Sale or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

L.    As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor afforded interested potential purchasers a full and fair opportunity to qualify as Qualified Bidders under the Bid Procedures and to submit an offer for the CCRC Assets.

M.    The Successful Bidder is not an "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

N.    The consideration provided by the Successful Bidder for the CCRC Assets pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the CCRC Assets; (iii) will provide a greater recovery for all of the Debtor's stakeholders than would be provided by any other practical available alternative; and (iv) constitutes reasonably equivalent value and fair consideration under the

5

Bankruptcy Code, the Uniform Voidable Transactions Act and all other applicable laws.

O.     The Debtor has demonstrated a sufficient basis and compelling circumstances requiring the Debtor to enter into the APA and sell its CCRC Assets under section 363 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and are in the best interests of the Debtor, its estate and its creditors.

P.     The marketing and bidding processes implemented by the Debtor and its advisors, as set forth in the Motion, were fair, proper, and reasonably calculated to result in the best value received for the CCRC Assets.

Q.     The Debtor has full authority and power to execute and deliver the APA and related agreements and all other documents contemplated by the APA, to perform its obligations therein and to consummate the Sale.  No additional consents or approvals, other than those provided in the APA, are necessary or required for the Debtor to enter into the APA, perform its obligations therein and consummate the Sale.

R.     The Successful Bidder would not have entered into the APA and would not consummate the transactions thereby, thus adversely affecting the Debtor, its estate and creditors, if the CCRC Assets were not sold to it free and clear of all Claims and Encumbrances, except those expressly assumed by the Successful Bidder, or if the Successful Bidder would, or in the future could, be liable for any such Claims and Encumbrances, including based upon successor or vicarious liability or otherwise. A sale of the CCRC Assets other than one free and clear of all such Claims and Encumbrances would adversely impact the Debtor's estate and creditors, and would yield substantially less value to the Debtor's estate.

S.     The provisions of section 363(f) of the Bankruptcy Code have been satisfied, because, among other things: holders of Claims and Encumbrances have

6

consented to the transaction, pursuant to the terms of this Sale Order. Those holders of Claims and Encumbrances who did not object, or withdrew their objections, to the Sale are deemed to have consented to the Sale.

T.     The Bond Trustee and DIP Lender have consented to the sale of the CCRC Assets pursuant to the APA free and clear of Claims and Encumbrances, including any Claims and Encumbrances of the Bond Trustee and the DIP Lender against the CCRC Assets, pursuant to the terms of this Sale Order.

U.     Subject to the right of parties to object pursuant to the terms of this Order, the Debtor may assume each contract and lease listed on Schedules [ ] of the APA, as such Schedules may be amended pursuant to the APA (the "Assigned Contracts and Assigned Modified Resident Agreements"), and assign each of them to the Successful Bidder pursuant to sections 363 and 365 of the Bankruptcy Code and this Order notwithstanding any anti-assignment clause or other provision in the Assigned Contracts (as defined below) or the Assigned Modified Resident Agreements, as provided by section 365(f) of the Bankruptcy Code.

V.     The counterparties to the Assigned Contracts that were not listed on the Assumption and Assignment Notice, if any, shall be provided notice of the assumption and assignment and the proposed cure amounts pursuant to the procedures set forth in this Order.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:**

1.     The relief requested in the Motion is granted and approved in all respects.  The Debtor's entry into the APA and the Sale is hereby approved in all respects.  The terms and conditions of the APA are hereby approved in all respects.

2.     All objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits and with prejudice; provided, however, that any Assumption Objections and Assignment

7

Objections (as defined below) filed in connection with the Assigned Contracts shall be determined in accordance with paragraphs 16, 17 and 18 of this Order.

3.      The Debtor is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale in accordance with the Motion, the APA and this Order, and (b) perform, consummate, implement and close fully the Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA. After the date of entry of this Order, the Debtor and the Successful Bidder may enter into any amendment, supplement, or modification to the APA that is not material or is not adverse to the Debtor's estate upon prior written notice to the Bond Trustee and the Committee without the need of further notice, hearing or Court order.

4.      Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections prior to entry of this Order are deemed to have consented to this Order, the Bid Procedures Order, the Sale and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Successful Bidder, its affiliates, or any agent of the foregoing to recover any claim which such person or entity has against the Debtor. Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

**Sale and Transfer of the CCRC Assets**

5.      The APA, the Related Agreements (as defined in the APA), all transactions contemplated thereby and all of the terms and conditions thereof are hereby approved.

6.      Upon closing of the Sale with the Successful Bidder (the "Closing"), the CCRC Assets transferred, sold and delivered to the Successful Bidder pursuant to the APA shall be free and clear of all Claims and Encumbrances of any person or

8

Objections (as defined below) filed in connection with the Assigned Contracts shall be determined in accordance with paragraphs 16, 17 and 18 of this Order.

3.      The Debtor is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale in accordance with the Motion, the APA and this Order, and (b) perform, consummate, implement and close fully the Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA. After the date of entry of this Order, the Debtor and the Successful Bidder may enter into any amendment, supplement, or modification to the APA that is not material or is not adverse to the Debtor's estate upon prior written notice to the Bond Trustee and the Committee without the need of further notice, hearing or Court order.

4.      Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections prior to entry of this Order are deemed to have consented to this Order, the Bid Procedures Order, the Sale and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against the Successful Bidder, its affiliates, or any agent of the foregoing to recover any claim which such person or entity has against the Debtor. Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

**Sale and Transfer of the CCRC Assets**

5.      The APA, the Related Agreements (as defined in the APA), all transactions contemplated thereby and all of the terms and conditions thereof are hereby approved.

6.      Upon closing of the Sale with the Successful Bidder (the "Closing"), the CCRC Assets transferred, sold and delivered to the Successful Bidder pursuant to the APA shall be free and clear of all Claims and Encumbrances of any person or

8

entity (except those Claims and Encumbrances expressly assumed by the Successful Bidder), with all such Claims and Encumbrances attaching automatically to the proceeds of the Sale in the same manner, validity and priority that they attached to the CCRC Assets prior to the Sale. The transfer of the CCRC Assets to the Successful Bidder constitutes a legal, valid and effective transfer of the CCRC Assets and shall vest the Successful Bidder with all right, title and interest in and to the CCRC Assets described in the APA.

7. Upon Closing, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the CCRC Assets pursuant to the terms of the APA.

8. The CCRC Assets sold to the Successful Bidder pursuant to the APA and this Order shall, in accordance with and subject to applicable law, include any charitable funds held by or on behalf of the Debtor.

9. Except with respect to the Assumed Liabilities (as defined in the APA), effective on the date of entry of this Order, all persons and entities, including, but not limited to, the Debtor and its creditors, residents, employees, former employees and shareholders, administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claims and Encumbrances against the CCRC Assets, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the CCRC Assets, the Successful Bidder (or its members, representatives, or affiliates) as alleged successor or otherwise, with respect to (i) any Claims and Encumbrances on or in respect of the CCRC Assets, and (ii) recovering from any claim which such person or entity had solely against the Debtor or any of the Debtor's subsidiaries, affiliates, directors,

9

officers, agents, representatives, employees, investors, owners, shareholders, partners, or joint venturers.

10. The terms and provisions of this Order shall be binding in all respects upon all entities, including, but not limited to the Debtor, the Successful Bidder, creditors, residents, former residents, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including, but not limited to, persons asserting any Claim and Encumbrance against or interest in the Debtor's estate or the CCRC Assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

11. Upon Closing, except to the extent such liability is expressly assumed by the Successful Bidder under the APA, all entities holding a Claim and Encumbrance of any kind and nature against the CCRC Assets hereby are barred from asserting such Claim and Encumbrance against the Successful Bidder and/or the CCRC Assets and, effective upon the transfer of the CCRC Assets to the Successful Bidder upon Closing, the Claims and Encumbrances shall attach to the proceeds of the Sale with the same force, validity, priority and effect, if any, as against the CCRC Assets.

12. This Order (i) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances existing as to the CCRC Assets conveyed to the Successful Bidder have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such Claims and Encumbrances attaching automatically to the proceeds in the same manner, extent, validity and priority as existed at Closing, and (ii) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

10

agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the CCRC Assets conveyed to the Successful Bidder. All Claims and Encumbrances of record as of the date of this Order shall be removed and stricken as against the CCRC Assets in accordance with the foregoing. All entities are authorized and specifically directed to strike all such recorded Claims and Encumbrances against the CCRC Assets from their records, official or otherwise.

13. If any person or entity which has filed financing statements, mortgage, lis pendens or other documents or agreements evidencing Claims and Encumbrances on the CCRC Assets shall not have delivered to the Debtor prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Claims and Encumbrances which the person or entity has or may assert with respect to the CCRC Assets, the Debtor is hereby authorized and directed upon Closing, and the Successful Bidder is hereby authorized upon Closing, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the CCRC Assets. Upon Closing of the Sale, each of the Debtor's creditors is authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the CCRC Assets.

14. Upon a Closing, the Successful Bidder shall not be deemed to be (i) a successor to the Debtor, (ii) party to a *de facto* merger of the Successful Bidder and the Debtor or (iii) a mere continuation of the Debtor. Without limiting the generality

11

of the foregoing, and except as specifically provided in the APA, the Successful Bidder shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, other than as expressly provided for in such APA. Further, except as expressly provided in the APA, the Successful Bidder is not assuming nor shall it in any way be liable or responsible, as successor or otherwise, for any claims, debts, obligations, Claims or Encumbrances of the Debtor or its estate of any kind or character in any way whatsoever relating to or arising from the CCRC Assets or the Debtor's operation or use of the CCRC Assets prior to the Closing, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, under the laws of the United States, any state, territory, or possession of the United States, the District of Columbia or any other country or foreign jurisdiction.

## Application of the Sale Proceeds

15. All amounts received by the Debtor at Closing shall be paid directly to the DIP Lender and the Bond Trustee, and the Debtor is authorized and directed to pay such amounts directly to the DIP Lender in an amount up the aggregate amount of the DIP Obligations outstanding, and to the Bond Trustee in an amount up to the aggregate amount of the outstanding prepetition and postpetition obligations of the Debtor to the Bond Trustee for indefeasible application by the Bond Trustee to all outstanding obligations owed to the Bond Trustee.

## Assumption and Assignment of Assigned Contracts

16. On or before five (5) Business Days prior to the Closing, the Successful Bidder shall provide a list of all non-resident executory contracts or unexpired leases of the Debtor not already identified in any Assumption and Assignment Notice (the "Supplemental Contracts," and together with the Initial Contracts, the "Assigned Contracts") that it seeks to have assumed by the Debtor and assigned to the

77343845.2
20-51066-mar    Doc 396    Filed 05/06/21    Entered 05/06/21 14:49:40    Page 104 of 137

Successful Bidder pursuant to the APA. Additionally, on or before five (5) Business Days prior to the Closing, the Successful Bidder shall provide a list of all executory contracts or unexpired leases of the Debtor that it seeks to have removed from the list of Initial Contracts. To the extent it has not already done so, the Debtor shall file one or more Assumption and Assignment Notices with respect to the Supplemental Contracts in accordance with the Bid Procedures Order that, among other things, sets a deadline of fourteen (14) days after service of the Assumption and Assignment Notice (the "Objection Deadline") by which the counterparty to a Supplemental Contract must assert an objection (an "Assumption Objection") to the assumption by the Debtor and assignment to the Successful Bidder of the Supplemental Contract.

17.     If, as to any Assigned Contract, a counterparty does not assert an Assumption Objection by the Objection Deadline, and unless Successful Bidder removes such Assigned Contract from the list of Assumed Contracts in accordance with the APA, such Assigned Contract shall be deemed assumed by the Debtor and assigned to the Successful Bidder pursuant to section 365 of the Bankruptcy Code without further order of the Court, effective as of the later of (i) the Objection Deadline; (ii) payment of the applicable cure amount, if any; and (iii) the Closing Date. If, however, an Assumption Objection is received by the Objection Deadline, and the Debtor and/or the Successful Bidder is unable to resolve such objection consensually, the proposed assumption and assignment which is the subject of the Assumption Objection shall be subject to further order of the Court, and the Debtor and/or the Successful Bidder shall promptly schedule a hearing to consider the Assumption Objection.

18.     The Debtor has demonstrated that assuming and assigning the Assigned Contracts in connection with the Sale is an exercise of its sound business judgment, and that such assumption and assignment is in the best interests of the Debtor's

13

estate. Pursuant to the Assignment Procedures, the Debtor will provide adequate assurance of cure of any defaults existing prior to the Closing Date, which is the effective date of the assumption of the Assigned Contracts, and will provide for compensation or adequate assurance of compensation to any non-Debtor party to such contracts for any of their actual pecuniary losses resulting from any default arising prior to the Closing Date under the Assigned Contracts, within the meaning of section 363(b)(1)(B) of the Bankruptcy Code (collectively, the "Cure Amounts").

19.     Subject to paragraphs 16, 17 and 18, and subject only to the payment of the Cure Amounts (which amounts may be satisfied or waived in part or whole according to any separate agreements with any non-Debtor party thereto), each Assigned Contract will be in full force and effect and enforceable by the Successful Bidder against any non-Debtor party thereto in accordance with its terms upon the Closing of the Sale. The Debtor shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Successful Bidder.

20.     Unless otherwise agreed by any party potentially entitled to a Cure Amount, on the Closing Date or such other date as determined by the Court, the Successful Bidder will pay in full all Cure Amounts in respect of all undisputed cure claims and all Cure Amounts that have been determined by this Court or resolved by agreement. Any agreements regarding Cure Amounts shall be binding as if and have the same effect as if the Court had made a final determination of such Cure Amounts pursuant to this Order and the motion or notice filed by the Debtor regarding assumption and assignment of such Assigned Contracts.

21.     Subject to paragraph 16, 17 and 18, except for the obligation to pay the Cure Amounts, each nondebtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtor or the

Successful Bidder, or the property of any of them, any default existing as of the date of the Sale Hearing, whether declared or known or unknown.

22.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of any Assigned Contracts or allow the non-Debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition a renewal or extension, or modify or limit any term or condition upon the assignment of such Assigned Contract, constitutes unenforceable anti-assignment provisions that are void and of no force and effect.  Subject to paragraphs 16, 17 and 18, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Successful Bidder of the Assigned Contracts have been satisfied.

23.     Subject to paragraphs 16, 17 and 18, the Successful Bidder has provided adequate assurance of its future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

24.     Assumption of the Assigned Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Debtor has rights or licenses granted in connection with or under the Assigned Contracts, so long as such ancillary or related agreements do not create additional obligations of the Debtor or Successful Bidder beyond those set out in the Assigned Contracts (unless Successful Bidder subsequently agrees to such obligations).

25.     The Debtor and the Successful Bidder shall jointly file and serve a Notice of Closing and Schedule of Assigned Contracts (the "Closing Notice") within two (2) business days following the Closing, and service of such Closing Notice by CM/ECF shall be deemed sufficient in all regards.  No assumption and assignment of any Assigned Contracts shall be binding on the Debtor and the Successful Bidder until the Closing of the APA pursuant to this Order, and until the Debtor and

Successful Bidder have identified each such Assigned Contract on the Closing Notice to be filed with the Court.

## **Assumption and Assignment of Assigned Modified Resident Agreements**

26.     The Debtor, immediately prior to the Closing, shall enter into Assigned Modified Resident Agreements with those residents who have accepted the terms of such Assigned Modified Resident Agreements in accordance with the terms and conditions of the APA. All such Assigned Modified Resident Agreements shall be deemed assumed by the Debtor and assigned to the Successful Bidder pursuant to section 365 of the Bankruptcy Code without further order of the Court, effective as of the later of (i) payment of the applicable cure amount, if any (the "Resident Cure Amounts"); and (ii) the Closing Date.

27.     The Debtor has demonstrated that assuming and assigning the Assigned Modified Resident Agreements in connection with the Sale is an exercise of its sound business judgment, and that such assumption and assignment is in the best interests of the Debtor's estate.

28.     Subject to the payment of the Resident Cure Amounts, each Assigned Modified Resident Agreements will be in full force and effect and enforceable by the Successful Bidder against any non-Debtor party thereto in accordance with its terms upon the Closing of the Sale.  The Debtor shall be relieved from any further liability with respect to the Assigned Modified Resident Agreements after such assignment to and assumption by the Successful Bidder.

29.     Except for the obligation to pay the Resident Cure Amounts, each non-Debtor party to an Assigned Modified Resident Agreements hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Successful Bidder, or the property of any of them, any default existing as of the date of the Sale Hearing, whether declared or known or unknown.

30.     Any provisions in any Assigned Modified Resident Agreements that prohibit or condition the assignment of any Assigned Modified Resident Agreements or allow the non-Debtor party to such Assigned Modified Resident Agreements to terminate, recapture, impose any penalty, condition a renewal or extension, or modify or limit any term or condition upon the assignment of such Assigned Modified Resident Agreements, constitutes unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Successful Bidder of the Assigned Modified Resident Agreements have been satisfied.

31.     The Successful Bidder has provided adequate assurance of its future performance under the Assigned Modified Resident Agreements within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

32.     Assumption of the Assigned Modified Resident Agreements shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the Debtor has rights or licenses granted in connection with or under the Assigned Modified Resident Agreements, so long as such ancillary or related agreements do not create additional obligations of the Debtor or Successful Bidder beyond those set out in the Assigned Modified Resident Agreements (unless Successful Bidder subsequently agrees to such obligations).

33.     The Debtor and the Successful Bidder shall jointly file and serve a Notice of Closing and Schedule of Assigned Contracts (the "Closing Resident Notice") within two (2) business days following the Closing, and service of such Closing Resident Notice by CM/ECF shall be deemed sufficient in all regards.  No assumption and assignment of any Assigned Modified Resident Agreements shall be binding on the Debtor and the Successful Bidder until the Closing of the APA pursuant to this Order, and until the Debtor and Successful Bidder have identified

17

each such Assigned Modified Resident Agreements on the Closing Resident Notice to be filed with the Court

## No Assumption of Liability under Former Resident Residency Agreements

34.    The Successful Bidder has not assumed any former resident Residency Agreements or any liability thereunder. The sale and transfer of the CCRC Assets shall be free and clear of any such liabilities.

## Assumption and Assignment of Provider Agreements

35.    This Order contemplates the Debtor's assumption and assignment of the Medicare provider agreement of its skilled nursing facility ("SNF"), and the subsequent sale of that SNF, together with its Medicare provider agreement, to the Successful Bidder.  The sale of the SNF will constitute a Change of Ownership ("CHOW") within the meaning of 42 C.F.R. § 489.18, meaning that the Medicare provider agreement may be assigned to the Successful Bidder without interruption. Throughout the assumption, assignment and CHOW process, the Debtor and the Successful Bidder will comply with all applicable Medicare program requirements as set forth in Title XVIII the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare Act"), and all relevant rules and regulations.

36.    Except as otherwise provided by mutual agreement between Centers for Medicare & Medicaid Services ("CMS") and Debtor in a separate written agreement, compromise and/or extended liquidation schedule that Debtor and CMS may (but are not obligated to) enter into prior to the Assumption Date, Debtor must cure all monetary defaults and pay all known claims due under the Medicare provider agreement that CMS has identified to the Debtor in writing before the Assumption Date.  CMS's right to cure of such identified monetary defaults per the Plan will be in addition to and without limitation upon its right to recoup Medicare debts or its other rights and authorities under the Medicare Act.  If Debtor and/or CMS propose a separate agreement, compromise and/or extended liquidation schedule, the process

18

for consideration of any such proposal will remain governed by the Medicare Act, as well as all relevant rules and regulations, as if Debtor were not in bankruptcy.

37.     Provided that any defaults under the Medicare provider agreement are cured, the Debtor shall assume and assign the Medicare provider agreement upon the entry of this Sale Order to the Successful Bidder (the "Assumption Date"). Notwithstanding anything to the contrary in this Sale Order, the Sale Motion, any exhibits thereto (now or as amended), or in the related sale documents, the term "cure," for purposes of the Debtor's assumption of the Medicare provider agreement, means being governed by, and subject to, the terms and conditions of the Medicare provider agreement and the incorporated statutes and regulations; and remaining liable for any debt under the Medicare provider agreement to CMS as if the Chapter 11 Case had not occurred.

38.     If the Successful Bidder accepts assignment of the Medicare provider agreement, then after the CHOW date occurs, CMS must determine whether to approve the CHOW in accordance with CMS's rules, regulations and procedures. If approved, the effective date of assignment would be the date of the CHOW within the meaning of 42 C.F.R. § 489.18. However, payment will not be made to the Successful Bidder until the relevant Medicare administrative contractor receives and implements a "tie in notice" confirming that CMS has approved the CHOW. Until that process is complete, Medicare payments may continue to be made to the Debtor as the Medicare provider of record. CMS is not a party to the Debtor's and Successful Bidder's terms of the sale and the allocation of Medicare overpayments and/or underpayments between themselves pursuant to the terms of the Sale Order, Sale Motion and related sale documents. Because CMS is not a party to their arrangements, disagreements between the Debtor and the Successful Bidder regarding their rights and responsibilities under these arrangements may not affect

19

CMS and its claims, rights and duties under Medicare statutes, rules and regulations in regard to the Medicare provider, regardless of its ownership.

39.     Although the Medicare Act does not require the Successful Bidder to accept assignment of the Medicare provider agreement because continued participation in Medicare is voluntary, if Successful Bidder chooses to reject assignment and thereby avoid Medicare liabilities associated with the SNF, the Successful Bidder must do so promptly and in writing. If assignment is rejected, the Medicare provider agreement terminates as of the date of the CHOW.  In such circumstances, if Purchaser wishes the SNF to participate in Medicare and be eligible to receive Medicare reimbursement, the SNF must first complete the certification and enrollment process for a new Medicare provider.

40.     Given Successful Bidder's agreement as to assignment of the Medicare provider agreement and provided Successful Bidder does not promptly reject assignment, Successful Bidder must accept assignment of the Medicare provider agreement in full, including its benefits and burdens, and must comply with all applicable CMS rules and regulations.  No provision of this Order, Sale Motion or any exhibits thereto (now or as amended), associated sale documents, or any other order will be interpreted as superseding Medicare's rules for CHOWs, enrollment, and/or survey and certification, including requirements that the Medicare provider's new owner who receives assignment through a CHOW be subject to successor liability.

41.     If any lender, creditor, or other entity were to seek direct payment from CMS or its Medicare contractors of reimbursement due the Medicare provider before, during or after the assumption and assignment of the Medicare provider agreement, that lender, creditor or other entity must do so in accordance with the applicable anti-assignment provisions of the Medicare Act and CMS's implementing regulations.

20

42.     Without limiting CMS's right to cure, all of CMS's claims shall pass through the Chapter 11 Case and the Sale unaffected and shall not be impaired within the meaning of 11 U.S.C. § 1124.  Any amounts due on CMS's claims may be collected in the ordinary course of business, and the United States, on behalf of CMS, shall not be required to file any separate claim in the Chapter 11 Case to collect any amounts due to CMS under the Medicare program, whether via proof of claim, claim for cure, or administrative claim.  Nothing in this Sale Order, Sale Motion, related sale documents or other orders shall release or operate to enjoin any claim of the United States, on behalf of CMS, against the Debtor, the Successful Bidder, or any non-debtor.

43.     Notwithstanding any other provisions of the Sale Order, Sale Motion and related sale documents, all agreements, issues, and disputes arising under the Medicare Act shall be governed exclusively by Medicare statutes, rules, regulations and procedures for administrative and judicial review, without regard to the Bankruptcy Code or Bankruptcy Rules.  Without regard to when the events giving rise to the issue or dispute occurred, the jurisdictional limitations of the Medicare Act shall apply.  Such limitations include, but are not limited to presentment of claims and exhaustion of administrative remedies under the relevant statutory process for administrative review of Medicare provider enrollment, certification, reimbursement or other Medicare determinations.

## Additional Provisions

44.     The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (i) confirming or consummating any plan of reorganization or liquidation of the Debtor; (ii) converting the Debtor's bankruptcy case from Chapter 11 to Chapter 7; (iii) dismissing the Debtor's bankruptcy case; or (iv) appointing a Chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests

21

granted pursuant to this Order and the APA shall continue in this Chapter 11 Case or any superseding case and shall be binding upon the Debtor, the Successful Bidder and their respective successors and permitted assigns.

45.     Each and every federal, state and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

46.     Pursuant to section 1146(a) of the Bankruptcy Code, the sale of the CCRC Assets shall not be taxed under any law imposing a stamp tax or similar tax.

47.     Upon Closing, the Successful Bidder shall pay to the Debtor the Purchase Price pursuant to the terms of the APA, less the Deposit.  Additionally, upon Closing, the Deposit shall be paid by the Title Company to the Debtor.

48.     In the event the Successful Bidder cannot consummate the APA when and as required by its terms, the Debtor may designate [ ] (the "Back-Up Bidder") as the Successful Bidder and consummate the bid submitted by the Back-Up Bidder at the Auction without further order of this Court. Under such circumstances, and for all purposes of this Order, the Back-Up Bidder shall be determined to be the Successful Bidder.

49.     To the extent, if any, anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

50.     The Successful Bidder is purchasing the CCRC Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.  The consideration provided by the Successful Bidder for the CCRC Assets is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

51. This Court retains jurisdiction, even after conversion of this Chapter 11 Case to a case under Chapter 7, to: (i) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (ii) protect the Successful Bidder and the CCRC Assets from and against any of the Claims and Encumbrances, other than those expressly assumed by the Successful Bidder; (iii) resolve any disputes arising under or related to the APA or the Sale; (iv) adjudicate all issues concerning (alleged) pre-Closing Claims and Encumbrances and any other (alleged) interest(s) in and to the CCRC Assets, including the extent, validity, enforceability, priority and nature of all such (alleged) Claims and Claims and Encumbrances and any other (alleged) interest(s); (v) adjudicate any disputes related to the Assigned Contracts or the Assigned Modified Resident Agreements between the Debtor and the Successful Bidder or the Debtor and a counterparty to the Assigned Contracts or the Assigned Modified Resident Agreements; and (vi) adjudicate any and all issues and/or disputes relating to the Debtor's right, title or interest in the CCRC Assets, the Motion and the APA.

52. From and after the date hereof, the Debtor and the Successful Bidder shall act in accordance with the terms of the APA.

53. This Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of the Successful Bidder, the Debtor and its affiliates and subsidiaries, the CCRC Assets, and any subsequent trustees appointed in this Chapter 11 Case or upon (a) a conversion of this Chapter 11 Case to a case under Chapter 7 or (b) dismissal of the Debtor's Chapter 11 Case.

54. The provisions of this Order are nonseverable and mutually dependent.

55.     The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the APA with the Successful Bidder, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

56.     This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

### ###End of Order###

25

# **EXHIBIT 1**

## **APA WITH SUCCESSFUL BIDDER**

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**HFV OPCO, LLC**

**AND**

**HENRY FORD VILLAGE, INC.**

**Dated as of May 4, 2021**

These Disclosure Schedules (collectively, the "Disclosure Schedules", and each individually, a "Schedule") are delivered pursuant to that certain Asset Purchase Agreement, dated as of May 4, 2021 (the "Agreement"), by and among Henry Ford Village, Inc., a Michigan nonprofit corporation ("Seller"), and HFV Opco, LLC, a Delaware limited liability company ("Buyer"). These Schedules are dated as of March 26, 2021, and are arranged in sections corresponding to the numbered and lettered sections and subsections contained in the Agreement. Terms used but not otherwise defined in these Schedules will have the meaning ascribed to such terms in the Agreement.

**<u>Schedule 1(tt)</u>**
**List of Equipment, Furniture, Machinery, Etc.**

See attached.

**Schedule 2.8**
**Allocation Schedule**

Buyer to provide for Seller's review on or before June 30, 2021.

## Schedule 3.3
### Permits

See attached.

**<u>Schedule 3.4</u>**
**Litigation**

**Pending Litigation:**

| |
|---|
| Case No. 21-003642-NH, *Miller v. Henry Ford Village, et al.*, Wayne County Circuit Court 3/17/2021 |
| Case No. 20-016647-NH, *Hood v. Ogden, et al.*, Wayne County Circuit Court 12/22/2020 |
| Case No. 20-016649-NH, Hood v. Ogden, et al., Wayne County Circuit Court 12/22/2020 |
| Case No. 20-013873-CK, *Mallett v. Henry Ford Village, Inc.*, Wayne County Circuit Court 10/21/2020 |
| Case No. 20-013791-CK, *Davis v. Henry Ford Village, Inc.*, Wayne County Circuit Court 10/20/2020 |
| Case No. 20-183729-CK, *Lee v. Henry Ford Village, Inc.*, Wayne County Circuit Court 9/28/2020 |
| Case No. 20-011413-CK, *Currie v. Henry Ford Village, Inc.*, Wayne County Circuit Court 9/2/2020 |
| Case No. 20-011079-CK, *Harbin v. Henry Ford Village, Inc.*, Wayne County Circuit Court 8/27/2020 |
| Case No. 351995, *Fisanik v. Henry Ford Village, Inc.*, Michigan Court of Appeals 12/23/2019 |
| Case No. 19-010892-NO, *Roddy v. Henry Ford Village, Inc.*, Wayne County Circuit Court 8/9/2019 |
| Case No. 19-003674-NH, *Abboud v. Henry Ford Village, Inc., et al.*, Wayne County Circuit Court 3/14/2019 |
| Case No. 18-013973-CZ, *Fisanik v. Henry Ford Village, Inc.*, Wayne County Circuit Court 10/25/2018 |
| Case No. 14-006796-CK, *Plumley, et al. v. Henry Ford Village, Inc., et al.*, Wayne County Circuit Court 5/23/2014 |

**Judgments:**

| |
|---|
| Case No. 19-011948-CZ, *Colton v. Henry Ford Village, Inc.*, Wayne County Circuit Court 9/4/2019 |

**Schedule 3.5**
**Employee Relations**

See attached re workers' compensation claims.

**Schedule 3.8**
**Compliance**

1. LARA Escrow Order.

2. Seller has paused ordinary-course entrance fee refunds, except for entrance fees subject to the LARA Escrow Order.

**<u>Schedule 3.10</u>**
**Licensed Beds and Current Rate**

Seller has 89 licensed beds, all of which are single beds, and 27 are dually certified for Medicare and Medicaid.

See attached.

**Schedule 3.17**
**Environmental Matters**

No disclosure.

**<u>Schedule 3.18</u>**
**Financial Information**

See attached.

**Schedule 3.19**
**Real Property**

**LEGAL DESCRIPTION**

Land situated in the City of Dearborn, County of Wayne, State of Michigan, more particularly described as follows:

Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant South 89 degrees 53 minutes 57 seconds East (recorded as South 89 degrees 54 minutes 20 seconds East) 33.01 feet along the Northerly line of said Section 18 and South 01 degree 13 minutes 50 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 87 degrees 04 minutes 00 seconds East 567.79 feet; thence North 72 degrees 26 minutes 40 seconds East 230.81 feet; thence North 82 degrees 58 minutes 10 seconds East 166.62 feet; thence South 89 degrees 45 minutes 50 seconds East (recorded as South 89 degrees 05 minutes 34 seconds East) 320.14 feet (recorded as 320.65 feet) to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION AND JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 01 degree 33 minutes 58 seconds East (recorded as South 00 degrees 47 minutes 00 seconds East) 1253.93 feet (recorded as 1253.21 feet) to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY MANOR SUBDIVISION, South 89 degrees 22 minutes 20 seconds West (recorded as South 88 degrees 39 minutes 10 seconds West) 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 01 degree 13 minutes 50 seconds West (recorded as North 01 degree 57 minutes 00 seconds West) 1150.03 feet (recorded as 1150.96 feet) to the Point of Beginning.

ALSO DESCRIBED BY SURVEY AS FOLLOWS:
Part of the Northwest fractional 1/4 of Section 18, Town 2 South, Range 11 East, City of Dearborn, Wayne County, Michigan, described as follows: Beginning at the point of intersection of the Southerly right-of-way line of Ford Road (variable width) and the Easterly right-of-way line of Greenfield Road (120.00 feet wide), distant North 88 degrees 40 minutes 28 seconds East, 33.01 feet along the Northerly line of said Section 18 and South 02 degrees 39 minutes 42 seconds East 163.04 feet from the Northwest corner of said Section 18; proceeding thence along the Southerly right-of-way line of Ford Road, North 85 degrees 38 minutes 25 seconds East 567.79 feet; thence North 71 degrees 01 minutes 05 seconds East 230.81 feet; thence North 81 degrees 32 minutes 35 seconds East 166.62 feet; thence North 88 degrees 48 minutes 35 seconds East 320.14 feet to the Northwest corner of Lot 1 of JOHN FORD SUBDIVISION, as recorded in Liber 44 of Plats, page 73, Wayne County Records; thence along the Westerly line of said JOHN FORD SUBDIVISION and JOHN FORD SUBDIVISION NO. 1, as recorded in Liber 45 of Plats, page 15, Wayne County Records, South 02 degrees 59 minutes 33 seconds East, 1253.93 feet to the Northeast corner of GARLING AND LAWRY MANOR SUBDIVISION, as recorded in Liber 70 of Plats, page 96, Wayne County Records; thence along the Northerly line of said GARLING AND LAWRY

MANOR SUBDIVISION, South 87 degrees 56 minutes 45 seconds West, 1282.26 feet to the Easterly right-of-way line of Greenfield Road; thence along the Easterly right-of-way line of Greenfield Road North 02 degree 39 minutes 42 seconds West, 1150.03 feet to the Point of Beginning.

Commonly known as:  Henry Ford Village, 15101 Ford Road, Dearborn, Michigan

Tax Parcel No. 82-10-181-01-001

## Schedule 3.20
### Insurance

See attached.

**<u>Schedule 3.21</u>**
**Intellectual Property**

Domain Names:

    henryfordvillage.com

## Schedule 3.22
## Tax Matters

See attached.

**<u>Schedule 5.7</u>**
**Employee Matters**

(a) Buyer to provide applicable list to Seller on or before June 30, 2021, with such list to be updated fifteen (15) days prior to the Closing Date (as such date is determined under the Agreement).

(d) Schedule of Employees to be provided not more than fifteen (15) days after the Execution Date.

## Schedule 5.9(b)
## Assumed and Rejected Contracts

All Entrance Fee Residency Agreements and Rental Residency Agreements will be addressed pursuant to Section 5.13 of the Agreement.

See attached list of contracts.

## Schedule 5.10
## Buyer's Regulatory Approvals

1. Written assurance from the Michigan Department of Licensing and Regulatory Affairs ("LARA") that a home for the aged ("HFA") license will be issued in Buyer's name for operation of the Facility's HFA as of the Effective Time, following (a) approval of any policies and procedures as required by LARA; (b) completion of an on-site fire safety inspection by LARA's Bureau of Fire Services; and (b) completion of an on-site Home for the Aged survey conducted by LARA.

2. Receipt of a Final Decision issued by the Michigan Department of Health and Human Services ("MDHHS") approving a Certificate of Need ("CON") for Buyer's acquisition of the Facility's skilled nursing home.

3. Written assurance from the Department of Licensing and Regulatory Affairs that a Nursing Home License for operation of the Facility's skilled nursing home will be issued in Buyer's name as of the Effective Time.

4. Pre-closing notices of the nursing home CHOW to LARA, acting in its capacity as Medicare State Agent of the Centers for Medicare & Medicaid Services and to MDHHS's Medicaid Long Term Care Reimbursement & Rate Setting Section.

5. Receipt of a food service establishment license issued by the Michigan Department of Agriculture and Rural Development for provision of food to visitors, staff, and residents of the Facility's non-licensed living units.

6. Notice of the CHOW to LARA's Laboratory Improvement Section CLIA Program.

7. Registration with the Michigan Department of Environment, Great Lakes, and Energy as a medical waste producing facility.

8. Any other Approvals from Governmental Authorities including the federal government, the State of Michigan and the City of Dearborn, Michigan without which the Buyer would be prohibited from operating the Facility as of the Closing Date, which are identified in writing by Buyer to Seller on or before June 30, 2021; provided, that any such Approval described in this paragraph would not give rise to the ability to terminate the Agreement under Section 2.7 of the Agreement unless the Parties are unable to address the delay or lack of such Approval through other means.

**Schedule 6.3**
**Seller's Regulatory Approvals**

1. Written approval of the Michigan Attorney General, Charitable Trust Division for sale of substantially all of the assets of Seller.

2. Bond payoff approval with respect to tax-exempt bonds, to be effective as of the Effective Time.

3. Written order from LARA with respect to termination of the its Order dated June 10, 2020 requiring escrow of funds ("Escrow Order") and the distribution of any funds escrowed pursuant to the Escrow Order in accordance with the terms of the applicable escrow agreement and each affected resident's continuing care agreement.

4. Written confirmation from LARA of the termination of Seller's registration as a continuing care community as of the Effective Time.

5. Written confirmation from CMS or the applicable Medicare Administrative Contractor of the repayment of any outstanding Medicare Advance Payments.